# January Term, 1906.

[No. 5681.]

## THE PEOPLE EX REL. THE ATTORNEY GENERAL V. THE NEWS-TIMES PUBLISHING COMPANY AND THOMAS M. PATTERSON.

**1. Contempt—Pending Cause—Petition for Rehearing.**

A cause pending before the supreme court upon a petition for rehearing is a pending cause within the meaning of the law of contempt.

**2. Supreme Court—Constitutional Court—Common-law Powers.**

The common law of England having been adopted by the territorial legislature of Colorado and being in force when the constitution was adopted creating the supreme court, the supreme court became and is a constitutional court with common-law powers, except where the constitution otherwise provides.

**3. Contempt—Criminal Contempt—Statutory and Common Law.**

Chapter 30, Mills' Ann. Code, Revised Ed., page 597, entitled "Of contempts and their punishments," contains substantially all the statutory law on contempts. Said code provisions are not applicable to criminal contempts, but proceedings for criminal contempts are governed by the common law.

**4. Contempts—Criminal Constructive Contempt.**

The doctrine of criminal constructive contempt as to pending causes obtains in this jurisdiction as at common law.

**5. Same—Constitution.**

The constitution of Colorado does not change the status of contempts as to pending causes, but leaves it as it was at common law as to what constitutes contempts, the procedure and defenses.

**6. Contempts—Information—Verification.**

In a proceeding for criminal constructive contempt based upon an information by the attorney general, it is not essential that the information be verified by affidavit.

7. **Contempts—Newspaper Publications.**

Articles published in a newspaper of general circulation charging the supreme court and certain of its judges with having been influenced by corrupt motives in their rulings theretofore made in pending causes, and that they would be so influenced in the final disposition of the same, constitute criminal constructive contempt.

8. **Contempts—Newspaper Publication—Truth of Publication— Intent.**

In a proceeding for contempt against the publisher of a newspaper for publishing articles charging a court or the judges thereof with being influenced by corrupt motives in their actions with reference to a pending cause, the truth of the publication is no defense. Neither is it a defense to show that there was no intent to commit a contempt. Nor to show that the court was not affected by the contemptuous language.

9. **Contempts—Supreme Court—Power to Punish.**

The power to punish for criminal constructive contempt is inherent in the supreme court.

*Original Proceeding.*

Mr. N. C. Miller, attorney general, and Mr. I. B. Melville, for relator.

Mr. Thomas M. Patterson, *pro se*, Messrs. Richardson & Hawkins, Mr. Henry M. Teller, Mr. Charles S. Thomas, Mr. Sterling B. Toney, Mr. Harvey Riddell, Mr. James H. Blood, Mr. John A. Rush, and Mr. S. W. Belford, for respondents.

Mr. Justice Gunter delivered the opinion of the court.

June 30, the attorney general, in his official capacity, filed in this court an unverified information, a copy of which, omitting the caption, is the following:

"Comes now N. C. Miller, attorney general of the state of Colorado, in behalf of and in the name of The People of the State of Colorado, who respectfully shows and gives this Honorable Court to understand and be informed as follows:

That on the 24th day of June, A. D. 1905, there were and still are pending in this court the following named and numbered causes for the adjudication and determination of this court, namely:

No. 4850, wherein The People of the State of Colorado are petitioners, and Henry V. Johnson is respondent;

No. 4976, wherein The People of the State of Colorado are plaintiffs in error, and S. H. Alexander is defendant in error;

No. 5619, wherein Robert J. Byrne is plaintiff in error, and The People of the State of Colorado, etc., are defendants in error;

No. 5622, wherein The People of the State of Colorado are appellants, and Charles S. Elder is appellee;

No. 5637, wherein The People of the State of Colorado are appellants, and Berger *et al.* are appellees;

No. 5654, wherein The People of the State of Colorado, etc., *ex rel.* Nisbet, are appellants, and Hamilton Armstrong is appellee;

No. 5655, wherein The People of the State of Colorado *ex rel.* Lawson *et al.* are appellants, and J. N. Stoddard *et al.* are appellees;

No. 5660, wherein The People *ex rel.* Harrington are appellants, and Rice *et al.* are appellees; which cases are generally known as 'the county offices election cases.'

That on June 23, A. D. 1905, this court rendered a decision in each of the foregoing causes, but said decisions are still under the control of and subject to revision by this court.

· That The News-Times Publishing Company is a corporation organized and existing under the laws of the State of Colorado and engaged in publishing two daily newspapers in the City and County of

Denver, in said State of Colorado, which said papers are known as The Rocky Mountain News and The Denver Times.

That on the 24th day of June, A. D. 1905, there appeared in The Denver Times, one of said newspapers so published as aforesaid, in the editorial columns thereof, of and concerning said causes so pending in this court, and of and concerning this court and the justices thereof, and the action of this court with reference to said causes, a certain article in the words following, that is to say:

## 'THE ELECTIONS DECISION.

The decision rendered yesterday by a majority of the supreme court in the election cases is the most far-reaching and portentous that has ever been rendered by any court in the United States. For the first time in the country's judicial history it is announced that the people may amend their state constitutions only just so far as a supreme court is willing that they should. With the twentieth amendment as much a part of the constitution as any one of the original articles, with the addition that the provisions of the twentieth article are the latest expressions of the sovereign will of the people, the supreme court holds that portions of it are inoperative because they are unconstitutional. In other words, a part of the state constitution is unconstitutional—treating constitutional provisions as though they were state statutes and subject to be annulled by measuring them with the constitution of which they are a part.

The wrongs that this decision will work are innumerable and irreparable. The chief scheme of government under the twentieth amendment—the consolidation of offices, the retrenchment in salaries, home rule in local matters—are all practically wiped

out and the old, old and pernicious order of things restored. .

The people of St. Louis and San Francisco, who have been enjoying the full benefits of just such a system of government as the twentieth amendment provides, will be astonished to learn that they no longer live in a republic—for the Colorado supreme court holds that such a government is so unrepublican that it cannot be tolerated in Colorado.

What next? If somebody will let us know what next the utility corporations of Denver and the political machine they control will demand, the question will be answered.'

. That the concluding paragraph of said editorial article is as follows:

'What next? If somebody will let us know what next the utility corporations of Denver and the political machine they control will demand, the question will be answered.' [Meaning thereby that this court and the justices thereof are controlled by certain corporations and by partisan political influence, and were so controlled in rendering the decision in said causes.]

## II.

The attorney general further gives the court to understand and be informed, that on the 25th day of June, A. D. 1905, there appeared on the first page of The Rocky Mountain News, one of said newspapers, so published as aforesaid, a certain cartoon and illustration, wherein are shown caricatures of five members of this court, namely, Chief Justice Gabbert, Mr. Justice Maxwell, Mr. Justice Bailey, Mr. Justice Campbell and Mr. Justice Goddard, and wherein Chief Justice Gabbert is represented as 'The Lord High Executioner' in the act of beheading certain persons described therein (being the in-

cumbents of certain county offices and the litigants mentioned in the foregoing causes, pending in this court), with display headlines in large letters over said cartoon and illustration, reading as follows, namely:

'IF THE REPUBLICAN PARTY HAS OVER-LOOKED ANYTHING FROM THE SUPREME COURT, IT WILL NOW PROCEED TO ASK FOR IT.'

Also the .following words appeared therein as describing this court, namely:

'The Great Judicial Slaughter-house and Mausoleum.' [Thereby meaning and intending to convey the impression to the public that this court and the several members thereof, and especially Chief Justice Gabbert, Mr. Justice Maxwell, Mr. Justice Bailey, Mr. Justice Campbell and Mr. Justice Goddard were and are influenced by, and were and are under the control of the Republican party, and were and are governed by political prejudice, and that this court is under the domination of a partisan political machine and of certain political bosses, and were, at the time of rendering said decisions, and are at the present time, so influenced, controlled, governed and dominated.]

That the said cartoon and the accompanying headlines, as published in said newspaper, are attached hereto as a. part hereof, and are as follows:

## III.

The said attorney general further gives the court to understand and be informed that on Monday, June twenty-sixth, A. D. 1905, there further appeared in the said Denver Times of said day and date, and upon the first page thereof, of and concerning the said election cases so pending in this court, and of and concerning this court, and of and concerning

certain of the justices thereof, and the action of said court and of the said justices, with reference to said causes, a certain article, in words and figures as follows:

## 'A PROPHECY.

To The Denver Times:

Let me indulge this one time in prophecy. I feel the spirit of prophecy moving me. I do not for a moment imagine that I may be touched by the divine afflatus—I have merely studied the decisions of the supreme court [meaning the supreme court of the state of Colorado], for I am a lawyer. I know as common history the influence that created the majority of the court [meaning the supreme court of the state of Colorado] as it now is [meaning thereby that undue influences were brought to bear in appointing certain judges of said court], and I am old and experienced enough to judge of motives; and, knowing the sponsors of the chief justice [meaning Chief Justice Gabbert] and his colleague Goddard [meaning Mr. Justice Goddard], and the interest they control, I am convinced that their intervention after the last election to overturn the senate as it stood, and to bowl out Governor Adams, was not merely to prove themselves powerful bosses, or to advance themselves politically, but it was to carry out a business proposition that means millions upon millions to them, and especially to William G. Evans, the most conscienceless boss that ever bestrode a suffering people [meaning that Chief Justice Gabbert and Mr. Justice Goddard were under the control, directly or indirectly, through third persons, of William G. Evans for the purpose of carrying out certain business propositions which would bring millions upon millions of dollars to said third person, unnamed, and especially to William G. Evans].

They find the Denver charter in their way. The clauses that under the Rush amendment prohibited the granting or renewal of franchises is an obstacle to the renewals both Evans and Cheesman must soon have, or the vision of Denver continuing their lawful prey for half a century will vanish as the morning mist. Their activity to secure a court that is under obligation to them commences and ends with these franchises—hence, my prophecy. [Meaning thereby that the decisions of this court and the so-called election cases is the entering wedge for finally declaring the Rush amendment unconstitutional, and thus obtain for Evans and Cheesman the possibility of renewing certain franchises.]

But I should add that my prophetic spirit has been quickened by a conversation with one of Boss Evans' collaborators which, though guarded as to the court [meaning the supreme court of the state of Colorado], was as clean-cut as Denver's bracing morning air about Evans' and Cheesman's expectations. The provisions of the charter requiring the submission of the extension of franchises must be gotten out of the way—and they can be eliminated from their business problems only by the total destruction of the Rush amendment and the charter. [Meaning thereby that this court was so under the influence of Evans and Cheesman that, in order for the latter to get an extension of certain franchises, this court will render an opinion, declaring the Rush amendment unconstitutional, and thus destroy the charter of the city and county of Denver.]

### OMINOUS HINTS FROM COURT.

Already some of the vital features of the amendment and charter have been stricken out by the late decision. That the sheriff and other county officers may not be elected in the spring, and city officers

may not perform their duties, as decided by the court [meaning the supreme court of the state of Colorado] is not so important to the rest of the governmental scheme; but the savage attack made by the court [meaning the supreme court of the state of Colorado] in its opinion on the entire scheme—guarded, but plainly inimical—is more ominous than the materiality of the question decided.

Now comes my prophecy. Before long—it may be through the decision upon the auditorium bond ordinance [meaning thereby case No. 4918, now pending and undetermined in this court, entitled "The City and County of Denver, appellant, v. Moses Hallett, executor, etc., appellee] that is . expected before the court adjourns—the supreme court will wipe out the Rush amendment and the Denver charter entire. If not altogether in the auditorium case [meaning thereby said case No. 4918], that opinion will eliminate more of the charter provisions, and before another year rolls around, amendment and charter will be no more. [Meaning thereby that by the influences exercised over this court by Evans and Cheesman this court, in order to carry out the will of said parties, will so decide said case No. 4918 as to declare unconstitutional the Rush amendment, and annul the Denver charter entire, or else eliminate more of its provisions.]

The process of killing by elimination is one well known to courts. *I have in mind the income tax law that the supreme court of the United States declared unconstitutional.* That august body first held certain provisions of the law to be unconstitutional, and while what remained was not unconstitutional, it held that it was altogether improbable that congress would have passed the law with the unconstitutional provisions eliminated; and so it annulled the entire

law—the constitutional parts of it, as well as the unconstitutional parts.

### Judge Gabbert's Change.

The application of this to the Rush amendment and the Denver charter is palpable. I can see through the windows of my mind that Judge Gabbert [meaning Chief Justice Gabbert] has never forgiven himself for agreeing with Judge Steele [meaning Mr. Justice Steele] in the Sours case—the case that upheld the Rush amendment. He had not then left the Democratic party and lined up politically with Evans, Cheesman, Hearne, Guggenheim and Co. Now he is of them, and with them, and that makes a difference. [Meaning thereby that Chief Justice Gabbert has now left the Democratic party and joined the Republican party, and for this reason his decisions would not be just and fair.]

I don't impugn Judge Gabbert's [meaning Chief Justice Gabbert] motives. I have no right to. Judges, as well as ordinary mortals, are largely the victims of their environments. So, unconsciously, moved by his environments—but, of course, they are of his own making—the chief justice [meaning Chief Justice Gabbert], with his brother, Goddard [meaning Mr. Justice Goddard] and his brother, Campbell [meaning Mr. Justice Campbell]—who has not stood in need of conversion—aided by the late judge of the Court of Appeals [meaning Mr. Justice Maxwell], will undo the amendment and charter piecemeal, and then, with one fell swoop, cast the rest into outer darkness. [Meaning thereby that the said justices of this court, influenced by improper motives, will, by the decisions of this court, including those rendered in said election cases, and the one to be rendered in the said auditorium bond case, pending and undetermined, declare the Rush amendment

unconstitutional, and destroy the charter of the city and county of Denver.]

This prophecy is a little discursive, you think. I think so, too. For I might have boiled it down into the following propositions, and left it to the public:

First—The Tramway and Water companies must have their franchises renewed.

Second—The Rush amendment, until utterly destroyed, prohibits the extension unless by a vote of the people.

Third—This the Tramway and Water companies can never get.

### WIPE OUT THE RUSH BILL.

Fourth—The supreme court, by the process of elimination and then with a final swipe at what is left, will annul the amendment and charter altogether.

Fifth—And then the corporations will be happy. With the double-headed machine they have constructed in Denver, a city council can always be depended upon to give them what they demand and will pay for.

But—I speak it advisedly—let the Tramway and Water companies and the city council REMEMBER PHILADELPHIA. What was done there can and will be done in Denver. THE PUBLIC ARE MIGHTY IN THEIR WRATH, AND WILL NOT SUBMIT TO BEING ROBBED WHOLESALE.

Denver, June 25, 1905.                         PUBLICUS.'

[Meaning thereby that the Tramway and Water companies control this court and certain of the justices thereof, and as said companies desire their franchises to be renewed, that this court, acting under

such undue influences, will erroneously and contrary to their oaths of office, render a decision annulling the Rush amendment and destroying the charter of the city and county of Denver.]

## IV.

The said attorney general further gives this court to understand and be informed that on Tuesday, June 27th, A. D. 1905, there further appeared in the said Denver Times of said day and date, and on the first page thereof, of and concerning said election cases so pending and undetermined in this court, and of and concerning this court, and of and concerning certain of the justices thereof, and the action of said court and of said justices with reference to said causes, a certain article, in words and figures as follows:

'SPEER IS NOW ADVANCING EXCUSES.

Mayor Says Evans Worked to Save Democrats, But Field Was False.

Many are the stories being told by the friends of the victimized county officials who have been thrown out by the recent famous decision of the supreme court [meaning the supreme court of the state of Colorado]. One thing is certain—that William G. Evans has been posing as the keeper of the conscience of the court [meaning the supreme court of the state of Colorado] in all matters governmental and political. Through his henchmen he had talked so much along that line that the Democratic county officials commenced to believe his claims were actually true, whether true or not. Of course the officials knew that Evans was chiefly

instrumental in the legerdemain of last winter that resulted in the supreme court [meaning the supreme court of the state of Colorado] being organized as it now is, and in the robbery of the governorship and turning the stolen office over to McDonald.. These and other matters, now so notorious that it is needless to mention them, led the Democratic officers to religiously believe in the power that Evans claimed to possess in high judicial quarters.

The officials knew that Mayor Speer was deeply concerned about the Democratic conference called by Senators Teller and Patterson, ex-Governors Thomas and Adams, with Hon. S. W. Belford, because he claimed it was a blow aimed at him and might sadly weaken his influence in local politics. The mayor had done much talking, denouncing Senator Patterson and insisting that the conference was called because the Senator was his enemy, and he started runners over the state to fix state committeemen before they had come to the conference and to disturb, as much as possible, the plans for the conference. Several Democratic officials, desiring Speer's active interference with Evans, and through Evans with the powers, held a meeting for consultation. The result of the meeting was that they went to Mayor Speer and told him that if he would interpose for them with Evans that the decision with which they were threatened might be averted, they would stand by Speer all through the conference, and in the future would back him in his political schemes. Mayor Speer gave the necessary promise, and the officials withdrew, much relieved as to their future. [Meaning thereby that Evans had such undue influence over this court that he was able to control its decision, and could influence or coerce said court into rendering any opinion he so desired in said election cases.]

### MAYOR SPEER'S EXCUSE.

It is not hard to judge of the astonishment of the officials after the decision of the court was announced. When they recovered from the excitement into which it threw them they went to Speer to berate him for his faithlessness. Speer insisted that he had done what he had promised, and that Evans had done all he could, but that they had been backcapped by Field, of the Telephone company, and that Field was the marplot who defeated Evans' efforts. [Meaning thereby that this court was also unduly influenced by Field, and that said court had so been influenced by him as to render the decision handed down in the said election cases.]

Just precisely the degree of good faith that Mayor Speer exercised is problematical. It is probable that he did the best he could, but it is idle to say that Bill Evans himself would think for a moment of raising his hand to keep the Democratic officials in power when he could, by permitting the decision which he anticipated to be rendered, fill all of the offices with his Republican henchmen, who would be subject to no influences outside of those he exerted himself. So long as Democrats held offices, however friendly they might seem to be to him and his schemes at present, he knew that a sentiment of extreme hostility against him and his plans of plunder was growing in the Democratic masses, not only of Denver, but of the entire state; and he also knew that the time would come when those in office who claimed to be Democrats would be compelled through public opinion in the Democratic party to either abandon him and his schemes or abandon the party of which they were members. [Meaning thereby that this court was and could be unduly influenced by Evans, so as to render any opinion desired by

him, and that said decisions in said election cases were erroneously decided on account of the said undue influence of Evans.]

If any Democrat, whether of the Evans type or any other, believes for a moment that Evans would remain true to a political obligation when the Tramway and Water companies' interests were involved, they have known the man to little purpose for twenty years. He is in politics, not for the sake of politics, nor for the pleasure it gives him to boss, nor is he moved by the slightest desire of political preferment for himself, but wholly and solely for business reasons. Such a man, moved by such impulses, could remain true to no party, and to no set of men, only so long as his business interests could be served by them. Hence, the beautiful manner in which he has backcapped and double-crossed the very men whom he put in office a little over a year ago because he believed they would best serve his business ends. [Meaning thereby that this court could be, and was, unduly influenced by the said Evans to decide said cases in accordance with his wishes.]

The question is asked by a good many of these Democrats: 'What will Mayor Speer do now that he has seen his colleagues upon the ticket with him slaughtered through as black treachery as was ever concocted?'

He and his appointees remain the only monument of the deal that placed them all in office. Will he stand by and use his office for the development of Evans' schemes after Evans has done his part— and it was no mean part—toward depriving all the rest of the political triumph that they recorded when they were elected? [Meaning that Evans had undue influence over this court, and could influence said court and certain of the justices thereof to render decisions favorable to him, and that he had so used

such influence to induce the court to render certain decisions favorable to him in the said election cases, although the same was contrary to the interests of those who had assisted him in the election.]

## V.

The attorney general further gives the court to understand and be informed that on Wednesday, June 28th, A. D. 1905, there appeared in the said Denver Times of said day and date, of and concerning said election causes so pending in this court, and of and concerning this court, and of and concerning certain of the justices thereof, and of and concerning the action of said court with reference to said causes, a certain article, in words and figures as follows:

### 'THE PRESS AND THE COURTS.

Thinking men long ago concluded that if this country shall ever lose its liberties it will be through the judiciary. ' The encroachments of the courts upon the fundamental principles of popular government have been rapid and marked, and in some states they are proceeding with accelerated speed.

The power conferred upon the courts to undo the work of both legislatures and the people is the kernel of the danger. This, backed by the power to punish whoever may criticise them in an unfriendly spirit, as for contempt, make them antagonists of the people when they assume to assail their rights, not only formidable, but almost unconquerable. They are the last resort for whatever comes within their jurisdiction, and if they are without jurisdiction they may usurp it. There is no appeal from any wrong they commit except TO THE PEOPLE themselves. The judiciary is the one department of government that may indict, try and convict for real or imaginary offenses against what it is pleased to term

its "dignity." The court is not only *"imperio in imperium,"* but it is "THE STATE" itself, the only higher tribunal being "THE PEOPLE."

And what is a court? It is an organization of men—plain, ordinary men. A man who is weak, vain or corrupt before he reaches the bench, will in all probability be weak, vain and corrupt on the bench. Usually the selection of judges is the people's work, but not infrequently public affairs so shape themselves that men without conscience and with private ends to serve succeed in foisting tools upon the bench, and when there their record is one of servility and entails reproach.

The power, the almost unlimited power, held by courts should cause them to approach its exercise with chastened hearts and nobility of mind. When the matters to be determined affect the people as a whole, or some deliberate act of the people constitutionally performed or expressed, nothing but the most solemn sense of the highest duty should lead courts to overturn what has been done. Great courts, and courts not so great, but nevertheless conscientious, have always moved along these lines; and great courts and conscientious courts never leave the public in doubt as to the cleanness of their hearts and uprightness of their motives in the performance of duty.

If there is one department of the government more than another that should receive the scrutiny of the public press, it is the judiciary. The tremendous power it possesses for good or evil; its unrestrained and unrestrainable power by The People, all demand that upon proper occasions and especially when dealing with matters of grave public concern, it should be frankly, fairly, but above everything else, FEARLESSLY criticised—not in a spirit of personal animosity, but having in mind the high-

est good of the state and for the preservation of the true dignity and influence of just and honorable courts. The journal is cowardly and a traitor to the cause of justice and the people which, conscious that grave wrongs have been committed by courts, and especially the highest courts, will, through fear of prison bars or heavy fine, or both, remain silent or criticise the wrong with less than manly frankness.

By concert, the two corporation papers of Denver—the Post and the Republican—have demanded that the editor of this paper shall be prosecuted and imprisoned for dealing with certain doings of judges during the past year [meaning thereby the judges of this honorable court] and with the supreme court's recent charter decision. The occurrences of the past year in which judges have been the principal actors—using their tremendous power against men and parties and measures—have seemed to the Times to merit the fullest criticism and that no reasonable censure could be too severe.

[Meaning thereby the judges of this court and that this court and the judges thereof, in the decisions rendered by said court and the judges thereof, were prejudiced, and were not actuated by honest motives, and that they were influenced by political bias and prejudice.]

With the feelings that the course of these judges [meaning the judges of this court] aroused in the breast of this editor, the wonder seems to him now that the criticisms the Times contained have been so moderate and reserved. If all the doings of last winter—the relation and connection of certain judges [thereby meaning the judges of this honorable court] with the legislature, and with the heads of great corporations, and with the appointing power of the state—could be uncovered, the public would be astounded.

[Meaning that this honorable court and the several judges thereof were corrupt, partisans and improperly influenced.]

The course of the Post and Republican is merely the will of their corporation owners—the Republican always, the Post for the present, in return for the price paid for its services. Doubtless Mr. Evans and Mr. Cheesman and Mr. Hearne feel that imprisonment or fine will either weaken the influence of the Times or palsy the hand of its editor. The co-operation of the Republican and the Post, pursuing precisely the same line, using exactly the same argument, making identically the same demands, show the corporation source of the orders and the corporation service in which they are engaged. But the Times mildly but firmly informs these corporation mouthpieces that the Times can as well be edited with its editor behind the bars as from the editorial room of the paper, and perhaps the more effectively arouse the public to its danger.

If there could be in fact an investigation! If there could be a tribunal before which under proper process no man, high or low, could shield himself from the probe of the examiner! If the heads of the great corporations and those whom they have elevated could be forced to tell the story of last winter's saturnalia of crime under the guise and pretense of the law, the temple they have created would tumble about their ears and the country would stand appalled.'

[Thereby meaning and imputing to this honorable court and the several judges thereof base and political motives, improper methods and dishonesty.]

## VI.

The said attorney general further gives the court to understand and be informed that on Friday,

June 30th, A. D. 1905, there further appeared in the said Rocky Mountain News of said day and date, and upon the first page thereof, of and concerning the said election.cases so pending in this court and undetermined, and of and concerning this court, and of and concerning certain of the justices thereof, and the action of the said court and of the said justices, with reference to said causes, a certain article in words and figures as follows:

'SENATOR PATTERSON TO BE CHARGED WITH CONTEMPT. HE EXPECTS THE CITATION OF THE SUPREME COURT OF THE STATE TO BE SERVED UPON HIM TO-DAY, AND HE WILL PROMPTLY RESPOND TO THE SUMMONS.

At the request of Chief Justice Gabbert and Judge Goddard, of the supreme court, a majority of the grievance committee of the State Bar Association met on Wednesday evening to consider the request of the above named judges that the committee recommend that contempt proceedings be instituted against Senator Patterson for articles and cartoons printed in THE NEWS and THE TIMES relating to the court's recent charter and other decisions and actions. The meeting was a stormy one, and though Lucius W. Hoyt favored recommendations for both disbarment and contempt proceedings, the resolution about disbarment was voted down almost unanimously. The question of contempt was then taken up, and after a heated discussion a resolution to the effect that certain of the editorials and cartoons justified proceedings for contempt—though the resolutions, as THE NEWS is informed, did not mention Senator Patterson by name. The meeting lasted until nearly midnight, and developed much opposition to any action whatever, but as there was a majority of the committee for reporting in favor

of proceedings for contempt, all of the committee present finally united upon the modified resolution that was adopted. There were two representatives from the attorney general's office present, who at times participated in the discussion. Lucius W. Hoyt was particularly vicious in his denunciation of Senator Patterson and insisted upon the committee going to the fullest length against him. It may be mentioned in passing that Judge Goddard is president of the State Bar Association [meaning thereby that such action of the said committee was influenced by the fact that Judge Goddard was president of the State Bar Association, and thereby used his influence for the above resolution]. It was stated at the meeting by those who represented the judges' wishes that they desired favorable action from the committee, that the court might have the moral backing such action would give, and that the court intended to proceed, whether the committee acted favorably or not. It was generally understood that the papers were being prepared in the attorney general's office yesterday, and they will probably be served to-day.

. When the above facts were communicated to Senator Patterson yesterday afternoon by the reporter he said to him: 'I had arranged to go to Boulder county to-morrow on business, but I will cancel the appointment and remain here, that service may be had upon me at the earliest possible moment.'

When asked as to whether the proceedings would interfere with his Philippine trip, he said: 'I don't know; that, of course, will remain with the supreme court. It isn't very important that I should go, yet I have wished to go, to learn what I could by personal investigation of conditions in our trans-Pacific possessions. I will not demur, however, if the court takes action to interfere with the trip. The

party with Secretary Taft will pass through Cheyenne on the train on Sunday evening, and I had arranged to join them there.'

'Of course,' continued Senator Patterson, 'I will promptly comply with any citation from the court. As to the articles complained of [meaning the said articles appearing in The Denver Times of June 24th, 26th, 27th, 28th, and the cartoon appearing in The Rocky Mountain News of June 25th in regard to and concerning the said election cases so pending and undetermined in this court, and the said auditorium bond case now pending and undetermined herein, and of and concerning this court, and of and concerning certain of the justices thereof, and the action of said court and of the said justices with reference to said causes], *I am responsible for every one of them, and either wrote or approved of them.* (The italics are our own.) I believe they were fair and just criticism, and fully warranted by what has transpired. [Meaning thereby that said articles, referring to this court and its action in and concerning said election and auditorium bond cases, were just and fair, and were and are warranted by alleged facts in connection therewith.] I will shirk no responsibility, and endeavor as best I can to demonstrate my right to compose or approve and publish them. [Meaning thereby that said articles concerning this court and certain of the justices thereof, in connection with said decisions of said election and auditorium bond cases, are true, and that the said Thomas M. Patterson will endeavor to demonstrate said fact, and will further attempt to prove said matters before this court.]

'Yes,' he said, 'I know that under the circumstances the tribunal to try me will be pretty much like a court martial, only there will be no reviewing court or officer or other tribunal to interfere with

whatever the court shall decide.  I consider the proceedings against me as a direct assault upon the freedom of the press, and I shall defend that ancient and important prerogative of a free people with all my power.  [Meaning thereby that he has the right, and it is his duty, to impugn the honesty and integrity of this court, and to interfere with the due administration of justice, and to intimidate, threaten and coerce this court and the justices thereof in rendering decisions in cases pending and undetermined before said court, and that any proceedings to compel him to desist from said actions concerning cases pending and undetermined before this court is an interference with the freedom of the press, and that he considers it his duty to insist upon his right to so do.]  I should say no more now.  Let the future tell the story.'

## VII.

The said attorney general further gives the court to understand and be informed that the respondent, The News-Times Publishing Company, on the days and dates and under the circumstances hereinbefore mentioned, and in the city and county of Denver, state of Colorado, published and caused to be published, permitted, inserted and authorized the publication of each of the several defamatory articles of and concerning this court, its justices and its action in the foregoing causes pending and undetermined, which appeared in the said The Rocky Mountain News and The Denver Times, as hereinbefore set out;

That the respondent, Thomas M. Patterson, is one of the directors and officers and is the owner of a majority of the capital stock of the said The News-Times Publishing Company, and is, in fact, the manager and editor-in-chief of the said newspapers, The

Rocky Mountain News and The Denver Times, having control and supervision of the articles published therein and dictating the editorials, leading articles and cartoons printed, published and appearing in each of said papers, and that he wrote, approved, caused to be written, procured, instigated, authorized, edited, published, permitted and is responsible for each and all of the foregoing articles and the said cartoon so published and appearing in said newspapers, as hereinbefore set out, and of and concerning this court, its justices, and of and concerning the foregoing causes pending and undetermined in this court and the action of this court with reference thereto; and caused and procured the said newspapers containing the aforesaid articles and cartoon to be extensively and generally circulated in the city of Denver and throughout the state of Colorado on the dates of their publication, as hereinbefore set forth. That said articles and cartoon, so written, printed, published and circulated, reflect upon the honor, integrity and purity of this honorable court, and were designed, intended and calculated to hold up to public opprobrium and to incite public contempt for this court and certain of the justices thereof, and for the purpose of leading the people of this state to distrust the fairness and impartiality of the decisions of this court, and for the further purpose of influencing, intimidating and coercing this court and the justices thereof in the final decision of said election cases, and in rendering an opinion in the so-called auditorium bond case, No. 4918, now pending and under consideration and undetermined by this court.

That said articles and cartoon were further intended to impede and corrupt the due administration of justice with reference to said causes in this court, and to impute to this court and certain of the justices thereof, unworthy motives and dishonorable

conduct, tending to bring said court and its justices into disrepute and to destroy the respect of the public for this court, for its decisions, its honesty, integrity and its dignity.

WHEREFORE, The said attorney general asks leave to file this information in the name of and on behalf of the people of the state of Colorado, and prays the consideration of this honorable court in the premises, and moves the court for a rule upon the respondent, Thomas M. Patterson, to be and appear in this court on a day to be named and show cause, if any he has, why he should not be held in contempt of this court, and punished accordingly, for the publication and circulation of said articles and cartoon, as aforesaid.

N. C. MILLER,

Attorney General.''

[No. 5681.]

''IN THE SUPREME COURT OF THE STATE OF COLORADO.

| | |
|---|---|
| THE PEOPLE OF THE STATE OF COLORADO EX REL. THE ATTORNEY GENERAL OF THE STATE OF COLORADO, *Relator,* v. THE NEWS-TIMES PUBLISHING COMPANY, A CORPORATION, AND THOMAS M. PATTERSON, *Respondents.* | AFFIDAVIT. |

N. C. Miller, being first duly sworn, deposes and says: That he is attorney general of the state of Colorado, and that the allegations made by him as attorney general in the information filed in the above entitled cause in the supreme court of the

State of Colorado on the 30th day of June, A. D. 1905, are true to the best of his knowledge and belief.

N. C. Miller,

Attorney General.

Subscribed and sworn to before me this 21st day of October, A. D. 1905.

Horace G. Clark,

Clerk of the Supreme Court of the
State of Colorado.

(Seal.)                 By James Perchard, Deputy.

Pursuant to an order of court, based upon this information, a citation issued with copy of information attached of date June 30th, returnable October 23d, requiring respondent to show cause why he should not be held in contempt because of the publications set out in the information. Upon the date of its issuance the citation was personally served in the city of Denver. Before its return day the attorney general, upon notice and leave, verified the information. The order permitting verification was over the objection of respondent, and subject to his right to question the correctness of the order and the sufficiency of the verification.

October 23d respondent moved to quash the information, a copy of which motion, omitting the caption, is the following:

Comes Thomas M. Patterson, respondent in the above styled cause, appearing personally, and also by Henry M. Teller, Charles S. Thomas, Sterling B. Toney, Harvey Riddell, James H. Blood, Samuel W. Belford, John A. Rush and Richardson & Hawkins, his attorneys, and moves the court to quash the information and writ in the above entitled cause, and as grounds of motion respondent alleges:

First—That said information and this prosecution against respondent is in violation of and contrary to section 10 of article XI of the constitution of the state of Colorado, providing that no law shall be passed impairing the freedom of speech, and that every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty; and that in all suits and prosecutions for libel the truth thereof may be given in evidence, and the jury, under the directions of the court, shall determine the law and the fact.

Second—That said information, and this prosecution against respondent, is in violation of and contrary to section 7 of article XI of the constitution of the state of Colorado, and particularly that part of said section which provides that no warrant to seize any person shall issue without probable cause supported by oath or affirmation reduced to writing.

Third—That said information and this prosecution against respondent is in violation of and contrary to section 25 of article XI of the constitution of the state of Colorado, which provides that no person shall be deprived of life, liberty or property without due process of law.

Fourth—That said information and this prosecution against respondent is in violation of and contrary to the fourteenth amendment to the constitution of the United States, and particularly that part of said amendment which provides that no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, *nor* deprive any person of life, *liberty* or *property* without *due process of law*, nor deny to any person the equal protection of the law.

Fifth—That said information does not contain or set forth facts sufficient to constitute or charge against this respondent the offense of contempt.

Sixth—That said information shows on its face that the respondent is not guilty of contempt of the supreme court, or of any judge or judges of said court.

Seventh—That the said information on which the rule to show cause was issued was and is an unverified information. That no affidavit was made or filed or presented to the court at or prior to the filing of said information, and the making and issuance of the rule to show cause; and the rule to show cause was, as is shown by the record, made and issued solely and alone upon and because of and was based solely upon the statements contained in said unverified information, and this court was and is, because of the matters and things aforesaid, without jurisdiction to order or issue said rule or to require respondent to answer or show cause herein.

Eighth—That the affidavit of N. C. Miller, attorney general, which was filed in this cause, was filed on October 21st, 1905, and after the filing of the information and the issuance of the rule to show cause, and is made only upon information and belief and does not give the court jurisdiction to proceed with this cause, and said affidavit is of no effect or validity.

Ninth—That the said information and the allegations and statements therein contained show that this court has no jurisdiction to cite respondent to show cause why he should not be punished for contempt.

Wherefore, the respondent prays judgment of the court, quashing the information and writ in this cause, the respondent hereby reserving to himself the right to make answer and showing in the event of this motion being overruled.

This motion to quash was heard on October 30th, and on November 13th overruled. Thereupon re-

spondent answered, a copy of which answer, omitting the caption, is the following:

## ANSWER OF RESPONDENT, THOMAS M. PATTERSON.

Comes now the above named respondent, Thomas M. Patterson, in his own proper person, and by Henry M. Teller, Charles S. Thomas, Sterling B. Toney, Harvey Riddell, James H. Blood, Richardson & Hawkins, S. W. Belford and John A. Rush, his attorneys, and the said respondent, being required to show cause why he should not be punished for contempt in and for the writing and publication of certain articles in The Rocky Mountain News and The Denver Times, alleged to be of and concerning the said supreme court of the state of Colorado, and some of the judges thereof, doth make answer to the said information as follows:

He denies that the cases mentioned in the information, except case No. 4918, entitled the City and County of Denver, appellant, v. Moses Hallett, executor, etc., appellee, were at the time mentioned pending in the said court; but as to the said cases, except said case No. 4918, he avers that the said supreme court had, at and before the time of the publication of said articles in the said News and Times, rendered its opinion therein, and had decided the said cases, after final argument and submission, and had ordered the entrance of a final order and judgment in each, except that the time had not elapsed within which motions for rehearing might be filed by parties thereto, and that subsequently the said supreme court overruled the motions for rehearing in each of said cases, affirming its former orders and judgments entered therein, except as to cases numbered 5622, 5655, 5660, 5637, 4976 and 4980, in which it amended its orders so that the Democratic officeholders af-

fected thereby would be the sooner ejected from the public offices they then held and for the possession of which said suits were waged, and a fuller reference to said final orders will hereinafter be made.

Respondent admits the incorporation of the said The News-Times Publishing Company, and the publication, by said company, of the said The Rocky Mountain News and the said The Denver Times, and he admits that he is the principal stockholder of said company; that he is the editor of said papers, and that the said several articles contained and set forth in the information herein were either written by him and published with his approval and consent, or were published with his approval and consent, except that the headline alleged to be above and associated with the cartoon of which complaint is made in said information was not written or approved by respondent before its publication; and, further, that the subheads contained in said articles were not written or approved by respondent before their publication; and he avers that the said alleged headline, associated in the said information with the said cartoon, was not connected or intended to be connected, in any way whatever, with the said cartoon, but that it was the headline prepared by the news editor of the said The Rocky Mountain News as the introduction to another and different article printed immediately thereunder and in the extreme right-hand column on the first page of the said The Rocky Mountain News.

He avers that the only words associated or connected with the said cartoon, in the said publication, followed and were printed underneath the said cartoon, and are quoted correctly in said information.

He denies that any of the innuendoes inserted in the bodies of the said articles or associated with them by the said attorney general in his said information, except such as identify the said supreme court or

judges thereof with reference to the terms "court" and "judge" or "judges," are just or warranted by the text of the articles, or any part thereof, to which the said inuendoes relate; on the contrary, he avers that the said inuendoes are unwarranted by the language to which they are applied, and are strained and unwarranted in connection with the said articles, and that, without said inuendoes, he denies that the said articles or any of them are contemptuous of the said supreme court or of any of its judges; but avers that the said articles and the said cartoon are legal and justifiable comment upon grave and important public issues—upon issues that are interwoven with our system of government, with the sanctity of the ballot box, the right of honest voters to cast their ballots and have them counted, the supremacy of acknowledged constitutional statutes over the views and desires of courts or judges, the proper enforcement of the law by which those declared to be elected to public office, in manner and form as by the constitution and laws of Colorado provided, shall receive their certificates of election, and of the electorial rights of the mass of the voters of Colorado—so that those lawfully declared to be elected shall be inducted into office and hold the same as by statute made and provided and the recognized laws of the land, until they shall be deprived of them by due process of law.

That, as to the articles and cartoon so charged in the said information to be derogatory to the supreme court and certain of its judges, respondent avers, as justification, the existence of the following facts and the occurrence of the events hereinafter set forth before their publication.   He avers that the supreme court of the state of Colorado prior to and until April, A. D. 1905, was composed of three supreme court justices, one of them being denomi-

nated "chief justice of the supreme court" and the other two "associate justices," and that, during the happening of the events transpiring prior to the 5th day of April, 1905, William H. Gabbert was the said chief justice of said court, and John Campbell and Robert W. Steele were the associate justices. That through and by means of a constitutional amendment, duly submitted to and ratified by the people of the state of Colorado, the court of appeals of said state was abolished and the membership of the supreme court of the state increased from three to seven. That, by said amendment, two of the judges— to wit, Messrs. Maxwell and Gunter—were transferred to and became members of the said supreme court; and it was provided therein that the governor of the state of Colorado should appoint two additional justices for said supreme court, and that the said amendment, the abolition of the said court of appeals, the transfer of the said judges from the court of appeals to become justices of the supreme court and the appointment of said judges by the governor of this state were to take effect and be in force from the 5th day of April, A. D. 1905, and not before; and that, during the happening of the events transpiring subsequent to the said 5th day of April, 1905, the said supreme court consisted of Chief Justice Gabbert and Associate Justices John Campbell, R. W. Steele, J. C. Gunter, John M. Maxwell, Luther M. Goddard and George W. Bailey.

And respondent further avers—

That one James H. Peabody had been inaugurated the governor of Colorado upon, to wit, the 13th day of January, A. D. 1903, and was to hold the said office until the 10th day of January, 1905.

That a large number of corporations—some railroad, some industrial and others that are denominated 'public utility corporations'—some of which

were organized under the laws of other states and others under the laws of Colorado, all of which were doing business in the state of Colorado, held and controlled large property interests therein and employed a very large number of laborers in operating and managing the same.

That the said James H. Peabody had so conducted himself, in the office of governor, in his dealings with labor unions and the use of the national guard of this state to suppress and drive out of the state certain labor unions, and in the lawless arrest, incarceration and deportation from the state of many hundreds of citizens whose only offense was their connection with obnoxious labor unions, all at the request and with the approval of many of the corporations hereinafter mentioned, that he became and was very unpopular with the people of Colorado; that of the said corporations before mentioned The Denver City Tramway Company, The Denver Union Water Company, The Colorado Fuel and Iron Company, The Victor Fuel Company, The American Smelting and Refining Company, The Denver & Rio Grande Railway Company, The Colorado & Southern Railway Company, The Union Pacific Railway Company, and a certain combination of gold mining corporations conducting business in the Cripple Creek mining district and generally known as and called The Mine Owners' Association, together with other such corporations and companies, determined, through their agents and representatives, to secure the renomination of the said Peabody by the Republican state convention for the office of governor and his election to said office. That the said Peabody had, by his said administration, made himself very obnoxious to the great mass of the voters of the Republican party of the state of Colorado; that without large sums of money to be expended to influence

the selection of delegates to said Republican state convention, to be held in the early fall of the year 1904, it was recognized that it would be next to impossible to renominate him for the said office. That, among other things that induced the said corporations, through their agents and representatives, to determine to secure the renomination and re-election of the said Peabody, was their wish to secure from him—if he should be so renominated and whether he was elected or not—the nomination of two supreme judges that the governor was authorized to appoint under the said constitutional amendment, whom said corporations, through their agents and representatives, would decide upon—to the end that the said utility corporations might obtain decisions from the supreme court confirming, extending and securing to them immensely valuable franchises in the city and county of Denver, and that the said railroad and other corporations might obtain decisions favorable to them in the many cases in which they are being constantly involved, and that they might prevent from being overruled the decision in a certain case that they considered of vital importance to their corporations and the conducting of their business in the state of Colorado, popularly known as the "Moyer decision." That, being so moved and influenced, and the said James H. Peabody earnestly desiring to be renominated and re-elected to the said office of governor, the said Peabody and the said agents and representatives of the said corporations did, in the fall of 1904, enter into a contract and agreement by which, among other things, it was agreed by the said Peabody that if he should be renominated and re-elected through and by the agency of the said corporations and the money they might expend therefor he, the said James H. Peabody, would permit the agents and representatives of the said corporations

to name the persons for the two judgeships, and that he would nominate, for confirmation by the senate of the next (the fifteenth general) assembly of the state of Colorado, the persons so named to him for the two judgeships of the supreme court that were to be filled by the appointment of the governor as aforesaid, and that the said corporations did agree, in consideration of the foregoing pledge by the said Peabody, that they would undertake to nominate him and elect him to the office of governor. On information and belief respondent avers that these corporations, through said agents and representatives, did, to carry out the said agreement and to secure the renomination of the said Peabody, contribute and pay, to wit, the sum of forty thousand dollars, or thereabouts, which was to be expended to secure the renomination of the said Peabody. That more largely through the agency of said corporations than by any other means the said Peabody was renominated, and thereupon the said corporations, through the said agents and representatives, did agree, among themselves, to—and they did—contribute the sum, to wit, of $200,000, to be expended by them in securing the re-election of the said Peabody; and the said sum of $200,000 was contributed and paid by said corporations, each in proportion to the amount each had been assessed for taxation in the state of Colorado for the year 1903. That, notwithstanding this and other large sums of money, amounting in the aggregate to many additional thousands of dollars, all of which was expended largely to corrupt the voters of the state of Colorado and election officers in different parts of the state on or before the said election day, the said James H. Peabody was defeated by Alva Adams for the said office of governor, the official returns of said election showing that he was so defeated by more than nine thousand

votes. That, after the said election, and after it was known that the said Peabody was defeated, the original conspiracy entered into by the corporations aforesaid and the said Peabody was extended, and the said Peabody and the said corporations did agree, through themselves, their agents and other evil-minded persons, to persuade, coerce, intimidate and debauch so many of the Republican members of the general assembly as they could to, if possible, induce the legislature, when assembled in joint convention, canvass the returns for governor and other state officers, in violation of the laws of the state and their oaths of office, and under various and divers false and fabricated pretenses, throw out and reject of the said returns for the said office of governor enough of returns from the counties giving the said Alva Adams majorities to overcome the said Adams' majority and to declare that James H. Peabody has received, according to the returns, a majority of the votes case at the election, and to have him inaugurated as governor for the then ensuing two years. But respondent avers that the said conspiracy failed because the said corporation agents and others in their behalf failed to debauch, terrorize and intimidate enough of the Republican members of the said legislature to effectuate the said conspiracy, notwithstanding their persistent efforts made to do so.

Respondent further avers that it became and was necessary, if the corporations would secure the appointment of the two supreme judges whom the said Peabody had agreed they should name to him for appointment, that there should be a majority of Republicans in the senate of the said fifteenth general assembly. That the said corporations, through their agents aand representatives aforesaid, expected and intended to control said senate by, among other things, appeals to senators as Republicans; but, at

the said election, on the face of the lawful returns as the same were made, the Republicans did not have a majority of the said senate, and the Democrats did have such majority—the said senate, counting the hold-over senators with those who on the face of the returns were elected in November of that year, being divided as follows: Democrats 19, and Republicans 15; one Democratic hold-over senator, not included in the above enumeration, having died after said election, but before the convening of the legislature. Respondent further avers that prior to the said election the said corporations, through their agents and representatives, employed one John M. Waldron, and induced the attorney general of Colorado, then also a candidate for re-election on the Republican ticket, to co-operate with the said Waldron to, in the name of the people of the state of Colorado, on the relation of the said attorney general, united with said James H. Peabody and D. B. Fairley, chairman of the Republican state central committee, as copetitioners, present to the supreme court a petition, in which a conspiracy was charged against the elections commission of the city and county of Denver, with a large number of Democratic election officials to, by various and divers frauds, intimidations, forgeries and other crimes, steal the election in said city and county, and secure, on the face of the returns, such a large fraudulent majority in the said city and county, for the said Alva Adams and other Democratic candidates, as to overcome the Republican majority that would be otherwise given at said election. That the said bill set forth, among other things, that the elections commission in and for the city and county of Denver was composed of three members—two Democrats and one Republican; that each of said members had appointed an election judge for each of the precincts of said city and county; that two

of said judges in each precinct were Demo-
crats and one a Republican; that said bill
charged no bad faith against either the Re-
publican member of the said elections commission
or the Republican judges of election appointed by
him, nor did it charge that the said Republican mem-
ber of said commission, or the judges appointed by
him, would in any degree fail to perform each and
every of the duties imposed upon them by the law
and their oaths of office; that said bill was verified
by D. B. Fairley, chairman of the Republican state
central committee; that no proofs, oral or written,
other than the said verified petition, were presented
to the supreme court for its action; that although
the respondents, all who had been served with notice
of said petition and appeared in response thereto,
under oath, denied each and every allegation that
impugned their good faith, and charged them with
conspiracy and intention to commit crimes in con-
nection with the said election, the said court, never-
theless did grant the prayer of said petition, and,
in and by the writ issued in accordance with the
prayer thereof, did command and enjoin the respond-
ents, and every other accused person in said petition
named, from committing any and every of the election
crimes alleged in the petition they intended to com-
mit, and did command each and all of them to per-
form the duty enjoined upon them by law, and, in ad-
dition, the said court did authorize the said Republi-
can party to nominate two persons for each and every
voting precinct in said city and county set forth in
said petition, whom the court did appoint and de-
nominate "supreme court watchers," and the said
court did direct its clerk to issue certificates, under
the seal of the court, to such watchers, to the effect
that they had been duly appointed watchers of the
said court in that behalf, and that they should, pur-

suant to the order of the court, be and remain at all times during said election, on said election day, at said polling places respectively, both outside and inside the guard rail in each of said polling places to witness the casting of ballots, the proceedings at said election and the counting of ballots, the making of the returns of said election and of everything in and about the proceedings of the election officers, from and before the opening of the polls until the returns were duly made and certified, including the right and power to examine poll books, and, in case of challenge of voters, to compare the description of the proposed voter with that given in the registration books of the said polling places; and all of the election judges, police officers and all others were commanded, in and by the writ issued in said cause, to fully observe the said judgment and to respect the said supreme court watchers and facilitate them in the performance of the duties and powers conferred by the said order.

Respondent further avers that entertaining jurisdiction of said proceedings and the entering of the said order and judgment, and the issuing and testing of said writ, was in direct conflict with a recent former decision and adjudication by the said supreme court, in which Chief Justice Campbell and Mr. Justice Gabbert, the two judges of the court who entertained said jurisdiction and issued said writ, agreed, and with whom also agreed the then Mr. Justice Goddard, who was on the supreme bench with them at the time, in the case of *People ex rel. L'Abbe v. The District Court,* at the April term, 1899, of said supreme court (26 Colo. 386), in which it was adjudicated and declared that the courts of Colorado were without jurisdiction to enjoin the commission of threatened crime, and the said court

did, in its opinion in said case, make the following forceful declarations:

"However desirable or convenient it might appear to put a stop to criminal practices by invoking the extraordinary writ of injunction, we cannot permit the constitutional and statutory rights of individuals to be thus violated. We cannot allow the writ of injunction to usurp and take the place of the orderly processes of the criminal law which the constitution and the legislature have provided. Such a course as the district judge adopted, if approved by us, would make of a single judge both court and jury in the trial of a criminal action, whose sole object is to punish one for committing a crime; and if a defendant refused to obey his injunctive order, there could be no redress from a sentence for contempt imposed for its violation. Such an unlimited power is too great to confer; at least, *it has not yet been entrusted to any judge or court by the constitution or laws of the state.* * * * As for this court, its highest obligation is to observe and enforce the constitution whose creature it is, and it is contrary to the conception of duty entertained by its members to permit precedence to be made in defiance of the constitution."

And respondent further alleges that in assuming, in and by said injunction and order, to supervise and interfere with the said election, the said majority of the supreme court did assume authority and command the performance of things which, by the constitution of Colorado, they were and are prohibited from doing. That article III of the said constitution declares that

"The powers of the government of this state are divided into three distinct departments—legislative, executive and judicial—and no person or collection of persons charged with the exercise of power

properly belonging to one of these departments, shall exercise any power properly belonging to either of the others, except as in this constitution expressly directed or permitted.''

That the constitution of Colorado, in and by article VII thereof, distinctly and in terms confers upon the legislative branch of the government the making of all laws and regulations for the conduct of elections in said state, and to secure the purity of such elections and guard against abuses of the elective franchises, and that under and by said constitution the judicial department is without authority in that behalf. That the said legislature, in pursuance of its constitutional duty and authority, had enacted a full and complete system of laws for the conduct of elections, the registration of voters, and to punish crimes of every kind against the franchise, including every offense the election officers and others were, by the injunctive order and writ aforesaid, enjoined from committing. That a very material part of the said injunction and writ was and is in direct conflict with and in violation of the expressed letter and spirit of the election laws enacted by the legislature of Colorado. That the said laws provide for polling places and for voting booths or compartments therein, and for a guard-rail, within which shall be the said booths and the ballot boxes and within which the election judges and clerks shall be to conduct the said election. That the said law (Act 1891, and amendments, sec. 24) declares that

''No person, other than the election officers and the watchers provided by law, and those admitted for the purpose of voting as hereinafter provided, shall be permitted within such guard-rail, except by authority of the judges of election, and then only when necessary to keep order and enforce the law.''

That section 25 of said election law provides that

"Each of the political parties that cast the largest and next largest number of votes at the last general election in the state shall be entitled to have one person as watcher within the guard-rail during the casting and counting of the votes and the declaration of the result thereof."

That the said law further provides for "challengers," representing each political party, who should be permitted to remain "just outside the guard-rail," to perform the duties of challengers.

That the said section 25 further provides that

"Besides the election officers and watchers, not more than four voters in excess of voting shelves or compartments provided shall be allowed in said enclosed space within said guard-rail at one time, except as provided in section 28."

That those provided for in section 28 are "interpreters, who may be called in to interpret for such voters as cannot speak and understand when spoken to in the English language," and none others. Yet the said supreme court did, notwithstanding the express provisions of the statute aforesaid, in and by said decree and writ, create election supervisors and watchers unknown to the law, and did order and require the election officers in each of said precincts to admit the said officers so created, called "supreme court watchers," and to enter and remain within said guard-rails, at each of said election precincts, during the whole of the day and evening of said election, and to supervise, watch and otherwise to interfere with the conduct of said election; all in violation of the plain provisions of the statute in such cases made and provided.

Respondent further says that though controlling and editing the said daily papers, the News and the

Times, at the times last hereinbefore mentioned, he did not, in such papers or otherwise, adversely criticise the said court and judges for their aforesaid action. On the contrary, hoping that the sole and only purpose of said action by the court was to secure an honest election and prevent the commission of crimes thereat, he at all times urged cheerful acquiescence to the said injunction and the commands of the court connected therewith; and were it not that what was subsequently done by the court in and under the said injunction proceedings was practically to overturn the plainly expressed will of the people at said election, and to disregard the plain provisions of the election statutes of the state, and to compel and require others to do so, and thereby to unlawfully deprive senators and representatives who had been lawfully declared elected of their seats in the legislature, and to deprive other candidates of the offices to which they had been elected, and to pave the way for the nomination and confirmation of two supreme court justices who were to be selected by the corporations aforesaid, and to make it possible for the state canvassing board to make subsequent elections for legislative and state offices a farce, thus opening the door to anarchy and disorder by reason of partisan and political disregard of the law in the canvass of returns for such offices—all of which will be more particularly hereinafter set forth—this respondent would have indulged in no criticism whatever of the supreme court or the judges thereof, notwithstanding its and their actions in the matters hereinbefore set out were, as respondent believes, unwarranted by the law, and arbitrary and unconstitutional.

Respondent further avers that while the said corporations and associations, through their said representatives and agents, were inaugurating and pressing their said suit in the said court for the said

injunction, under the guise and pretext of securing an honest election in the said city and county of Denver, they or a large number of them were busily engaged in and were parties to plans to steal the election in the counties of Huerfano, Las Animas, Pueblo, Teller and other counties in Colorado, all for the purpose of securing the election of said Peabody and a state senate and house of representatives that would be subservient to their will; and that they did carry their scheme into effect and did, by bribery, violence, repeating, ballot-box stuffing and other election crimes practiced at said election and subsequently, defeat the will of the honest electors of said counties, and that the Democratic committees and candidates did apply for the assistance of the said supreme court to prevent the commission of such election crimes in the said last named counties, asking the said court for the same character of relief it had before granted in the suit on the relation of the attorney general *et al.*, hereinbefore at large set forth. That the attorneys for the Democratic state central committee on the 5th day of November filed petitions similar in form and substance as said prior suit, duly verified, in said supreme court, praying for injunctive relief against the election officers of the counties of Pueblo, Las Animas and Huerfano; that the said court, though constantly urged for prompt action by said attorneys, held their action in said petition in abeyance until late in the evening of the day before the election and then refused the relief prayed for as to the election officials of the counties of Pueblo and Las Animas, and granted it as to Huerfano county; but the said order as to Huerfano county, that is more than 150 miles distant from Denver, where the supreme court meets, by the most direct route of travel, was granted at so late an hour before the opening of the polls the next day for said election

that its effect was almost completely lost and nullified.

Respondent further avers that immediately following the said election, which was held on the 8th day of November, A. D. 1904, the said corporations, through the said John M. Waldron and his associates, caused affidavits to be filed in the supreme court against divers and sundry election judges and clerks, deputy sheriffs and constables and private persons, charging them with having, in divers and sundry ways, violated the said injunction; and they did cause citations and attachments to be issued out of the said supreme court, and served upon those accused, requiring them to appear before the said supreme court and show cause why they should not be punished for contempt. That, among others, attachments and citations were issued against some of the election officers and civil officers and private persons who were connected with the election held as aforesaid, in the following named precincts of the city and county of Denver, to wit: Precinct 8 of ward 7, precinct 13 of ward 3, precinct 1 of ward 4, precinct 2 of ward 4, precinct 33 of ward 4, precinct 6 of ward 5, precinct 7 of ward 5, precinct 8 of ward 5, precinct 9 of ward 5, precinct 18 of ward 7, and precinct 10 of ward 7; all of which more fully appears in the files and records of the said supreme court. That, notwithstanding each and every of the persons so required to appear and answer to the said contempt charges, did object to the assumption by the court of jurisdiction to try and punish them for the said alleged contempts, and did deny the charges made against them, the said court did assume to hear and determine the said contempt charges and did deny to them the right of trial by jury, although the statutes of Colorado expressly provide that in cases of constructive contempt, such as was the contempt

with which the accused persons were charged, they should be tried by a jury, if they so desired, and the said court as the result of said hearings, did adjudge as follows, against the persons so accused and tried:

On November 18, 1904, the court found that Peter Miller, Thomas Shephardson and Michael Dowd did, with full knowledge of the injunction, knowingly and willfully violate the commands of the injunction with respect to the appointment of an election clerk in precinct 8 of ward 7; that Peter Miller and Thomas Shephardson substituted, counted, returned and certified ballots in said precinct, in the place and stead of those cast, and the court did thereupon order and adjudge each of the foregoing to be guilty of contempt and it ordered that Michael Dowd be committed to the common jail for the period of sixty days and pay a fine of $250.00 and costs, and stand committed until such fine and costs were paid; and that Peter Miller and Thomas Shephardson be committed to the common jail for one year, and be fined in the sum of $1000 and costs, and stand committed until the same were paid.

That, on December 22nd, 1904, the court found that Clarence B. Dickson officiated as an election clerk in precinct 13 of ward 3; that he

"Interfered with and prevented the election judge, Breese, from having its clerk appointed, and also that through his action the watchers appointed by the court were prevented from examining the registration book and prevented from comparing the description on this book with the person or persons who might present themselves to vote."

And the court did find that the said Dickson was

"Guilty of contempt in committing repeating on account of the willful miscount and the violation of the injunction with respect to the appointment of a clerk, and the examination of the registration book."

And for the reasons above, the said court did adjudge that the said Dickson should be confined in the said jail for four months and be fined the sum of $250.00 and costs, and stand committed until the same were paid.

That, on January 5, 1905, the court acquitted John Bennett, the only person tried for offenses in precinct 1, ward 4, and in acquitting him the court in substance stated that the testimony shows that repeating was permitted at the polls where Bennett officiated; that, from the testimony of one Crocker, and the court's own inspection, it was satisfied that a great many ballots appear in the box written by the same person; that it appeared that two names were added to the poll book representing persons who had voted after the polls closed, but that, since the duties of Bennett were merely clerical, and that the court thought frauds were established of a kind different from those charged against him, he should be acquitted.

That, on December 21, 1905, the court adjudged (the proceedings being against Edward Sweeney and Isaac N. Goldman) that the said Goldman acted as judge of election in precinct 2, ward 4, and that he knowingly and willfully permitted a great many persons to vote there more than once on election day, and the court therefore adjudged him guilty of contempt, and that he be confined in the common jail four months and pay a fine of $100, and stand committed until paid.

That, on December 19th, 1904, the court did find, as to respondents DeSaye and Green, McMahon and Goodman, the only persons tried for offenses in precinct 3 of ward 4, as follows:  That

"DeSaye was a judge, and he knowingly permitted a great many persons to vote more than once, and that Green, McMahon and Goodman connived at,

abetted, aided and assisted DeSaye in the commission of this act, in that they brought repeaters there and engaged them in repeating, and protected them.''

And the court did order that each be confined in the common jail six months and pay a fine of $100 and costs, and stand committed until paid.

That, on December 8, 1904, the court did find as to respondents Mullins, Kitson, and Bergman, the only persons tried for offenses in precinct 6, ward 5, that from 71 to 83 votes were cast by repeaters; that one voted eight times, and others voted two, five and six times; that Mullins and Reid were responsible for these frauds, and that Mullins ejected watcher Hanson, whereupon the court did adjudge that Mullins be committed to the common jail for nine months and be fined $500 and costs, and that Kitson and Bergman be committed to the common jail for six months and be fined $500 and costs, all to stand committed until the same were paid.

That, on January 4th and January 5th, 1905, the court did find, as to respondents Dague, Kern, Campbell and Higgins, as follows: That Dague, Kern and Campbell were judges and were responsible for repeating at the polls in precinct 7, ward 5, but that Higgins had more to do with it than the others. It found that 169 ballots, all written by one person, were found in the box, but that the court placed no responsibility for that on either of the respondents, nor does the finding state the number of repeaters; and the court adjudged that Kern, Dague and Campbell be committed to the common jail for two months and Higgins for four months, and that each pay the costs and stand committed.

On November 29th, 1904, the court found, as to precinct 8, ward 5, that respondents Kratke, Ray, Kofsky and O'Malla violated the injunction in two particulars, which the court states as follows: One

with respect to the appointment of an election clerk; second, in permitting divers and sundry persons to repeatedly vote at such election; wherefore the court adjudged that Frank Kratke be confined in the common jail for one year and fined $100 and costs; that Ray and O'Malla be confined in the common jail for six months and each fined $500 and costs, and that Kofsky be confined four months and fined $250 and costs, each to stand committed until the fine and costs were paid; and the said finding does not state the number of votes cast by repeaters.

That, on December 4, 1904, the court found as follows, as to precinct 9, ward 5: That, after the polls were closed, the respondent Barker mingled with the ballots cast a large number of false, fictitious and spurious ballots, and that the other respondents aided and abetted him in the act, and that such false and spurious ballots were subsequently counted and certified by the respondents, who were judges and clerks of election, and the court committed Barker, Reid, Dickson and Sullivan to the common jail for nine months each and fined them each $500 and costs, each to stand committed until fine and costs were paid. The respondent Spencer was committed to the common jail for four months and Branch for three months. The number of false and spurious ballots is not given in the finding.

That, on December 12th, 1904, the court found as to precinct 10, ward 7, that respondents Culp and Devaney added more than two hundred ballots to the box, after the polls were closed; that 176 of them were written by the same person; wherefore the court adjudged that Culp and Devaney be each confined in the common jail for one year and each fined $100 and costs, and each stand committed until the same were paid.

And the respondent further avers that each and every of the said respondents were committed to the common jail of the city and county of Denver, to serve out the sentences above set forth, and this notwithstanding that the supreme court, by a unanimous decision—two of the judges comprising a majority of the supreme court when the injunction herein set forth and the contempt proceedings were had and determined—had, as before herein set forth, decided and solemnly announced that the supreme court would not allow the writ of injunction to usurp and take the place of the orderly processes of the criminal law which the legislature and constitution had provided, and that no such powers had been entrusted to any court or judge, by the constitution or laws of the state, and that to issue an injunction to prevent the commission of threatened crime and to punish individuals as for contempt for violating the injunction, would be "to permit precedents to be made in violation of the constitution."

And respondent further avers that immediately following the said election, and the discovery by the said corporations and their agents that the said Peabody had been defeated for governor, and that the Democratic party had a majority of four in the senate of the general assembly soon to convene, and that the said Peabody could not appoint the judges of the supreme court he had agreed with the said corporations and their agents they should name, unless he should do so in the few days that would intervene between the assembling of the legislature and the inauguration of said Alva Adams (which respondent believes he had no right to do, and that so to do was contrary to law), and that should he nominate said judges, that the senate, after it was organized as it was elected, would not confirm them, because the appointment of judges by a governor who

could not be in office when they under the constitution should assume the duties of said judgeships, would be illegal, and because it was the clear intention of the legislature that proposed the amendment to the constitution and of the people when they voted to adopt it, that said two vacancies created by the amendment should be filled by the governor to be elected in the fall of 1904, the said corporations and their agents and representatives, as aforesaid, did further conspire with the said Peabody and certain officials of the Republican party, and they did then and there agree, confederate and combine, with the assistance of the supreme court, if its assistance could be secured, to prevent, by an order of the supreme court, the elections commission of the city and county of Denver from canvassing and including within their canvass enough of the regular and lawful returns of the said election from the principal Democratic precincts of said city and county, to defeat the two Democratic senators, to wit, Samuel W. Belford and Daniel Delaney, and the six Democratic members of the legislature who had been elected on the face of the returns, to wit, George A. Collins, John W. Jones, Jr., Peter Gorman, Max Morris, Harvey E. Garman and Dennis W. Mullins, and to cut down, by several thousand, the majority that had been given to Alva Adams for governor, in the said city and county of Denver.   That the said corporations, to the more effectually carry out the said unlawful conspiracy, did further agree and determine to induce the board of state canvassers, in violation of the law, and their oaths of office, to go behind the lawful returns of the counties of Las Animas and Boulder, in order that Michael Beshoar, the Democratic candidate for the senate in Las Animas county, who, on the face of the returns was elected by about 400 majority, and that Charles B. Ward, the

Democratic candidate for the senate in Boulder county, who, on the face of the returns was elected by 61 majority, might each be declared defeated and their Republican opponents, Casimiro Barela in Las Animas county, and H. B. Millard in Boulder county, be declared elected, and receive the certificates for the said office of senator. That the said corporations, through their agents and representatives, did, after said election, unlawfully and wickedly conspire to induce and compel the Republican members of the general assembly, then soon to convene, to, in the canvass of the vote for governor, in violation of the statutes and their oaths of office, when the returns for the office of governor were canvassed by the legislature in joint session, throw out and refuse to tabulate in their said canvass the returns from enough counties giving the said Alva Adams majorities for governor to overcome the 9,000 majority or thereabouts that he had upon the face of the returns, and that the defeat of the said Democratic senators and representatives hereinbefore particularly named, and the granting of certificates of election for said offices to their Republican competitors, were important and essential accomplishments for the success of said last mentioned conspiracy. That the institution of said proceedings in contempt, hereinbefore set forth, was but the first essential step toward carrying out the aforesaid conspiracy.

And respondent avers that under and by virtue of the constitution and laws of the state of Colorado, it became and was the duty of the said election commission, on the 10th day after said election, or sooner if all the returns were received, to, in the language of the statute, "proceed to open the said returns, and make abstracts of the votes in the following manner:" The abstract of the votes for electors for president and vice-president of the United States

on one sheet, and the abstract of votes for representatives in congress upon another sheet, and the abstract of votes for members of the executive department on another sheet, and the abstract of votes for senators on another sheet, and the abstract of votes for representatives on another sheet, and the abstract of votes for county and precinct officers upon another sheet, and, further, "to make out a certificate of election to each of the persons having the highest number of votes for county and precinct officers respectively, and to cause such certificate to be delivered to the person entitled to it." That, under and by virtue of these provisions, the said elections commission had no discretion whatever, when said returns were regular in form and properly certified, but to make abstracts of the said returns and to further proceed as by the statutes directed, and the said supreme court had, in several cases, so decided. That, at the expiration of ten days from the said election, the returns from all of the precincts of the city and county of Denver having at that time been received, the said election commission proceeded to open said returns and make abstracts as by law required.

And respondent further avers that, in furtherance of the said conspiracy as to the Democratic senators and representatives from the city and county of Denver, and the vote for governor, etc., the said corporations and their said representatives and agents did, through their said attorney, John M. Waldron and his associates, in the name of the people of this state of Colorado, and in the cause in which said injunction had been issued and contempt proceedings had, file a motion, on, to wit, November 21, 1904, to compel the said election commission, in the canvass of said votes, to wholly exclude the returns of said election from precinct 8 of ward 7, in the said city and county of Denver, and the said court did, over

the protest and argument by counsel representing the said commission, on, to wit, December 14, 1904, make the said order as prayed for, directing and requiring the said elections commission to exclude the returns from the said precinct in their canvass of the returns from the different election precincts of the said city and county, and to proceed with the said canvass as though no returns whatever had been made from the said precinct, except that the said order should not affect the abstract of votes for presidential electors or for representatives in congress. That Mr. Justice Steele, the third member of the said supreme court did, from the bench at the session at which the opinion on said motion was delivered and immediately upon its being announced, declare:

"The conclusion of the court was handed to me only last night at 5 o'clock. I have therefore had no time to prepare a dissenting opinion, but I dissent from the judgment of the court because it is unwarranted, without precedent and directly contrary to the law."

That thereafter, and in continued furtherance of said conspiracy, a like motion was filed in said original injunction cause and, as a part of said contempt proceedings, for a like order against the said elections commission, as to the returns from precincts 6, 8 and 9 of ward 5, and precinct 10 of ward 7, and, on December 17, 1904, the said supreme court did grant said motion and did make said order and cause the same to be served on the said commission, and thereupon the said court did order the said commission to complete the making of the abstract of votes from the said city and county of Denver, but to exclude therefrom the vote of all precincts above mentioned, and to deliver their said abstracts, as by law required, to the secretary of state, to the end that he might submit the same to the state board of can-

vassers for its official action. That the said elections commission did obey the said several orders of the said court, and did complete the abstract of the returns of the election in the said city and county of Denver, and did omit therefrom the returns from the said five precincts, notwithstanding, by the statutes, they were prohibited from so doing and were by statute commanded to include the abstracts of votes from said precincts in their said canvass, and the said elections commission did certify the returns to the secretary of state for the city and county of Denver, as though no election had been held in said five precincts or returns had been received therefrom.

And respondent further avers that the said returns from the said five precincts were in every way regular in form, and were duly and properly signed and certified by the judges and clerks of the said several precincts. That the only ostensible claims or pretext upon which the said court made said order concerning them was the testimony elicited in the said contempt proceedings, and the findings of the court thereon as the same had been hereinbefore set forth. That after the findings of the said court and the entry of the order in the contempt proceedings against officials and others for alleged violations of the injunction, no further or additional testimony was taken and no further or additional findings were made, and respondent avers that, in effect, the direct result of said several orders made by the said court was to defeat Samuel W. Belford and Daniel Delaney for the said senate, and the said Collins, Jones, Gorman, Morris, Garman, and Mullins, Democratic candidates for the house of representatives, who otherwise would have been and must have been certified to the secretary of state as having been duly elected senators and representatives to the fifteenth general assembly, from the city and county of Denver.

Respondent avers that after the exclusion of the returns aforesaid for presidential electors, state officers, and members of the legislature, there yet remained to be canvassed the returns for the election of candidates for the various offices in the city and county of Denver. That said elections commission was required to await, by said previous orders further orders from the supreme court, before completing the canvass for said local offices. That while, by the elimination of the returns from the last five precincts hereinbefore set forth, said Democratic senators and representatives were all defeated, enough of precincts had not been excluded by the order of the court to defeat all of the Democratic candidates for the said local offices for the city and county of Denver, and that thereafter, and on, to wit, the 7th day of January, 1905, twenty-one days after the order requiring said commission to omit from its canvass the returns from the said five precincts, the supreme court did, in the said injunction proceedings, and as a part of said contempt proceedings, and without further or additional testimony, order and direct the said election commission to complete the canvass of the votes for city and county officers, but that, in so doing, it should omit returns from precinct 13 of ward 3, from precincts 1, 2 and 3 of ward 4, and from precinct 6 of ward 5, and should not count the same; but, in completing the said canvass, said commission should treat the returns from the said precincts as though no election had been held therein, and that the said commission should forthwith make up and certify the official abstract of votes cast in the city and county of Denver for the said local offices, excluding from the said returns the votes cast in the precincts last hereinbefore mentioned, as well as the votes cast in the said first five precincts hereinbefore mentioned, and to forthwith make, execute and de-

liver certificates of election to those who appeared elected after the exclusion of said returns, respectively, which said order the said elections commission did, as soon as might be, comply with. Thus, by the direct adjudication and orders of the supreme court in the contempt proceedings aforesaid, all instituted and conducted in the original cause, in which the injunction against the election officers of the city and county of Denver and others was issued, the supreme court did deprive of the election certificates to which, under the constitution and laws of the state they were entitled, the following Democratic candidates, to wit:

Samuel W. Belford, elected state senator;

Daniel Delaney, elected state senator;

George A. Collins, elected to the house of representatives;

Harvey E. Garman, elected to the house of representatives;

Peter Gorman, elected to the house of representatives;

John J. Jones, Jr., elected to the house of representatives;

Max Morris, elected to the house of representatives;

Dennis W. Mullins, elected to the house of representatives;

Hamilton Armstrong, elected sheriff;

Schuyler H. Alexander, elected assessor;

C. S. Elder, elected treasurer;

R. J. Byrne, elected recorder;

W. P. Horan, elected coroner;

W. F. Hines, elected justice of the peace;

W. A. Rice, elected justice of the peace;

B. F. Stapleton, elected justice of the peace;

Joseph Berger, elected constable;

M. E. Garry, elected constable, and

P. A. Reid, elected constable;

And did cause the election certificates for said offices to be delivered to their Republican competitors.

Respondent avers that after the votes of the said precincts were excluded from the canvass of the votes, by order of the supreme court, all of which were necessary to be excluded to defeat all of the Democratic candidates, the vote for no other or additional precinct was excluded, nor was an order therefor requested. That without the exclusion of said precincts, said Alva Adams, candidate for governor as aforesaid, would have been certified as having received several thousand more votes than he was by the said canvass awarded.

And respondent avers that entertaining jurisdiction of the said injunction proceedings to prevent the commission of election crimes, and the issuing of said injunction order, and compelling election officers to recognize the said supreme court watchers, to require them to be permitted within the said guardrails, and the prosecution of said persons aforesaid for violating said injunction, and their fines and incarceration in the common jail, and the several orders of said court requiring the elections commission to omit from its canvass of the said return the returns from the said several precincts—are and were all without precedent in the electorial and judicial history of the United States, and of each of the states of the Union, and are as respondent believes, in direct conflict with the constitution and laws of the state of Colorado, as well as in direct conflict with the solemn decision of the supreme court of the state of Colorado hereinbefore referred to.

And respondent further avers that to the said proceedings by which the Democratic candidates

aforesaid were deprived of the offices to which they were elected, neither of said candidates were parties nor did they have any opportunity to appear, nor were they heard; and the direct and necessary result of such proceedings was to deprive each and every of said candidates of the offices to which they had been elected, without due or any process of law.

That, during the said proceedings in which the orders to exclude the said ten precincts were made, the court was appealed to by the attorneys for the respondents in said cases, to institute proceedings to discover which votes, if any, were in fact illegal, to the end that instead of throwing out and annulling the votes of thousands of honest and legal voters with such as might be illegal, the votes of the legal voters would be counted; but this the said court refused to do. And respondent avers that there would, under the provisions of the election laws of Colorado, have been little or no difficulty in separating the legal ballots from the illegal ballots, if any were found in said boxes, because the provisions of the statutes of the state are minute and complete for so doing.

And respondent further avers that in the said journals—the News and the Times—he controls and edits as aforesaid, repeated appeals were made to the court, since it had entered upon the work of supervising and controlling the canvass of the returns by the said elections commission, to take steps to eliminate the legal from the illegal ballots, to the end that the thousands of honest voters in the said ten precincts should not be disfranchised, and that those who had been honestly elected should not be deprived of their offices.

And respondent further avers, as to the findings of the supreme court, that in several of the precincts excluded by its orders it was found by the court that considerable numbers of the ballots found in the bal-

lot boxes had been written by one or more persons—that is, that one person wrote the name "Democratic" or "Republican" at the heads of said ballots, as the case might be—and that under the law each voter able so to do should have written the name of the party ticket he voted upon the ticket himself, and because they did not appear to have done so the said ballots were fraudulent and that the said boxes had been stuffed with them, the evidence upon which said conclusions were based was that of a local, so-called "hand-writing expert."

Respondent further avers that on the hearings aforesaid, as to the precincts in which such testimony was given, the respondents denied that such acts had been committed except in the case of illiterate persons, in whose cases somebody else might, under the law, fill out the ballots. That whether or not the judgment or conclusion of such experts was correct might readily have been determined. That, under the election law of Colorado, one of the judges of election is required to write on the corner of each ballot the number that is placed opposite the name of the voter on the poll list, before the ballot is deposited in the box, and that such corner is turned down and sealed so as to conceal the number thereon written. That, if the seals on these ballots had been broken, the number thereon written would have disclosed, by the like number on the poll list, the name of the voter credited with having deposited the ballot, and, by reference to the registration list the residence of the voter and his age and personal description would appear, so that such voter, if the ballot were genuine, might be readily produced to testify whether or not the ballot was in fact his ballot. That, during the said contempt proceedings respondent, denying the truth of the conclusions of said experts, requested the court that it would order the seals of the said ballots

claimed to have been written by other than the legal voters, broken, that those who purported to have cast them might be produced before the court to testify thereto, but the court denied this request and refused to permit the seals to be broken, and said court reached its conclusions upon that class of testimony without that sure and reasonable proof that was readily availed of and to their hands. And respondent says true it is that the statute provides that such seals shall only be broken in case of a contested election, but he also says the statute provides that the ballots and one of the tally lists shall be placed in the ballot box and the opening of the glass part carefully sealed and each of the judges shall place his private mark on the said seal; that the wooden cover shall then be locked and each of the judges preserve one of the keys thereto, and that the ballot box, thus sealed and locked, shall be delivered to the county clerk—in the case of the city and county of Denver, to the elections commission—and that the ballots, when not required to be taken from the ballot box for the purpose of an election contest, shall remain in the ballot box, in the custody of the county clerk and recorder—and, in the case of the city and county of Denver, in the custody of the elections commission—until the next election. That the returns and tally lists necessary for the canvass of the returns from election precincts are provided to be sent sealed in a separate package, to the county clerks. Yet, nevertheless, the said court, for the purpose of said contempt proceedings, did order that the ballot boxes of the several precincts should be opened and the ballots taken therefrom for examination by said writing experts, and for other purposes, while it refused to allow the seals upon the ballots to be broken, to determine whether or not the ballots were in fact honest or spurious ballots.

And respondent, to show the utter unworthiness and unreliability of the said writing expert Hamma, and the other experts who testified from comparison of the writing of the names of the party written on said tickets "Democratic" and "Republican," avers that, subsequently, as will be hereafter more particularly set forth, the said Peabody contested the election of said Alva Adams before the fifteenth general assembly; that nearly all of the proof offered by contestor to secure the rejection of the vote of the city and county of Denver by said general assembly was that of said writing expert Hamma and other such experts who testified before the supreme court in the contempt proceedings, the said Hamma having been given access to the ballot boxes during said contest in a great many precincts, that as such expert he might testify what ballots were fraudulent; and he afterwards did, after examination of said ballots, declare, as a witness before the legislative committee, in substance, that he had examined the ballots in said boxes and, among others, those of the precincts of Elyria and Harman, both precincts in the city and county of Denver; that, in the ballot box of Valverde, one hundred fifty-three Democratic ballots were written by one person, and twenty Republican ballots were written by another, he desiring to have it inferred, because they appeared to be so written, that they were fraudulent ballots. Yet, nevertheless, after said testimony, the contestee's attorneys having been permitted to break the seals on said assailed ballots, and learning thereby the numbers of said ballots, and, from the numbers finding the names of the persons who had done the writing thereon, and voting, they found and produced 145 of the 153 who had voted said alleged fraudulent Democratic tickets, and they appeared in person, either before said committee or a notary public, as witnesses in said contest

proceedings, and testified to their identity and to having voted the said tickets. That in the ballot box of the Harman precinct, the said Hamma testified he found 57 Democratic ballots written by the same person. In that connection a ballot box was brought in from Kiowa precinct, in Adams county, an agricultural precinct. When shown ballots in the box he testified that seven of the ballots were written by the identical person who had been writing all the other ballots which he assailed. The contestee brought before the committee four of the seven, resident farmers of the precinct, who fully identified four of said ballots, declaring that they themselves had written and voted them.

That writing experts for the contestor, Hamma, with others, testified, in said contest, that 77 ballots in the box of ward 6, precinct 3, were written by the same person; yet, breaking the seals of said ballots, contestee produced 74 of the 77 persons whose ballots had been assailed and who testified in said contest proceedings that they had written them, each for himself, and had voted the same.

Again, in ward 6, precinct 4, 58 ballots were so assailed by said writing experts; yet 47 of the voters who cast 47 of said ballots were produced and testified that they were their ballots and that they were prepared and voted by them.

Again, in the ballot box of ward 6, precinct 7, 51 ballots were identified by said experts as having been written by the same person; yet, on breaking the seals of said ballots, 47 of those who had voted 47 of the ballots were produced, and they testified that they were their ballots and they had been prepared and voted by them.

Again, in the ballot box of precinct 4 of ward 1, 111 ballots were identified by said experts as having been written by the same person, but the seals thereof

being broken and the names of those who appeared to have deposited them being learned, contestee produced 97 of those who identified a like number of the said 111 ballots as having been prepared and voted by them, and they so testified.

Again in precinct 1 of ward 5, the said experts declared 38 ballots were written by the said person; yet contestee produced 37 persons who had voted 37 of the said ballots and who testified that they had prepared and voted the same.

That respondent can cite a large additional number of precincts in which said experts were as flagrantly in error, as shown by the production of the persons who cast the ballots they assailed, as in those particularly cited; but it is sufficient to further say, in this connection, that of all the ballots declared fraudulent by these writing experts—and there were 7,891 such Democratic ballots and 1,148 such Republican ballots—the contestee produced 80 per cent. or thereabouts of those who had actually prepared and cast the said percentage of the same; and so complete and overwhelming was the proof on the part of the contestee that the contestor, who had assailed the integrity of such ballots by said writing experts, did not attempt to overcome or disprove the testimony of the living witnesses produced by the contestee to establish the integrity of said ballots.

Respondent further avers that, after the said Democratic senators and representatives from the city and county of Denver had been deprived, as aforesaid, of their said offices, the said corporations, through their said agents and representatives, bent all their energies towards inducing the state board of canvassers to ignore the law and go behind the returns properly made out and certified from the county of Boulder and from the county of Las Animas; that the county of Boulder is one senatorial dis-

trict and the county of Las Animas is another sena-
torial district, and that by the returns, duly authen-
ticated as aforesaid, from the county of Las Animas
and delivered to the secretary of state, as by law
required, Michael Beshoar, Democrat, was shown to
be elected to the senate by about 400 majority; and
that, by the returns from the county of Boulder, duly
certified, as aforesaid, Charles B. Ward was shown
to have been elected by 61 majority.

That, by the statutes of Colorado, the governor,
secretary of state, the treasurer of the state and
attorney general, or any three of them, constitute the
board of state canvassers, and, by the said statute, it
is made their duty to "canvass the abstracts of votes
cast in the different counties of the state for electors
of president and vice-president, for representatives
in congress, for regents of the state university, for
the judges of the supreme and district courts, for dis-
trict attorneys and for senators and representa-
tives;" that the statutes of the state further provide
that "for the purpose of canvassing the result of
elections, the state board of canvassers shall meet at
the office of the secretary of state at 10 o'clock of the
forenoon of the twenty-fifth day after election, * * *
when they shall, if the returns from all the counties
of the state be in the possession of the secretary of
state, proceed to canvass the votes." That the stat-
utes of the state do further provide "that the state
board of canvassers, when met in accordance with the
law, and a quorum (3) being present, shall proceed to
examine and make statement of the whole number of
votes given at any such election, * * * which state-
ment shall show the names of the persons to whom
such votes shall have been given for either of said
offices, and the whole number given to each, distin-
guishing the several districts and counties in which
they were given; they shall certify such statement to

be accurate and subscribe their names thereto, and they shall thereupon determine what persons have been by the greatest number of votes elected to such offices, or either of them, and they shall endorse and subscribe on such statement a certificate of their determination and deliver them to the secretary of state.'' And it is further provided, by the said statutes, that ''before the day fixed by law for the assembling of the general assembly the secretary of state shall lay before each house the returns of the members elected thereto, with the districts they represent, in accordance with the returns in his office.''

Respondent further avers that to carry out the conspiracy aforesaid, and that the said corporations, their agents and representatives, might secure a majority in the senate as aforesaid, they did, through agents and emissaries, induce H. B. Millard, the Republican opponent of the said Charles B. Ward, and Casimiro Barela, the Republican opponent of Michael Beshoar, to present and make claim to the said state board of canvassers that they had been elected, instead of said Ward, and Beshoar, and to induce said board to go behind the lawful returns and to throw out the votes of certain precincts in the said two counties sufficient in number to change the result as to the said Ward and Beshoar in the said counties. That Luther M. Goddard, one of the present judges of the supreme court, acted as one of the attorneys for the said Barela and Millard, in that behalf.

That on, to wit, the 1st day of December, 1905, as by the law they should, the state board of canvassers met, and, as provided for in the statutes of the state, ''*to canvass the abstract of votes cast in the different counties of the state*'' for the candidates for the several offices hereinbefore mentioned, and for senators and representatives. That the said Luther M. Goddard and others, in behalf of the said Barela

and Millard, appeared before the said board and did induce them to make an order in which they agreed to go behind the abstracts of votes from the said counties of Las Animas and Boulder, and to hear testimoney (all by affidavit and wholly *ex parte*) with reference to the elections within some of the precincts therein. That the said Ward and Beshoar and the Democratic committee of the state of Colorado had no question but that a majority of the said board of canvassers would, in pursuance of the conspiracy aforesaid, and being unduly and improperly influenced by the said corporations, their agents, attorneys and representatives, make application to the supreme court of Colorado to take original jurisdiction, and did submit two petitions, one in behalf of the said Ward, and the other in behalf of the said Beshoar, praying that the said court might command the said board of state canvassers to canvass the abstracts of votes from the said counties of Las Animas and Boulder, as by the law they were required to do, and to refrain from going behind the said returns and abstracts. That, under the law, and the custom in such cases made and provided, the supreme court first determines whether it will take jurisdiction of applications for such original writs, and the mere presentation of such petitions does not constitute an action pending in the supreme court, until the said court, by order, shall direct the filing of the petitions, and thus doing assume jurisdiction of the cause, to determine the merits thereof. That, application being made to the court to permit said petitions to be filed, and for the court to assume jurisdiction of the cause, and the said petitions having been left in possession of the clerk of said court, notice was given the attorneys of the respondents therein of the pendency of said applications for leave to file, and a time being fixed by the court for hearing and determining whether or not the said court would

assume jurisdiction of the causes, and permit said petitions to be filed, the attorneys for the respective parties appeared before the said court and argued the question of jurisdiction only. That the said Luther M. Goddard, one of the attorneys of said Barela and Millard, appeared and argued against the court taking jurisdiction of said cause.

Upon information and belief, respondent avers that on the said hearing the only question presented to the court was whether or not the court would take jurisdiction of the said cause and permit the said petitions to be filed, that it might subsequently determine the said petitions upon their merits, and the attorneys did not discuss the law applicable to the legal questions involved in said petitions, nor the power nor duty of the state board of canvassers in the premises. On the contrary, the said court strictly prohibited any such argument, and confined the attorneys to the question as to whether the court could or should assume the jurisdiction prayed for; and, having heard the arguments therein, the said court did adjourn, to render its opinion at a later date; but, thereafter, to wit, on December 28th, 1904, the court met and rendered an opinion in the said causes, which said opinion assumed to determine said causes upon their merits; but respondent avers that the said court did not, in fact, take jurisdiction of said causes, and did not permit the same to be filed in said court, and the said causes were never filed therein; yet, nevertheless, the said court not only rendered an opinion which was professedly in said causes, but it did, in addition, in said opinion, decide and determine that no other court should issue writs of mandamus in such cases should application be made to them therefor, and respondent says that the said opinion and the declaration or order contained therein were not made in causes pending in said court, but were made

in connection with the decision of the court, in effect declining to take jurisdiction thereof. Respondent further avers, that, while in said opinion the court held that it would not issue the writs of mandamus, it did so without independently passing upon the force and effect of the statutes that provide for and govern the said state board of canvassers and prescribe their duties; and in the said opinion it expressly declared that the court would not decide for itself what the law governing the state board of canvassers was, but would hold that a decision formerly rendered by the state court of appeals, a statutory court, and one of inferior jurisdiction to the supreme court, should stand and be held as the law by all the courts of the state, until the legislature of the state should repeal, amend or modify the same, as appears from the following extract from said opinion:

"In brief, our conclusion is that whether this decision is right or wrong, as to which we express no opinion, until such time as the general assembly sees fit, by statute, to change or abrogate the rule there announced, it should be followed by all the inferior judicial tribunals of this state."

The supreme court thus declaring that *nisi prius* courts should and must be bound by a former decision of the court of appeals, and should not take jurisdiction of any sort to interfere with the said state board of canvassers.

That in and by the said opinion the said supreme court, avoiding passing upon the questions of law presented in the said petitions, as to the duties and powers of the state board of canvassers, laid down and declared in effect the following extraordinary and unprecedented proposition: First, that because the state court of appeals had rendered an opinion as to the powers and duties of the board of state canvassers, that it would not, whatever its views of the law

might be, take up and decide the law upon its own responsibility, and this, too, notwithstanding the fact, as the supreme court has decided, the opinions of the court of appeals are only persuasive and should receive favor from the supreme court only as said opinions express sound law and are based on sound reasoning; Second, that because in such a case said court of appeals delivered an opinion stating its views of what the powers and duties of the board of state canvassers were, and there having been a session of the legislature between the filing of said opinion and the presentation of the petitions in behalf of said Ward and Beshoar without legislative action upon the matters involved, the supreme court should hold such omission by the legislature to be legislative approval of such opinion and the rule established in such opinion must prevail until the legislature saw fit to change the same; Third, that the supreme court had the right and authority to prescribe rules of action for lower courts in matters affecting statutes setting forth the powers and duties of the state board of canvassers and to forbid them taking jurisdiction in such cause, in proceedings in which the supreme court did not assume jurisdiction except to decline the same, except "for persuasive reasons." Respondent further avers that the attorneys for the said Beshoar and Ward, fearing and having reason to fear that the supreme court would not take jurisdiction of the said causes, and not anticipating that the court would, in declining to take jurisdiction, forbid the *nisi prius* courts to do so, were ready, should the supreme court decline to take jurisdiction, to file new petitions for mandamuses against the said state board of canvassers, in the district court in and for the city and county of Denver. That said attorneys being notified that the supreme court had refused to take jurisdiction, immediately filed said petitions in the district court, and

from the branch thereof presided over by District Judge Carpenter alternative writs of mandamus, as prayed for in the said petitions, were issued. That neither the said attorney, at the time he filed said petitions, nor the said judge at the time he issued the said alternative writs of mandamus, had knowledge that the said supreme court had in said proceedings forbidden *nisi prius* courts to act affirmatively in such cases. That on the same day, following said action by said district court, the said supreme court did cite the said District Judge Carpenter and John A. Rush and Everett Bell, attorneys for the said Ward and Beshoar; the district judge to show cause why he should not be commanded to enter an order dismissing said suits and holding for naught the said alternative writ, and that no further jurisdiction of said cause should be entertained by him and to abide by any further order of the court in the premises; and the said Rush and Bell to show cause why they should not be punished for contempt. That subsequently the said District Judge Carpenter appeared and in effect stated that he was not aware of the opinion of the court in that behalf, and that he would quash said writ and further not assume jurisdiction in said matter, and the said Carpenter was thereupon dismissed, and the said Rush and Bell appeared and filed their answer to the citation showing cause why they had not been guilty of contempt, and the said supreme court on, to wit, January 3, 1904, by order referred the matter of the contempt proceeding against said Rush and Bell to the grievance committee of the State Bar Association of Colorado, and the said committee, having examined the said matter, decided and reported that no contempt had been committed, whereupon the supreme court dismissed said contempt proceedings against said Rush and Bell.

Respondent further avers that said state board of canvassers, being relieved from the danger of interference from any of the courts of the state by reason of the action of the supreme court as aforesaid, and in violation of the plain letter and spirit of the statute, did immediately proceed to ignore the abstract of the returns of the said election from the said counties of Boulder and Las Animas, and did, although the testimony was overwhelming that the election had been honestly and lawfully conducted in the assailed precincts in said two counties, and that no fraud in behalf of the said Ward and Beshoar had been practiced, reject, and disregard the votes of a sufficient number of precincts as the same had been certified to said board, in the said counties of Boulder and Las Animas, to overcome the majorities that had been given and certified to said board for the said Ward and Beshoar, and did declare and certify that the said Barela and Millard had been duly elected; that, in and by the said decision of the supreme court, and of the state board of canvassers, the status of the state senate was further changed so that it thereafter stood 15 Democrats and 19 Republicans, giving the Republicans in said senate a majority of four, when in truth and in fact, under the law, if it had been fairly administered, the said senate would have stood 19 Democrats and 15 Republicans. That, shortly after the said last mentioned decision, and on, to wit, the 4th day of January, 1905, the fifteenth general assembly of the state of Colorado duly convened and the senate thereof organized with its political status as above stated.

And respondent further avers that for a long time before the proceedings relating to the state canvassing board, it had been determined by the corporations aforesaid, through their agents and representatives, or a considerable majority of them, that

Luther M. Goddard should be one of those to be named by them for the office of supreme judge, and they selected him by virtue of the agreement aforesaid between the said corporations and the said Peabody, although the said corporation agents were not unanimous in his behalf.  That the said The Colorado and Southern Railway Company and the said The Denver and Rio Grande Railroad Company feared that he was too closely allied with the interests of the said The Denver City Tramway Company and The Denver Union Water Company and certain natural persons, which would or might seriously conflict with the interests of these corporations.  That it became and was important to placate the hostility of the said last named railway companies, as it was understood and agreed that unless the said last named companies concurred in the selection of judges made by the said corporations they could and would, through certain of their Republican senators who were friendly to them, defeat their confirmation and, upon demand of the said The Colorado and Southern Railway Company, by its agents and representatives, they agreed to permit the said Colorado and Southern and Denver and Rio Grande Railway Companies to name the other of said judges, and thereupon the said two last mentioned railway companies, by their representatives and agents, did select and name George W. Bailey as the other of the said judges to be selected by the corporations, and appointed by the said Peabody as aforesaid.  And the said corporations, through their agents and representatives aforesaid, notified the said Peabody that they had agreed upon the said Luther M. Goddard and the said George W. Bailey as their selection for justices of the supreme court, and respondent avers, that the said Luther M. Goddard did appear for and in behalf of the said Barela and Millard, in their

contest before the said state board of canvassers, and did take a great interest in all of the proceedings before the said supreme court, in the way of consultation and advice with and to those who were representing the said corporations in all of the said proceedings, and that he did use all of his skill and influence to lead and induce the said supreme court and state board of canvassers to decide as they did decide; and the said Goddard did further advise with and consult with the said John M. Waldron and his associates in connection with nearly all the court proceedings hereinbefore set out; all to the end that the complexion of the said senate might be changed as aforesaid.

Respondent further avers that after the failure of the said corporations, through their agents and representatives, to carry through the conspiracy to induce the legislature in its canvass of the votes for the office of governor as aforesaid, and the legislature had on the 7th day of January, 1905, canvassed said vote as by law required, and had declared the said Alva Adams governor of the state of Colorado, the said corporation did prevail upon and induce the said Peabody to nominate to the said senate, for its advice and consent, the said Luther M. Goddard and the said George W. Bailey, for the offices of justices of the supreme court, it being necessary, if the said nominations were to be confirmed by the senate, that the names should be sent in and the appointees confirmed before the said Adams was inaugurated governor, which, under the law, would occur on the 10th day of January, 1905. That it was well known to the said corporations that, should the said Goddard and Bailey not be confirmed before the said Alva Adams became governor, he, the said Adams, as governor, would immediately withdraw their said names from the consideration of the senate, and

would not renominate them.  That the said Peabody, recognizing the necessity for immediate action, did, on Saturday, the 7th day of January, A. D. 1905, in furtherance of the wishes aforesaid of the said corporations, and in compliance with his compact and agreement aforesaid, nominate to the senate, for its advice and consent, Luther M. Goddard and George W. Bailey, for such justices.  That the said The Colorado and Southern and The Denver and Rio Grande Railway Companies, through their representatives and agents, yet fearing the influence of the said The Denver City Tramway Company, and the other Denver utility corporations and natural persons over the said Luther M. Goddard as such judge, and fearing that said influence might be exerted over said Goddard, as judge, to their detriment and injury, withheld or withdrew their consent to the confirmation of the said Goddard, and did continue to so object, and, for a time, it appeared as though they would, through those in the senate who were influenced and controlled by them, prevent said Goddard from being nominated, and, with the inauguration of the said Adams as governor, prevent his selection and confirmation altogether.  That, by law, the said Adams was to be inaugurated the governor of the state at noon on Tuesday, the 10th day of January, A. D. 1905, and on the night of Sunday, January 8th, the said corporations, through their agents and representatives, did convene together in the city of Denver, to induce the said Colorado & Southern and Denver & Rio Grande Railway Companies, through their agents and representatives, to consent to withdraw their opposition to the confirmation of the said Goddard and consent to their friends in such senate acting favorably upon it; but, up to midnight of Sunday, January 8, the other corporations had not succeeded in changing the opposition

of the agents and representatives of the two railway companies, and, as a last resort, the agent and representative of the said Colorado & Southern Railway Company was induced to and did, after midnight on Sunday, the 8th day of January, and at about 1 o'clock in the morning of Monday, the 9th day of January, repair to the home of the said Luther M. Goddard, in a carriage, calling him out of his bed, having then and there such conversation with the said Goddard that the said railway corporations, through their agents and representatives, withdrew their opposition to his confirmation, and they did, on said morning, at about 3 o'clock thereof, announce to the remainder of the said corporations, through their said agents and representatives, that their opposition had been withdrawn, and, the withdrawal of the said opposition having been announced, the said senate of the fifteenth general assembly did, almost immediately on its convening on the morning of Monday, the 9th day of January, confirm the said nominations of the said Goddard and Bailey.

The respondent further avers that, although the said Goddard and Bailey could not enter upon the duties of their said offices of justices of the supreme court until, under the amendment of the constitution aforesaid, the 5th day of April following, they being in attendance at the state house and being informed of their said confirmation, did immediately repair to the office of Chief Justice Gabbert, in the said state house, and he, at their request, did immediately administer to them the oath provided for administration to the justices of the said supreme court.

And respondent further avers, on information and belief, that when it first became known to the said Peabody that the said corporations could not induce a sufficient number of Republican members of the legislature to reject and disregard a sufficient num-

ber of the returns from the several counties of the state to count out the said Adams as governor, and to count in the said Peabody, the said Peabody became very angry, and in his anger, refused for a time to nominate the said Goddard and Bailey for justices of the supreme court, or to nominate any justices, to the senate; whereupon the said corporations, through their said agents and representatives, did immediately call to the state house a number of other persons influential with the said Peabody, that they might induce the said Peabody to change his mind and send in said nominations in accordance with his agreement. That, on information and belief, respondent avers the said Chief Justice Gabbert and Mr. Justice Campbell did also repair to the governor's office on this occasion and did, with the others, urge the said Peabody to change his mind and nominate and to send in the names of the said Goddard and Bailey for confirmation as such justices.

And, upon information and belief, respondent avers that, in order to induce the said Peabody to comply with his agreement as aforesaid, the said corporations, through their agents and representatives, did assure the said Peabody, in substance, that should he so nominate the said Goddard and Bailey they would bear the expense of a contest by him against the said Adams, for the office of governor, before the state legislature, and they then and there assured him that they would see that he would be seated as the result of said contest, and, being so assured, and being importuned as aforesaid by those who came to the office of the governor for that purpose, and believing the pledges made to him, the said Peabody did send in the nominations of the said Goddard and Bailey, upon the said 7th day of January, 1905, and they were confirmed, under the

circumstances hereinbefore set forth, on the said 9th day of January.

That thereafter, and following the confirmation aforesaid, and the inauguration of the Honorable Alva Adams as governor, the said James H. Peabody did, as had been agreed upon, inaugurate a contest against the said Adams for the office of governor, and much evidence was taken, but respondent avers that so overwhelming was the proof in said contest that the said Peabody had been defeated and the said Adams elected, although the legislature as it had been constituted in manner aforesaid on joint ballot was at the time divided practically sixty-seven Republicans and thirty-one Democrats, it became manifest, on a count of the Republican members of the said legislature that enough would refuse to vote for Peabody to defeat him, and thereupon the corporations, through their agents and representatives, did meet together to adopt measures by which, notwithstanding the attitude of the Republican legislators who could not be induced to vote for said Peabody as against Adams, the said Adams should, in any event, be deposed from the office of governor. That said corporations were moved to this extraordinary and revolutionary procedure because, among other things, they feared that the said Adams would appoint two men to be justices of the supreme court whom they did not desire, they, fearing, as most of those believed who had given the subject investigation, that the said appointment and confirmation of the said Goddard and Bailey was not legal, and that the said Peabody had no authority whatever to appoint them or any others, as said justices. That the said corporations, so meeting for the purpose aforesaid, did, through their agents and representatives, invent and contrive the following infamous scheme to overcome the scruples of the Republican legisla-

tors who did not believe from the evidence that the said Peabody had been elected; that, if the said objecting Republican members of the legislature would vote to oust the said Adams and give the said office of governor to Peabody, the said Peabody would, before the vote, write out his resignation as governor, and place it in the hands of one W. S. Boynton, who would hold it and pledge himself in the most solemn manner to file it in the proper state office to make said resignation effective within twenty-four hours after the said Peabody should thus be made governor; and, further, that immediately after the vote should be had, ousting the said Adams as governor, the said Peabody would be sworn in as governor, and within twenty-four hours, said resignation having been filed, he would faithfully observe it, and a vacancy would thereby be created in the office of governor, and Jesse F. McDonald, who was a candidate on the same ticket as the said Peabody, for lieutenant governor, and who had been elected to such office, would immediately become governor and would be qualified and enter upon the duties of said office. That the said James H. Peabody at first refused to submit to the said scheme of fraud and outrage, and insisted that he should be either declared governor or that Adams should continue to be governor, but, on information and belief, this respondent avers that the said corporations, through their agents and representatives, did, by promises of material advantage to the said Peabody, if he would consent to the said scheme, and by threats if he did not, induce the said Peabody to consent to it; and respondent avers that the said Peabody did, before the vote on said contest for the office of governor, write out his resignation as governor of the state and did place it in the hands of the said Boynton, who had been selected by the said corporations to hold the same, under solemn

pledges made by said Boynton that he would file the same within twenty-four hours after the said Peabody had been inaugurated; and thereupon the said facts were communicated to the said objecting Republican members of the legislature, and shortly thereafter the final vote was had in the legislature, on the said contest, with the result that the said James H. Peabody was declared to have been elected governor and that Alva Adams had not been elected governor; and respondent avers that almost immediately after the said vote the said Peabody was sworn in as and became governor for the second time, and within twenty-four hours the said resignation was filed by the said Boynton, in accordance with the terms of the said conspiracy, and the said Jesse F. McDonald thereupon qualified for the office of governor and he became governor, and is yet the governor of the state of Colorado.

And respondent further avers that the general assembly of the state of Colorado, by act thereof, approved on the 18th day of March, 1901, caused to be submitted to the people of the state, at the general election held in the fall of 1902, an amendment to the constitution of the state, designated "Article XX." That by its terms, the said proposed amendment consolidated the city and county governments of the city of Denver and the county of Arapahoe, within the limits of the city of Denver, into one municipality, to be known as the city and county of Denver, and for the government of such consolidated city and county declared that the said territory and governments

"Are hereby consolidated and are hereby declared to be a single body corporate and politic, by the name of the city and county of Denver."

That the said amendment provided, among other things, that the qualified electors of such body politic

and corporate should, through a charter convention therein provided for, frame and adopt their own charter, and that the franchises belonging to the said city and county should not be conferred upon others unless by a direct vote of the people. It also provided for the amendment of the charter by popular vote, for the performance of the duties necessary for the proper government of said body politic and corporate, by a single set of officers, and otherwise it provided a full and perfect system of government for said new municipality, both in itself and through a charter to be adopted under its provisions. That the people of Colorado voted upon the said amendment at the said general election of 1902, and adopted the said amendment by a majority of thirty-four thousand votes and more.

That, in reference to the officers for said city and county of Denver, and their duties, the said amendment provided that

"The officers of the city and county of Denver shall be such as by appointment or election may be provided for by the charter, and the jurisdiction, terms of office, duties and qualifications of such officers shall be such as in the charter may be provided, but every charter shall designate the officers who shall respectively perform the acts and duties required of county officers to be done by the constitution or by the general law, so far as applicable."

That the said amendment further provided for a special election to be called within ten days after the adoption of the amendment, of twenty-one tax-payers to constitute a charter convention to frame a charter for the said city and county, in harmony with the amendment.

That the said amendment further provided that, upon the proclamation by the governor, announcing the adoption of the amendment,

"The city of Denver . * * * and that part of the county of Arapahoe within the boundaries of said city, shall merge into the city and county of Denver." And that

"The terms of office of all officers of the city of Denver * * * and of the county of Arapahoe shall terminate—except that the then mayor, auditor, engineer, council (which shall perform the duties of the board of county commissioners), police magistrate, chief of police and boards of the city of Denver, shall become respectively said officers of the city and county of Denver, and said engineer shall be *ex-officio* surveyor, and said chief of police shall be *ex-officio* sheriff of the city and county of Denver, and the then (judges of the district court, district attorney), clerk and *ex-officio* recorder, treasurer, assessor, coroner (and county judge) of the county of Arapahoe, and the justices of the peace and constables holding office within the city of Denver, shall become respectively the said officers of the city and county of Denver. * * * The foregoing officers shall hold said offices as above specified until their successors are duly elected and qualified as herein provided for. * * * "

That the proclamation of the governor was duly issued, announcing that the said amendment had been adopted, that an election was held, as in the amendment provided, for a charter convention; that the said convention adopted a charter which was duly submitted to the voters of said city and county, and was declared to have been duly ratified and adopted upon the 29th day of March, 1904; that shortly thereafter an election was held for officers under said charter, and those elected were duly qualified and entered upon the discharge of their duties, and continued to perform them until the happening of the things hereinafter set forth.

That at and before the adoption of the said amendment, one Charles S. Elder was treasurer of the county of Arapahoe, and one Paul J. Sours was treasurer of the city of Denver. That, upon the proclamation aforesaid being made, Paul J. Sours, declining to surrender the books, money, etc., that he held as the treasurer of the city of Denver, the said Charles S. Elder filed, in the supreme court of Colorado, his petition praying that the writ of mandamus issue commanding the said Sours to turn over to him, the said Elder, all the property, of every kind, in the hands of said Sours, belonging to the city of Denver. That the said Sours duly answered the said petition, setting up that he had been duly elected treasurer of the city of Denver; that he held property by virtue of said office; that the said Elder claimed the property under an alleged amendment to the constitution, known as article XX, and averring that the said amendment had not been properly submitted, etc. That the supreme court, by a majority of the then judges, Justices Gabbert and Steele (Chief Justice Campbell dissenting), held and adjudged that the said article XX had been duly and legally submitted and adopted, and that it thereby became and was a part of the constitution of the state, to be thereafter respected as such. That said suit was considered so important, in view of the questions involved, the convening of the charter convention and the inauguration of the new government of the city and county of Denver, that the court gave it almost immediate consideration, and did decide the same at an early day.

That, in deciding the said case, the supreme court expressly held and declared that the provisions in the amendment that "Every charter shall designate the officers who shall respectively perform the acts and duties required of county officers to be done

by the constitution or by the general law as far as applicable,'' completely contradicted the assumption of the attorneys for petitioner Sours that the amendment regarded such ''duties'' as being subject to local regulation and control. That the city and county of Denver could not, under the charter amendment, or by means of any charter it adopted, alter, amend or modify, in any way, the acts and duties required of county officers to be done, by the constitution or by the general laws, and that the said amendment required that the charter to be adopted should designate the officers to perform such duties.

That Mr. Justice Gabbert, concurring specially with the writer of the opinion of the court (Mr. Justice Steele), expressly declared, in his opinion, that ''All the objections raised to article XX, possessing any merit, involved the single one of whether or not this rule of law has been observed,'' that is, whether the procedure to be followed in amending the constitution had been observed, thereby brushing aside, as without merit, the claims of the attorneys for respondent Sours, that the part of the amendment last hereinbefore quoted, section 2 of the amendment, displaced and was intended to displace the constitution and the laws of the general assembly, within the limit of said city and county of Denver, and that it conferred upon said city and county authority, by its charter, to subject the duties imposed by the constitution and the general assembly upon state officers, to its regulation and control.

That Mr. Justice Gabbert further, in his opinion, did declare that, as to the other questions discussed by Mr. Justice Steele in the opinion of the court, which he had not touched upon, he ''agreed with his conclusions without attempting to discuss them with the exception of the one affecting the rights of the adjacent towns, which I do not think presents any

proposition which respondent could raise in these proceedings.''

That, in and by said decision and opinion, the said supreme court did solemnly adjudge and declare that the said section 2, of the said amendment, was lawful and effective, and further, that the provisions of the said amendment, hereinbefore quoted, which terminated the terms of office of all the officers of the county of Arapahoe, and of all officers of the city of Denver, except those specifically mentioned in said amendment, and that imposed the duties of county officers and of city officers whose terms were thus terminated upon those continued under the amendment, were lawful and effective and did not in any wise conflict with the constitution of the state or of the United States. But, acting upon such decision, the said supreme court did decree and order that the term of office of the said Sours as city treasurer had terminated, and that the said Elder was entitled to all the property held by him as city treasurer and that belonged to the said city of Denver, and thus, by the amendment and said decision, the officers of city and county treasurers became merged, the said county treasurer to perform all the duties of said treasurer until a charter was adopted that might otherwise provide.

And respondent avers that, almost immediately following the said decision, the following officers of the said county and of the said city did, after full consultation, recognize such to be the clear scope and meaning of the said decision, and held and considered their terms of office ended, and surrendered all the public property in their possession, as follows:

The board of county commissioners of Arapahoe county to the council of the city and county of Denver; David D. Seerie, sheriff, to Hamilton Armstrong, chief of police; Paul J. Sours, city treasurer,

22

to C. S. Elder, county treasurer; Harper M. Orahood, city attorney, to H. A. Lindsley, district attorney; John T. Bottom, county attorney, to H. A. Lindsley, district attorney; Frank Kratzer, city clerk, to Julius Aichele, county clerk and recorder.

And respondent further avers that a charter convention was duly elected under said amendment. That said convention framed a charter which, upon being submitted to the people, was declared to be rejected. That, thereafter, and as required by said amendment, another charter convention was duly elected, which proceeded to and did frame a charter, which charter, being submitted to the people, was ratified and approved on, to wit, the 29th day of March, 1904, as aforesaid. That, in and by said charter, it was provided, section 24, article III, that the executive power of the city and county shall be vested in a mayor, sheriff, treasurer, auditor, attorney, clerk, assessor, recorder, county superintendent of schools, and in the departments and commissions therein created. That, by section 40 of said article III, the recorder was designated as the officer who "shall perform the acts and duties now required or that may hereafter be required to be performed under and by the constitution and general laws of the state, by the *ex-officio* recorder of deeds, together with such other acts and duties as may be required by the charter and ordinances."

That, by section 42 of said article III, the sheriff was designated as the officer "who shall perform the acts and duties * * * as now required or that may hereafter be required of sheriffs, under and by virtue of the constitution and general laws of the state."

That, by section 44 of said article III, it was provided that "The coroner shall perform the duties of the office of coroner, as prescribed by the general

laws of the state, and such other duties not inconsistent with such laws, as the council may, by ordinance, prescribe.''

That, by sections 45 and 46, article III, the county superintendent of schools and the assessor were required, among other things, to perform the duties of said offices, respectively, as the said were prescribed for such officers by the general laws of the state.

That, by said charter, all duties imposed upon the boards of county commissioners, by the constitution and general laws of the state, were imposed upon, and were to be performed by, the council of the city and county of Denver.

That, in accordance with the letter and spirit of the said section 2 of said constitutional amendment, the said charter designated the officers who should respectively perform the acts and duties required of county officers to be done, by the constitution or by the general laws.

That said charter did further proceed, under the authority of said section 2, which authorized it to provide for ''the terms of office'' of such officers as it provided for, to fix the term of said sheriff, treasurer, assessor, recorder, coroner and county judges at four years, and did provide that such officers should be elected upon the 17th day of May, 1905, and every four years thereafter.

That, after the adoption of said charter, an election to fill the offices provided for therein, for which both Republican and Democratic parties nominated candidates for all the offices to be filled, was held in the city and county of Denver on, to wit, the 17th day of May, 1904, and among those declared elected at said election to fill the offices placed after their respective names, were the following:

Sheriff, Hamilton Armstrong, Democrat.

Treasurer, Charles S. Elder, Democrat.

Recorder, R. J. Byrne, Democrat.

Assessor, S. H. Alexander, Democrat.

Coroner, W. P. Horan, Democrat.

County judges, B. B. Lindsey and H. V. Johnson, Democrats.

Justices of the peace, W. A. Rice, W. F. Hynes, and B. F. Stapleton, Democrats.

Constables, Joseph Berger, M. E. Gary, and P. A. Reid, Democrats.

And upon, to wit, the 1st day of June, 1904, they, with the mayor and other city and county officials elected at the same time, were duly qualified and entered upon the discharge of the duties of the said offices. And respondent avers that the public generally, and both the Republican and Democratic parties of the state of Colorado, and of the city and county of Denver, and the press and the bar of the city and county of Denver, acquiesced, without dissent, to the construction placed upon the said charter by the supreme court, and for many months thereafter no move whatever was made to contest the right of those elected to fill said offices, so far as any ineligibility under the charter was concerned.

That, prior to the general election of the year 1904, to be held in November of that year, for national, state and county offices, the Republican party of the city and county of Denver met in convention, to nominate a legislative ticket, and a candidate for district attorney, and it nominated such candidates, but nominated none for county judge, sheriff, recorder, treasurer, assessor, coroner, county commissioners, justices of the peace or constables. That some question was raised in the said convention as to whether or not the said election for officers of the said city and county of Denver, in June, 1904, was

legal as to such offices as before the adoption of article XX had been county offices, and whether or not the said convention should nominate candidates for county offices of the city and county of Denver as a county, upon the theory that said election in the spring for such offices was not legal, and, while the said convention did not nominate candidates for any such offices, it did, before it adjourned, appoint a committee of seven of the leading Republican lawyers of the state of Colorado to examine into the question and determine and report upon it, at a later date; and thereupon the said convention adjourned. That the said committee immediately took up the question, and, after carefully investigating the said twentieth article and the said charter and the election held the previous spring thereunder, it made the following report to the Republican central committee:

"In the opinion of the legal committee, a convention should be called by you, or should reassemble, for the purpose of nominating a candidate for the office of county judge for the city and county of Denver, for the term commencing the second Tuesday of January, 1905, and ending the second Tuesday of January, 1909, to succeed the present incumbent, Hon. Ben. B. Lindsey. The legal committee also recommends that no further nomination be made by the convention. Yours respectfully."

And the same was signed by the said seven leading Republican lawyers, to wit, George W. Allen, Frank C. Goudy, J. G. Starkweather, H. M. Orahood, M. B. Carpenter, H. J. Hersey and G. C. Bartels. That this report was the equivalent to a declaration by the said seven leading Republican lawyers that the election for sheriff, assessor, treasurer and the other officers involved was a valid election under said article XX and charter, and that the said charter was

valid as to the election of said officers, their terms of office, and the date of their election, and that no vacancies would exist in such offices until the year 1908. That, following this opinion, the Republican committee reconvened the said Republican city and county convention and nominated Hon. Ben. B. Lindsey for county judge, then adjourned *sine die;* and that it was not until after the said Republican convention and the report of said committee, and its adjournment, that tickets were put in the field for such county offices.

And, on information and belief, respondent avers that after the adjournment of said convention, it was reported and was believed by the said Democratic city and county committee that the Republican committee would, at the last moment, and only in time for the filing of tickets, put a full ticket for such local offices in the field, and the said Democratic city and county committee, not having acted up to that time, did, having called their convention, put a ticket in the field, nominating for the several offices those who had been nominated and elected the previous spring. That the ticket was so nominated lest such a ticket might be nominated by the Republican committee at a time when it would be too late for the Democratic committee to nominate; the Democratic committee, in so doing, not believing that there was any question about the validity of the amendment and the charter and the election thereunder, but, as a measure of precaution, holding that to nominate such a ticket, whatever action might be taken or decision made, could work no harm, and the Republican committee did also thereafter put a ticket in the field for all such local offices. That, being so nominated, the several nominees on both tickets were voted for at the said general election of November, 1904, and that, as the result of said election and from the returns thereof

as the same were duly made out, certified and delivered to the said elections commission, the said Democratic nominees were elected by the following majorities:

Hamilton Armstrong, sheriff, by 896 majority.

S. H. Alexander, assessor, by 2,262 majority.

Charles S. Elder, treasurer, by 751 majority.

R. J. Byrne, recorder, by 614 majority.

W. P. Horan, coroner, 514 majority.

But these majorities were all overcome through the orders of the supreme court in the said injunction and contempt proceedings, directing and requiring the said elections commission to reject and hold for naught the abstracts of returns from the said several voting precincts of the city and county of Denver, hereinbefore specifically set forth.

Respondent further avers that the candidates nominated by the said Republican city and county committee, having been declared elected on the canvass of the votes by the said election commission, under the order and direction of the supreme court as aforesaid, they brought their suits in *quo warranto* in the district court in and for the city and county of Denver, against said Democratic officials who had been elected in the spring of 1904 as hereinbefore set forth, which said suits having been decided by the said district court, were taken, on writ of error, to the said supreme court, and the said supreme court did, on the 23d day of June, A. D. 1905, decide said causes and file its opinion therein, and did order judgments to be entered therein, by said judgments ousting the said Democratic officials and adjudging said Republican candidates to be entitled to the possession of said offices under and by virtue of said decisions and opinion, holding and adjudging in effect that so much of the said article XX, and of the said charter of the city and county of Denver, as

provided for the election of such county officers at any other time than at the general state election, and increasing their terms of office from two to four years, and imposing the duties of said county officers upon the persons and officers designated in the said charter, was unconstitutional, inoperative and void. That it was following the publication of the said opinion in said causes that the publications complained of in the information filed herein were made and the said cartoon published.

And respondent further avers that, in and by the opinion filed in the said last mentioned causes, the said supreme court did in effect hold and decide that it was not within the power of the people of the state of Colorado to devolve the duties of county officers upon any other than regular county officers, or to so amend the constitution of the state as to authorize a charter convention to impose the performance of the duties imposed by the constitution and laws upon county officers upon others than the said county officers; that the people could not so amend their constitution as to authorize the election of such officers at other times than those fixed for the general election of county officers throughout the state, in some particular portion of the state, as in the city and county of Denver, and that the people could not so amend their constitution as to increase the terms of office of county officers or those upon whom were imposed the duties of county officers, in some particularly designated counties or sections of the state, and that, because thereof, section 2 of article XX, insofar as it authorized the making of a charter that inceased the terms of county officers, if it did, or of those performing the duties imposed by the constitution and laws upon county officers, and providing for the election of such officers within the city and county of Denver at a different time than that fixed by the

pre-existing constitution and laws for the election of such general officers, was unconstitutional, unrepublican and void.

And respondent further says that it was upon that theory, and for those reasons, that the judgment of ouster was entered in the said causes, against the Democratic officials aforesaid, and their Republican opponents were awarded possession of said offices, and that the said court did thereby, in the opinion of this respondent, hold and declare that it was not within the power and province of the people of the state of Colorado to so amend the constitution of the state as to provide as was provided in the said amendment and the said charter made thereunder.

And respondent further avers that besides the decision in the said case of the people on the relation of *Charles S. Elder v. Paul J. Sours,* decided by the said supreme court as aforesaid, and before the judgment and filing of the opinion of the supreme court in the cases last aforesaid, the question of the said twentieth amendment had been before the United States circuit court for the district of Colorado, in the suit of Fred P. Watts, who was one of the county commissioners of the said county of Arapahoe at the time of the adoption of the said twentieth amendment against the said Charles S. Elder, who was treasurer of the said county of Arapahoe. That the said circuit court of the United States, through Marshall, judge, in passing upon substantially the same question which was involved in the cases as before mentioned, though it did not directly relate to terms of office nor the date of election, but to moneys in the possession of said Elder as treasurer of said county, in an opinion rendered in said cause, stated as follows:

"But it is claimed that article XX of the constitution is in conflict with the state constitution, and

with that of the United States. So far as its conflict with the state constitution is concerned, that has been passed upon by a decision of the supreme court of this state. It is true that the opinion has not been handed down, but the decision has been made, and the article must be taken by us as an integral part of the constitution of Colorado. As such part, it must be construed with other provisions of that constitution. If there be a conflict, it does not mean that article XX is not a part of that constitution, or is not itself valid, but that it to some extent alters a pre-existing constitution of Colorado. With respect to its being in conflict with the constitution of the United States, it is said that it in effect creates a state within the boundaries of another state. That contention we do not think well taken. It provides for the creation of a municipal corporation, resting eventually on the will of the people, established by the will of the people of the entire state of Colorado. That agency of the people is not superior to the creator. Established by the will of the people, it may be annulled by the will of the people of Colorado, evidenced by some future constitutional amendment. It is in no sense a sovereign corporation, because it rests on the will of the people of the entire state, and continues only so long as the people of the entire state desire it to so continue. That a state has the power to establish municipal corporations, changing their boundaries and annulling such corporations once established, is, of course, familiar law. Such municipal corporations are ordinarily created by act of the legislature, but a state may create such a corporation in the constitution itself, by a constitutional amendment, and such corporation may be abolished and changed in like manner. * * * There is nothing in the amendment itself, it seems to us, that either expressly or implied-

ly authorizes the institution of an unrepublican municipality."

And respondent further avers that it had been long before determined by the supreme court of the United States, in the case of *Missouri v. Lewis* (101 U. S. 31), Mr. Justice Bradley delivering the opinion, that it was within the power of the people of a state in framing or amending their constitution, to have two different systems of judicature for the two portions—trial by jury in one, for example, and not in another—clearly showing that it was not at all necessary that the same class of state or county officers should be provided for in all portions of a state, and that dates of election differing in different portions of the state for county officials, and different terms of office in different parts of the state for the same class of officials, were not inimical, in any sense, to a republican form of government. And respondent avers that the case referred to was placed before the said supreme court of the state of Colorado in the briefs filed by the attorneys for the Democratic officials, and that the following extract from said opinion by Mr. Justice Bradley was quoted in their printed arguments:

"Diversities which are allowable in different states are allowable in different parts of the same state. Where part of a state is thickly settled, and another part has but a few inhabitants, it may be desired to have different systems of judicature for the two portions—trial by jury in one, for example, and not in the other. Large cities may require a multiplication of courts, and a peculiar arrangement of jurisdictions. It would be an unfortunate restriction of the powers of the state government, if it could not in its own discretion provide for these various exigencies. If a Mexican state should be acquired by treaty, and added to another adjoining state or part

of a state in the United States, and the two should be erected into a new state, it cannot be doubted that such new state might allow the Mexican laws and judicature to remain unchanged in the one portion, and the common law and its corresponding judicature in the other portion. Such an arrangement would not be prohibited in any fair construction of the fourteenth amendment. * * * We might go still further and say, with undoubted truth, that there is nothing in the constitution to prevent any state from adopting any system of law or judicature it sees fit, for all or any part of its territory. If the state of New York, for example, should see fit to adopt the civil law and its methods of procedure, for New York and the surrounding counties, and the common law and its methods of procedure for the rest of the state, there is nothing in the constitution of the United States to prevent its so doing."

And respondent further avers that impressed as he has always been since giving public and legal questions his attention, that the power of the people of a state, in creating or amending their constitution, is practically unlimited, so that it is republican in form—that is, a government that the people in their sovereign capacity may in their fundamental law, change or modify at will—he was shocked with the announcement of the doctrine contained in the opinion rendered in the said county officers' cases, which seemed to him to be but carrying out of a policy to eliminate from the government of the city and county of Denver all Democratic officials, whether senators and representatives or local officers, who could be reached through decisions of the said supreme court, and so feeling and believing, he did in some of the articles of which complaint is made, express his astonishment and give his reasons for so doing.

And respondent further avers that the cartoon of which complaint is made in said information was intended to represent, as graphically as possible, the fact that the said supreme court, through a majority of the judges, had been engaged, for a long time, in judicially decapitating Democrats who had been elected to office, in manner and form as aforesaid, in the said city and county of Denver, and in the state of Colorado; and he avers that, had it not been for the aforesaid decisions, in connection with the issuing of the said injunction and in the said contempt proceedings, it would have been impossible for the legislature to have ousted Honorable Alva Adams from the office of governor, to which he had unquestionably been elected by the sovereign people of Colorado. That, when the said officials of the city and county of Denver were ousted from their said offices, in manner as hereinbefore set forth, there were ousted not only the officials themselves, but fifty or more officials employed by them under the law to enable them to carry out and perform the duties of said office, and that, having in mind the large number of official positions to be filled by the governor of this state, by depriving the said Alva Adams of the said office of governor, to which he had been elected, at least two hundred and fifty or three hundred Democrats who would have been appointed had been deprived of the positions to which they would have been entitled, and that, had it not been for the decisions of the said supreme court, in the said contempt proceedings, there would have been two Democratic judges upon the supreme bench, instead of the said Luther M. Goddard and George W. Bailey, and that, including the said judges, the said governor, the said senators and representatives, the said county officials, all of whom had been deprived of their said offices by the decisions of the su-

preme court, within a less period than one year, and all who were employed by said Democratic officials and those whom the Honorable Alva Adams would in all probability have appointed, the said supreme court had, directly and indirectly, deposed from the offices to which they had been elected and appointed, and who would have been appointed, not less, in respondent's opinion, than four hundred in all, and the said cartoon was composed and published for the purpose of bringing that extraordinary fact to the attention of the people of the state of Colorado, in as strong and graphic a way as it was in the power of respondent to do.

And respondent further avers that the said contempt proceedings against him were inaugurated in the following manner: After the publication of the said cartoon and articles, the said Chief Justice Gabbert and, on information and belief, the said Luther M. Goddard, did seek the chairman of the grievance committee of the State Bar Association and did request him to call together the said grievance committee and have the grievance committee recommend that proceedings in contempt be instituted against this respondent, by reason of and growing out of the publication of the said cartoon and articles, and he avers that the said method of initiating the said contempt proceedings was adopted that the said judges and a majority of the court might have whatever moral weight might be attached to the initiation of such proceedings on the recommendation of the grievance committee of the State Bar Association; and he avers that the said grievance committee was called together and the matters placed before said committee at the special request of the said Chief Justice Gabbert and, on information and belief, of the said Luther M. Goddard, and a resolution of the said committee, recommending investigation of said charges

in contempt proceedings, was adopted, under the foregoing circumstances, and notwithstanding the said request of said judges, the said committee desired the truth of the charges contained in said article to be investigated, and adopted the following resolution:

"The grievance committee of the Colorado Bar Association, having examined certain articles which have appeared during the current week in The Rocky Mountain News and Denver Times, tending to bring into disrespect the supreme court, or some of the judges thereof, in connection with the decision in the so-called county officers' cases, believes that some of said articles contain matters of sufficient importance to justify an inquiry by contempt proceedings against the person responsible for their publication."

And respondent further avers, on information and belief, that in all of the proceedings by and before the said supreme court, that have been hereinbefore in this answer set forth, until in April, 1905, when the said supreme court was, by the operation of the constitutional amendment relating to the supreme court hereinbefore referred to, enlarged, but three judges comprised said court, to wit, Chief Justice Gabbert, and Justices Campbell and Steele; that the said Mr. Justice Steele has, in practically every instance, dissented from the doings and decisions of the said court in the proceedings herein set forth; and that, since the said enlargement of the said court in the month of April, 1905, Mr. Justice Steele and Mr. Justice Gunter have almost invariably dissented from the actions and doings of the said court, in the said proceedings.

And respondent avers that it was, by reason of all of the doings and things hereinbefore set forth, that he did at the times mentioned in the said information, compose and cause to be published, or

approve the publication of the cartoon and the articles in the information complained of; and he says that all of the questions involved in the said proceedings are of the gravest and most momentous character, that they relate to and have involved in them the perpetuity of free government in the state of Colorado. That, believing, as he did, that the constitution and the laws of the state were made to be observed, not only by the people of the state at large, and by all state and county officers and judges of the district courts and judges of the lower courts, but also by the supreme court and the judges thereof, he did, to arouse the people of the state of Colorado to what he sincerely believed to be the menace to free government and the danger to the sanctity of the ballot and the encroachments that were being made upon their rights and powers in connnection with the government of the state, publish the cartoon and articles in said information complained of, to the end that a more sacred regard might be insisted upon by the people in their sovereign capacity from their public servants; and he denies that any of the said publications were made with any intention or expectation of influencing the said supreme court or any of its judges, either directly or indirectly, in any of the cases that are alleged to have been pending by the said information.

And respondent avers that, having in mind all of the matters and things hereinbefore set forth, he is not guilty of contempt of the supreme court or of any of its judges, but that he simply performed the duties which, as a journalist and the publisher of the papers aforesaid, he believed he owed to the public of the state of Colorado, and that he would have been derelict in his duty to the public had he refrained from comment as in said articles contained.

And respondent says: That said information and this prosecution against respondent is in violation of and contrary to section 10 of article XI of the constitution of the state of Colorado, providing that no law shall be passed impairing the freedom of speech, and that every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty; and that in all suits and prosecutions for libel, the truth thereof may be given in evidence, and the jury, under the directions of the court, shall determine the law and the fact: That said information, and this prosecution against respondent, is in violation of and contrary to section 7 of article XI of the constitution of the state of Colorado, and particularly that part of said section which provides that no warrant to seize any person shall issue without probable cause, supported by the oath or affirmation reduced to writing: That said information and this prosecution against respondent is in violation of and contrary to section 25 of article XI of the constitution of the state of Colorado, which provides that no person shall be deprived of life, liberty or property without due process of law: That said information and this prosecution against respondent is in violation of and contrary to the fourteenth amendment to the constitution of the United States, and particularly that part of said amendment which provides that no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor deprive any person of life, liberty or property, without due process of law, nor deny to any person the equal protection of the law. That said information does not contain or set forth facts sufficient to constitute or charge against this respondent the offense of contempt: That said information shows on its face that the respondent is not guilty of

contempt of the supreme court of Colorado or of any judge or judges of said court: That the said information on which the rule to show cause was issued was an unverified information: That no affidavit was made or filed or presented to the court at or prior to the filing of said information, and the making and issuance of the rule to show cause, and the rule to show cause, was, as is shown by the record, made and issued solely and alone upon and because of and was based solely upon the statements contained in said unverified information, and this court was and is, because of the matters and things aforesaid, without jurisdiction to order or issue said rules or to require respondent to answer or show cause therein. That the said information and the allegations and statements therein contained show that this court has no jurisdiction to cite respondent to show cause why he should not be punished for contempt.

That the common law has been adopted in this state only by virtue of express legislative act, and only to the extent suitable to our condition; that the growth of constitutional liberty has abolished arbitrary power of courts to inflict punishment and penalties upon persons commenting upon courts and judges or upon the character thereof, through contempt proceedings, and the right to make any such comment upon courts and judges, in any respect, and as fully and freely as may be desired, is a right of every person, and is a right reserved to the people without any express reservation, as provided in article XI, section 28, of the constitution of this state.

And the respondent avers that to state the truth is not and cannot be a criminal contempt of this honorable court, and he avers, upon information and belief, that the allegations and statements in the said published articles for which he is arraigned, omitting the innuendoes inserted therein, in the information,

by the attorney general, are true, and this respondent especially sets up and claims, under the constitution of the United States, and under the constitution and laws of the state of Colorado, the right and privilege of introducing witnesses to prove the truth of said allegations, averments and statements in the said published articles contained, and of the things set up herein as his justification and defense. All of which matters and things hereinabove contained this respondent stands ready to maintain and prove, and of this he puts himself upon the country.

WHEREFORE, respondent asks to be discharged from the rule heretofore issued in this cause, and respondent dismissed hence.

STATE OF COLORADO, CITY AND COUNTY OF DENVER, ss.

THOMAS M. PATTERSON, first being duly sworn, upon oath deposes: That he has read the foregoing answer and showing, and that he knows the contents thereof, and that the matters and things therein set forth are true to the best of his knowledge and belief.

THOMAS M. PATTERSON.

Subscribed and sworn to before me this 20th day of November, A. D. 1905.

My commission expires March 6th, 1907.

JOSEPHINE L. TAYLOR,
(SEAL)                                    Notary Public.

After the incoming of the answer the attorney general filed a motion, conceded to be, for judgment upon the pleadings. November 28, pursuant to this motion, the cause was heard upon the pleadings, that is, upon the information and the answer.

November 29, the court convened and announced its readiness to rule upon the motion, but observing the absence of respondent, notified his counsel that

he must be present at the ruling. Counsel for respondent informed the court that respondent to save technical rights was not present and would not be present without the issuance of an attachment. Thereupon the court ordered out an attachment returnable forthwith.

When the motions to quash the information and for judgment on the pleadings were heard, respondent was personally present.

At the incoming of the court upon the hour to which the attachment was returnable, respondent was personally present in pursuance thereof. Thereupon the court sustained the motion for judgment on the pleadings, and found thereon that respondent was guilty of contempt as charged. Whereupon the court inquired whether respondent had anything further to say why judgment should not be pronounced in accordance with the findings. Respondent then addressed the court; and reasserted the matter set up in the information, and in his answer, and stood upon the sufficiency of the answer as a defense. No request was made for leave to adduce evidence in mitigation. Judgment was then pronounced, declaring respondent guilty of contempt as charged, and imposing a fine in the sum of one thousand dollars ($1000), and ordering a committal until the payment thereof.

The publications charged in the information were made June 24, 26, 27, 28 and 30. June 23 the causes mentioned in the information as "county offices election cases" were decided by this court. Under a rule of court, petitions for rehearing were filed in the causes and undisposed of on the date of the last of said publications, June 30. Upon the petitions for rehearing the original judgments in all of said causes, save one, were materially modified. While such causes were before the court upon the

petitions for rehearing they were, as to the law of contempts, pending causes.—*Re Chadwick,* 109 Mich. 588.

Cause No. 4918, mentioned in the information as the "auditorium case," at the time of the publications had been argued and submitted and was then under consideration for final decision.

The motion for judgment upon the pleadings was discussed by counsel and considered by the court upon the express theory of counsel that the answer admitted the publications charged and set out as a defense thereto the truth of the statements contained in such publications. In the course of the argument, the attorney general said:

"The peculiarity of this answer, in my estimation, consists in averring the truth of the contents of the newspaper articles set out as a contempt."

In the argument of Mr. Thomas, of counsel for respondent, it was said:

"Here as there the respondent was forced to allege the truth of publication unless he were a mere slanderer, and even then any other course would have demonstrated his pusillanimity, so that whatever may be said of the legal effect of the answer, the fact is that in respect to the ruling to show cause the respondent has tendered his answer to the consideration of this court, and this answer is conceded to be a statement of the truth of the criticisms which have brought him to the bar of this tribunal."

While we do not concede that the allegations of fact made in the answer, if admitted, show or tend to show that the charges made in the publications against this court and certain of its judges are true, we shall accept for the purposes of this ruling the construction placed upon the answer by counsel, that is, that it set up the truth of the statements made in the publications. Upon the argument of the motion to

quash the information it was urged in support thereof that the absence of a verification to the information at the time of its filing was fatal to our jurisdiction, also that the publications did not constitute a contempt of this court. On the final hearing—that is, upon the hearing based upon the motion for judgment on the pleadings—it was contended that the truth of the matters contained in the publications was a complete defense to the charge of contempt based thereon.

We will follow the course of counsel and consider:

1. Whether the absence of a verification to the information was fatal to the jurisdiction of this court.

2. Whether the publications charged in the information constituted a contempt of this court.

3. Whether the truth of the matters contained in the publications was a justification of the contempt charged.

Let us consider the law pertinent to these questions as declared in the constitution, statutory law and decisions of the courts of last resort of this commonwealth.

In 1861, the legislature of the then territory of Colorado adopted the common law of England so far as applicable and of a general nature, and all acts and statutes of the British parliament passed in aid of the common law prior to the fourth year of James the First, which were of a general nature. Certain statutes were excepted not material to this ruling.— Laws '61, p. 35. This statute was repealed in 1868, and afterwards at the same session of the legislature re-enacted, and has ever since been in force in this commonwealth.—Mills' Ann. Stats., vol. 2, sec. 4184.

On July 1st, 1876, the constitution of this state was adopted, and by sections 1, 2 and 3 of article VI thereof this court was created. As has been seen, the common law by legislative enactment was then in force in this jurisdiction and had been so in force for fifteen years prior thereto.

. While the original thirteen states took the common law by inheritance and so held it at the time of the adoption of their constitutions, we took it by legislative enactment and so held it at the time of the adoption of our constitution. If when their courts came into existence by constitutional creation they took common-law powers as they concededly did by reason of the then presence of the common law in their respective jurisdictions, for the same reason when this court came into existence by constitutional creation it took common-law powers except where the constitution otherwise provided. This court is then a constitutional court with common-law powers. That the common law was in force, as we state, see *Herr v. Johnson,* 11 Colorado 393; *Chilcott v. Hart,* 23 Colorado 40; *Teller v. Hill,* 18 Colo. App. 509. There has been no change in the jurisdiction of the supreme court since the adoption of the constitution material to questions here involved. · The membership of the court was organized and existing under this amendment submitted by an act of the legislature of 1903, which amendment went into effect April 5, 1905. The court was organized and existing under this amendment at the time of the publications involved in the information herein.

In 1877, after, as seen, the adoption of the state constitution, the legislature of this state adopted the Code of Civil Procedure. In this code, in the chapter designated as "Contempts and Their Punishments" (Mills' Ann. Code, Revised Ed., 1905, chapter 30, p. 597), is found substantially all of our statu-

tory law on contempts. This chapter as it appears
in Mills' Ann. Code is not exactly as it was originally
enacted, but no change has been made therein so far
as it is pertinent to this ruling. As we understand
the law, and as we shall attempt to show it to be, the
facts charged in the information constitute criminal
contempt, that as to criminal contempt our Code of
Civil Procedure does not apply, and that as to crimi-
nal contempt the law of this jurisdiction is the com-
mon law. We shall further attempt to show that ac-
cording to the common law criminal contempt could
be proceeded against without a verified information,
and applied to this case, that the absence of a verifi-
cation to the information was not fatal to the juris-
diction, and further, that the truth of the matter con-
tained in the publications is no justification of the
acts of contempt charged. We shall further attempt
to show that such is, and for near a quarter of a cen-
tury has been, the law of this jurisdiction as unequiv-
ocally declared by this, its court of last resort. In
*Hughes v. The People,* 5 Colo. 436, decided at the
September term of this court, 1880, proceedings were
had in the county court in relation to the settlement
of an estate. From the determination of some issue
therein an appeal was taken to the district court,
which, upon the hearing, found that certain moneys
and other personal property of the estate were in the
possession of one Hughes and other persons named.
It was thereupon ordered by the district court that
such property be delivered to the administrator of
said estate. A citation issued from the county court
requiring Hughes and the other defendants to appear
in that court and show cause why they should not
comply with the order certified from the district
court. To this citation Hughes appeared by counsel
and filed a sworn answer and also an affidavit for a
change of venue, both of which papers contained

charges against the judicial conduct and integrity of the judge of said county court. Thereupon a writ of attachment issued against Hughes to bring him before said court to answer for a contempt in the use of the language so employed. To this writ Hughes filed his answer, containing *inter alia* the following:

"The defendant in this cause makes answer and alleges the truth of the allegations in his affidavit for a change of venue as is therein stated.   *   *   * That the facts set forth in said affidavit, the defendant believes, has reason to believe, and therefore charges the fact to be, are true in each and every particular; and the facts therein contained this defendant learned from (Names of certain persons are here stated)   *   *   *   *   *   * Defendant denies that he has intended to treat said county court contemptuously or insultingly, or put scandalous matters and facts in the court records, except so far as he has been advised by counsel, and verily believes, are matters relevant to the cause before the court, and are susceptible of proof."

The court without distinguishing between civil and criminal contempt holds that our civil code (above chapter), which enumerates certain acts and omissions as constituting contempt, is not a limitation upon "the inherent power of a court for its own preservation, and for that proper dignity of authority which is essential to the effective administration of law," to punish for contempt. It quotes approvingly the following language from *In re Woolley,* 11 Bush. 95:

"The right of self-preservation is an inherent right in the courts. It is not derived from the legislature and cannot be made to depend upon the legislative will. The power of the legislative department to interfere with the manner in which the judicial department shall protect itself against insults and

indignities is denied by the supreme court of Arkansas, *State v. Morrell*, 16 Arkansas 384, and doubted by the supreme court of the United States. *Ex parte* Robinson, 19 Wallace 510.''

The following is cited approvingly from Mr. Bishop in his work upon criminal law, vol. 2, sec. 252:

''There is no exact rule to define these contempts, but any disorderly conduct calculated to interrupt the proceedings; any disrespect or insolent behavior toward the judges presiding; any breach of order, decency, decorum, either by parties and persons connected with the tribunal, or by strangers present; or, *a fortiori*, any assault made in view of the court, is punishable in this summary manner.''

The following quotation from Charlton's case, 2 Mylne & Craig 316, is approved:

''Every writing, letter or publication which has for its object to divert the course of justice, is a contempt of the court.   *   *   * ' Every insult offered to a judge in the exercise of the duties of his office is a contempt.''

The following from *Commonwealth v. Dandridge*, 2 Va. Cases 408, is quoted approvingly:

''Every court of record has a right to punish contempts offered to it, by fine and imprisonment. This power is given by the courts, not for the private advantage of the judges who sit in them, but to preserve to them that regard and respect which, without such authority, is entirely lost among the people, and for this reason the power results from the first principle of judicial establishment, and must be an inseparable attendant upon every such tribunal.   *   *   * These contempts may be committed by speaking or writing contemptuously of the court or judges acting in their judicial capacity, or by saying or writing anything which is calculated to prejudice the public

mind respecting any suit depending in court or tending to scandalize the judge respecting his judicial acts or character."

The court, in speaking of the language used by Hughes in his answer to the citation, says:

"It implies judicial corruption and unjust oppression on the part of the judge presiding. It comes within the definitions of disrespectful, contumacious, insolent and contemptuous language and behavior toward the court, or judge thereof, respecting his official conduct. It was in the face of the court, and warranted the judge in taking cognizance of it summarily, as though the words, instead of being written and read in court, had been spoken in *faciae curiae* by the plaintiff in error appearing in his proper person."

The court further on considers quite briefly the effort of the defendant Hughes to prove the truth of the charges made in his answer to the original citation and in his affidavit for a change of venue, and in his answer to the contempt proceeding, one of which was bribery of the presiding judge. The court said:

"It is further assigned for error, that the court rejected testimony offered to prove the truth of the matter charged in the writings.

"After what we have already said, it is scarcely necessary to add that this assignment is untenable."

And the court further said: .

"Nor is the contempt purged by an avowal that no contempt was intended. The question of contempt does not depend on intention, although, where the contempt was intended, this is an aggravating feature, which goes to the gravamen of the offense."

The following is quoted from *Commonwealth v. Dandridge, supra:*

"Courts, their officers and process, are shielded from invasion and insult, not from any imaginary

sanctity in the institutions themselves, or the persons
of those who compose them, but solely for the purpose
of giving them their due weight and authority, and
to enable those who administer them to discharge
their functions with fidelity and effect.''

The judgment of the lower court pronouncing
the defendant guilty of contempt was upheld. This
case, which has been repeatedly referred to with ap-
proval by this court, and has never in any particular
been disapproved by this court, and which has been
repeatedly cited with approval in other jurisdictions,
announces that this court has inherent power to pun-
ish for contempt, that such power is beyond legisla-
tive control, as it is necessary to the existence of a
court created by the constitution. This case further
announces, which follows from what we have just
said, that the enumeration in our code of certain acts
and omissions as constituting contempt is not a limi-
tation upon what constitutes contempt. This deci-
sion further announces the law to be that those acts
which constitute contempt at common law as to pend-
ing causes still constitute contempt, and that this
court has the inherent power to punish such acts. The
court further holds the rule to be that the truth of the
matter charged as contemptuous is not justification
to the charge of contempt.

In this case the statute provided that upon affi-
davit showing that an order of the county court in a
probate matter was being disobeyed that an attach-
ment for contempt might issue. It was complained
that the absence of such affidavit was fatal to the
jurisdiction. No such affidavit was filed. The court
held that the affidavit was not necessary, saying:

''As to this prescribed manner of bringing to the
knowledge of the court information respecting such
possession of property of the estate, the statute is
directory, and such knowledge when derived by the

court by authority or equal dignity with such affidavit should be regarded as a sufficient warrant for the process of the court.''

In *Cooper v. The People,* 13 Colorado 337, decided 1889, Cooper, Stapleton and another were cited to show cause why they should not be punished for contempt on account of the publication in the Denver Republican of certain articles having reference to a cause pending in the district court of Arapahoe county. The proceeding was in such court and resulted in Cooper and Stapleton being adjudged guilty of contempt of court and sentenced to pay a fine. The judgment was before this court upon writ of error. The court said:

''They—the acts complained of as contemptuous—consist of the publication in a newspaper, of general circulation in the place where the court was being held, of such articles in reference to a cause pending as were calculated to interfere with the due administration of justice, as it is said. It is admitted that by the common law such acts were held to constitute a contempt of court; but respondents challenged the authority of the court, under our constitution and statutes, to punish as for a contempt any publication not made in the presence of the court, whatever be the language used.''

The section of the constitution relied upon therein was 10, article II, guaranteeing freedom of speech and of the press. The court quotes approvingly the following from *Myers v. The State,* 46 Ohio 473:

''The article was a libel upon the presiding judge, but that alone did not form the basis of the information; the intention of the publication was to insult and intimidate the judge, degrade the court, destroy its power and influence, and thus to bring it into contempt; to inflame the prejudices of the people against it; to lead them to believe that the trial then

being conducted was a farce and an outrage, which had its foundation in fraud and wrong on the part of the judge and other officers of the court, and, if communicated to the jury, to prejudice their minds and thus prevent a fair and impartial trial. Besides the tendency was, when read by the judge, to produce irritation and to a greater or less extent render him less capable of exercising a clear and impartial judgment. It therefore tended directly to obstruct the administration of justice in reference to the case on trial, and its publication was a contempt of court. The fact that before its publication a professional opinion was given that the publication would not be a contempt does not change the essential character of the defamatory article, nor relieve the respondent of the responsibility of its origin and dissemination."

The following from *State v. Frew*, 24 West Virginia 416, 466, was also quoted approvingly:

"In every aspect of the case the publication is clearly a contempt of this court. Can such a publication be palliated or excused? Far be it from us to take away the liberty of the press, or in the slightest degree to interfere with its rights. The good of society and of government demands that the largest liberty should be accorded the press, which is a power and an engine of great good; but the press itself will not for a moment tolerate such licentiousness as is exhibited in said editorial. The press is interested in the purity of the courts, and if it had no respect for the judges on the bench, it should respect the court; for when the judges now on the bench shall be remembered only in the decisions they have rendered, the court will still remain; it never dies; it is the people's court, and the press as the champion of the people's rights is interested in preserving the respect due to the court."

This court in *Cooper v. People, supra,* further says:

"At the time these decisions were rendered both Ohio and West Virginia had constitutional provisions similar to the provision of the Colorado constitution quoted, and in the Ohio case it does not appear that the provision was ever considered by court or counsel as forming any barrier to the punishment as for a contempt, while in the West Virginia case it was expressly determined that the conviction and punishment were in accordance with the constitution of that state. Judge Cooley, in speaking of the statutory provisions, says: 'We understand liberty of speech and of the press to imply not only liberty to publish but complete immunity from legal censure and punishment for the publication so long as it is not harmful in its character when *tested* by such standards as the law affords. For these standards we must look to the common-law rules which were enforced when the constitutional guaranties were established, and in reference to which they have been adopted. Turning to Blackstone as an authority, as to what acts constituted constructive contempts at common law, we find among those enumerated the following: ''By speaking or writing contemptuously of the court or judges acting in their judicial capacity; by printing false accounts (or even true ones without proper permission) of causes then depending in judgment, and by anything, in short, that demonstrates a gross want of that regard and respect which, when once courts of justice are deprived of their authority (so necessary for the good order of the kingdom), is entirely lost among the people.'' '—4 Blackstone Commentaries 285.''

The court expressly observes that it does not claim the power of the courts to punish for contempt is now as indefinitely broad as stated by Blackstone,

and says: "However, upon principle and authority we must hold that at common law superior courts of record have inherent power summarily to convict and punish as for a contempt of court those responsible for articles published in reference to a cause pending which are calculated to interfere with the due administration of justice; and that neither the statutes of this state, nor the constitutional provisions quoted, present any barrier to the exercise of such powers by the district courts of the state, but that such power is inherent in those courts."

The court, in summing up the contemptuous matter contained in the publication proceeded on, says:

"There can be no doubt that the tendency of the articles and cartoon exhibited in this affidavit, responsibility for which plaintiffs in error admit by their answer, was to prejudice the public as to the merits of a cause then pending and undisposed of; to degrade the court and judge before whom the same was pending and to impede, embarrass and defeat the administration of justice in reference thereto."

The court further says:

"Parties have a constitutional right to have their causes tried fairly in court by an impartial tribunal uninfluenced by newspaper dictation or popular clamor. What would become of this right if the press may use language in reference to a pending cause calculated to intimidate or unduly influence and control judicial action? Days, and sometimes weeks, are spent in endeavoring to secure an impartial jury for the trial of a case; and when selected it is incumbent upon the court to exercise the utmost care in excluding evidence of matters foreign to the issues involved, so that the minds of the jurors may not perchance be unduly biased or prejudiced in reference either to the litigants or to the matters upon trial; but if an editor,

a litigant, or those in sympathy with him should be permitted through the medium of the press by promises, threats, invectives, sarcasm or denunciation to influence the result of the trial, all the care taken in the selection of the jury, as well as the precaution used to confine their attention at the trial solely to the issues involved, will have been expended in vain."

The court sustained the judgment of the court below in finding the plaintiff in error guilty of contempt.

The case approves *Hughes v. The People, supra,* it reiterates the inherent power of the court to punish for contempt; it holds that the doctrine of constructive contempt exists in this jurisdiction, and that the newspaper publication involved in that proceeding is a constructive contempt within the contemplation of the laws of this commonwealth. And cases such as *State v. Morrill; State v. Frew; Sturoc's Case,* 48 New Hampshire 428; *Myers v. State, supra,* are upheld and the doctrine of constructive contempts is approved, and it is further expressly held that section 10, article II of our state constitution, guaranteeing freedom of speech, is no defense in proceedings for constructive contempt in newspaper publications; that such section of the constitution, and every other section of the constitution, leaves unimpaired the law of contempts as to pending causes as it existed at common law.

It may be observed that no distinction is drawn in this case between criminal contempt and civil contempt. There was no occasion for the court to consider such distinction.

In *Wyatt v. The People,* 17 Colorado 253, decided at the January term, 1902, the secretary of the state being absent, the duties of his position devolved upon one Wyatt, as deputy; as such deputy he had

control and the custody of certain state property. The grand jury of the criminal court of Arapahoe county demanded an inspection of the legislative halls, in which said property was stored, for the purpose of obtaining information pertinent to matters before that body. Wyatt refused the inspection. Upon showing made, an attachment for contempt issued. A motion to quash the writ was overruled, and an answer was filed. Upon the pleadings Wyatt was adjudged guilty of contempt, and upon error such judgment was reviewed. Wyatt was sentenced to both fine and imprisonment. The civil code as it then stood, in terms, limited the penalty to fine or imprisonment, forbidding the infliction of both as substantive punishment in the same case.

It was contended that the court exceeded its jurisdiction in pronouncing judgment. It was conceded by counsel for the people that if the code provision was applicable that the court did exceed its jurisdiction, and if so, the judgment should be reversed. The court said:

"The statute in question, as indicated, is a part of the civil code. This act is by its title expressly limited to procedure in civil actions. The inhibition of section 21, article V of the constitution, against embodying in acts subjects not clearly expressed by the title, forbids legislation in this act relating to criminal offenses or procedure. If, therefore, Wyatt's alleged contempt be criminal, the provision in question is not applicable, and the judgment before us is valid since it would have been proper at the common law. * * * But while the apparent conflict of views cannot in all cases be reconciled, much of the inconsistency disappears if contempts be regarded as civil or criminal, according to their nature and effect. This distinction is substantially recognized by Sir William Blackstone, and may now be regarded as grafted

upon the ancient law touching these offenses. Mr.
Rapalje, in his work on 'Contempts,' at section 21,
gives the best general definitions relating thereto we
have found. He says: 'Civil contempts are those
*quasi* contempts which consist in failing to do some-
thing which the contemnor is ordered by the court to
do for the benefit or advantage of another party to
the proceeding before the court; while criminal con-
tempts are all those acts in disrespect of the court or
its process, or which obstruct the administration of
justice, or tend to bring the court into disrepute.' To
the former class of contempts belong such acts as the
disobedience of an injunction issued at the suit of a
private party; incidentally the court may vindicate
its authority, but the individual alone is interested
in the enforcement of the order and usually institutes
the contempt proceeding; formerly the process
whereby courts of chancery enforced all their decrees
was in form and in name an attachment for con-
tempt. To the latter class of contempts belong such
acts as misconduct by attorneys, or other officers, dis-
obedience of subpœnas or other process, disturbance
or insolent behavior in the presence or immediate
vicinity of the court, and the like.  *  *  *  Regard-
ing a large proportion of the contempts of court as
constituting criminal offenses, we do not decide that
the summary proceeding by attachment is unconsti-
tutional. It is true that section 8 of the Bill of
Rights, after providing that felonies shall be pro-
ceeded against by indictment, declares that 'in all
other cases offenses shall be prosecuted criminally
by indictment or information.' And sections 16 and
23 of the same article guarantee a trial by jury in
criminal prosecutions. But these constitutional pro-
visions do not relate to contempt proceedings. Nor
is the summary manner of punishing contempts in-
imical to section 25 of the Bill of Rights, which says

that no one shall be deprived of 'liberty' without 'due process of law' * * * The exercise of this power by summary attachment proceedings is as old as the common law; it antedates in the common law all constitutions and all statutes, even that of Magna Charta. * * * But if the proceeding for contempt could only be instituted by indictment or information, and if the accused were entitled to a trial by jury, it is obvious that great difficulty and delay would be occasioned in the transaction of ordinary judicial business, and the wise purpose of the power would in many instances be defeated.

The framers of our constitution never intended to thus interfere with the due and orderly administration of justice. It was not their purpose to have the procedure designated in the sections mentioned cover contempts of court, and thus give this class of offenses a *status theretofore unknown in either the statutory or the common law.* The constitutional guaranties apply to such acts as constitute *violation of public and general laws. They leave contempts, which are simply acts in disobedience of judicial mandates or process, or which tend to* obstruct the dignified and effective administration of justice, *to be dealt with in the summary manner theretofore universally followed.*"

The court then rules that the contempt charged constituted criminal contempt and says:

"It follows that the judgment pronounced was controlled by the common law, and not by the code provisions. We do not accept the suggestion that courts under like circumstances will, in criminal offenses of this kind, adopt by analogy the penalty provided by statute for civil contempts."

This was the first occasion when this court made a distinction between criminal and civil contempts, and ruled that the procedure for criminal contempts

was according to the course of the common law, while for civil contempts the procedure was as provided by the civil code.

Pertinent to what we have just said is the following observation of the court:

"It cannot be denied that there has been a seeming inconsistency in the practice of our courts whereby acts recognized in *Teller v. The People,* 7 Colo. 451, as criminal have been adjudicated under a chapter relating exclusively to civil cases."

The court then proceeds to consider whether the affidavit which was the basis for the attachment for contempt charged facts sufficient to constitute contempt against the defendant. The question that the court considers is not whether the information filed in the court as a basis for the attachment should have been verified, but whether or not it stated facts sufficient to constitute a contempt of court. It held that it did not do so, not because the court could not punish for constructive contempt, but for certain facts omitted from the information not material to this ruling. As for example an order of the court requiring the grand jury to make the inspection refused by the respondent. The court then considers the question as to whether the missing matter is supplied by the answer, and while not holding whether it could or could not be so supplied, held that the information was not aided in such particular by the answer. To sum up, the court approves the doctrine as to the inherent power of the court to punish for contempt as ruled in *Hughes v. The People,* also *Cooper v. People.* It approves the power of the court to punish for constructive contempt as announced in *Cooper v. The People,* and approves the doctrine as laid down in such two Colorado cases, and by Judge Cooley (Cooley's "Constitutional Limitations," page 390, note 3) that the guaranties provided by our constitu-

tion apply only to such acts as constitute violations of public and general laws and leave contempts to be dealt with in the manner universally followed before the adoption of our constitution, and that it was not the purpose of the framers of our constitution to give this class of offenses—contempts—a status theretofore unknown in either the statutory or common law. The only new point ruled in the case not covered by our previous decisions was that the chapter on contempts in our Code of Civil Procedure was not applicable to criminal contempts, and that criminal contempts must be proceeded against as provided at the common law. The opinion further observes, as we have shown, that our court in previous decisions had not kept clear the distinction between criminal contempts and civil contempts.

It may be well here to take up and consider *Thomas v. The People*, 14 Colorado 254. There Thomas filed a petition for a change of venue, alleging prejudice on the part of the judge. The court, after reading the petition, upon its own motion caused an order to be entered appointing a committee to inquire into the matters alleged in the petition, and to take such action thereon as it might deem proper. The committee was not required to take the oath of office. The committee reported that after a consideration of the matter stated in the affidavit for change of venue and other evidence adduced, the statements made in the affidavit were recklessly made, and without sufficient inquiry as to their truth, and that Thomas and other parties causing the affidavit to be filed were in contempt of court. It required other matter than the facts set up in the affidavit and petition for change of venue in order to constitute a contempt; in other words, the affidavit and petition were not contemptuous *per se;* the district attorney thereupon filed an unverified information charging con-

tempt. A warrant of attachment issued. Thomas filed a motion to quash the information and warrant, and as one ground therefor, that the information was not verified. This motion was overruled and the answer came in. Upon the information and answer the defendant was adjudged guilty of contempt and fined. The judgment was reviewed here on error. A brief was filed in this court by the plaintiff in error, but none on the part of the people. The point was made here that the proceeding was regulated by the code of civil procedure, and particularly as to the verification of the information by section 348 of such code, which expressly provides, that where the contempt is not committed in the immediate view and presence of the court, an affidavit shall be presented containing a statement of the facts constituting the contempt. Because such section of the code was not observed the judgment of the lower court was reversed. The gist of the holding was, that the procedure for contempt was regulated by the civil code; that the civil code permitted the contempt charged to be proceeded upon only upon a verified information; that the information was not verified; that the code in this particular was not observed, therefore that the court never acquired jurisdiction, and for such want of jurisdiction the judgment was a nullity. Neither counsel nor the court made a distinction between criminal contempts and civil contempts, nor was the point made that the contempt in that case was a criminal contempt, therefore not regulated by the code. The holding of the court that a contempt of the particular character there charged should be proceeded against under the code, and that the validity of the procedure was determined by the code, is clearly overruled by the case we have just considered of *Wyatt v. The People*, which holds, as we have seen, that if the contempt is a criminal contempt, to which

class the contempt in *Thomas v. The People* belonged, it should be proceeded against according to the common law and not by our code of civil procedure. It is not necessary for us to differ with the conclusion of the court that a civil contempt must be proceeded against according to the code. *Thomas v. The People,* therefore, cannot be considered as an authority for procedure in the matter of criminal contempts.

It may be well to consider here, out of its chronological order, *Bloom v. The People,* 23 Colorado 416, decided in 1897, because of its bearing on the question of criminal contempt, and because of its reaffirming the law in reference thereto as laid down in *Wyatt v. The People, supra.* There an information was filed in the lower court charging the defendant, Bloom, with constructive contempt for articles published by him in his newspaper impeaching the integrity of the court of the twelfth judicial district and its judge, with reference to pending causes, and tending to bring said court and judge into disrepute. The defendant appeared and filed his application for a change of venue. This was denied. A sworn answer was then filed. The court upon the pleadings, to wit, the information and the answer, adjudged the defendant guilty of contempt and sentenced him to the county jail for thirty days. The judgment below was affirmed, this court *inter alia* saying:

"Every legal proposition involved in this case has been determined against the plaintiff in error by previous decisions of this court."

The court first considered whether the matter set out in the information constituted a contempt of court. The court held that the articles set out in the information were contemptuous *per se,* and said:

"To publish of a judge that his decisions in a case pending are influenced by political or money

considerations, certainly would tend to bring him into disrepute, and to embarrass him in future decisions in the case and have a tendency to interfere with the administration of justice therein.   *   *   *   To any fair and candid mind it must be evident that, in making these publications, the defendant's object was to insult the court and to degrade the judge in the eyes of the community.   They naturally tended to impede the due administration of justice in impending causes.   They conclusively establish that defendant was guilty of constructive contempt.''

The court, after holding that the language contained in the newspaper publications as shown in the information was contemptuous *per se,* and after holding that the answer admitted the matter so charged, held that the facts set out in the answer tended to scandalize and insult the judge and constituted a direct contempt for which summary punishment might have been inflicted.   The court then holds, for reasons not material to this ruling, that the lower court committed no error in declining to hear evidence.   The last question considered is the contention of counsel that the judgment imposed by the lower court (imprisonment) was a nullity, because not authorized by the civil code.   His contention was that the civil code regulated the procedure, and that in the judgment the civil code was not observed.   The civil code at that time provided for only a fine in cases of contempt.   The judgment was imprisonment. The court held the facts charged to constitute criminal contempt; that the procedure for its punishment was not regulated by the code, but by the common law, and that the common law permitted imprisonment.   No new questions were decided in this case; the doctrines of inherent power, constructive contempts, criminal contempts, and procedure in criminal contempts according to the course of the com-

mon law and not by the code were adhered to and reannounced.

In the recent case of *Naturita C. & R. Co. v. People*, 30 Colo. 407, the distinction is recognized between civil contempts and criminal contempts.

*People v. Stapleton*, 18 Colo. 568, decided in 1893, was an original proceeding in this court for contempt. A petition was filed charging the respondents, the editor and manager of the Denver Republican, with the publication in their newspaper of certain articles containing charges against the honesty and integrity of this court, and tending to intimidate, influence and coerce the judges thereof, and to embarrass them in the administration of justice in a then pending case. Upon the presentation of such petition a rule was entered requiring respondents to appear and show cause why they should not be punished for contempt. No new question was decided in the case. The court adhered to the law of constructive contempts as announced in the cases above cited, and which had so long obtained in this jurisdiction. In the course of its opinion it said:

"Judges are human; they are possessed of human feelings; and when accusations are publicly made, as by a newspaper article, charging them directly or indirectly with dishonorable conduct in a cause pending before them and about to be determined, it is idle to say that they need not be embarrassed in their consideration and determination of such cause; they will inevitably suffer more or less embarrassment in the discharge of their duties according to the nature of the charges and the source from which such charges emanate.

When a judge tries and determines a cause in connection with which public charges against his judicial integrity have been published, the public as well as parties interested are frequently led by the

publication of the charges to distrust the honesty and impartiality of the decision; and thus confidence in the administration of justice is impaired. It is not only important that the trial of causes shall be impartial, and that the decisions of the courts shall be just, but it is important that causes shall be tried and judgments rendered without bias, prejudice, or improper influence of any kind. It is not merely a private wrong against the rights of litigants and against the judges: it is a public wrong—a crime against the state—to undertake by libel or slander to impair confidence in the administration of justice. That a party does not succeed in such undertaking, lessens his offense only in degree. * * * It is unnecessary to enter into a lengthy discussion of the law relating to newspaper interference with the administration of justice. In the case of *Cooper et al. v. The People,* 13 Colo. 337, the law upon that subject was very fully considered and explicitly declared. The case of *Hughes v. The People,* 5 Colo. 436, is also a valuable decision upon a similar subject. In the argument of this case, nothing essentially new has been presented. In fact, upon oral argument, the law as declared by the former decisions of this court was not seriously controverted, except upon a single point, which will be briefly noticed. * * * Counsel for respondent in last cited case says: He intended to concede then (in *Cooper v. The People, supra,* in which he appeared for respondent), as he concedes now, that the jurisdiction to punish for contempt is inherent in superior courts of record, and that such power is essential to their existence and to the maintenance of their authority; that such power existed at common law, and is not essentially abridged by the constitution of this state; but that while he concedes the existence of such power, he nevertheless insists that such power is subject to legislative control, and that such power

has been limited to such causes of contempt as are specified in the code of civil procedure.

We are glad to note this explicit statement of the learned counsel's position. Though he may have been misunderstood by the writer of the separate opinion in the former case, his views in respect to the effect of the code were not misunderstood nor overlooked. In the leading opinion, delivered by Mr. Justice Hayt, and concurred in by the whole court, the effect of the code provisions was considered and passed upon. Reference was made to the opinion of *Hughes v. The People,* 5 Colo. 436-446, where it was held, as early as 1880, that 'The right of self-protection is inherent in the courts; the power to punish for contempt is an incident to all courts, independent of statutory provisions.' In the *Hughes case* also, this court, speaking by Mr. Justice Stone, Chief Justice Elbert concurring, Mr. Justice Beck not sitting, said: 'Such a statutory enumeration of causes as is found in our code, when applied to the ever-varying facts and circumstances out of which questions of contempt arise, cannot be taken as the arbitrary measure and limit of the inherent power of a court for its own preservation, and for that proper dignity of authority which is essential to the effective administration of the law. The *Hughes case* was based upon the code of 1877. Chapter 30 of the present code is, however, a substantial re-enactment of the former provisions relating to contempt proceedings. These provisions were re-enacted more than six years after the announcement of the decision in the *Hughes case.* Thus by a well-known rule of statutory construction it must be presumed that the legislature had knowledge of and were satisfied with the construction given to such provisions, and so re-enacted them without change.—*Harvey v. Travelers' Ins. Co.,* 18 Colo. 354. Moreover, neither in the code

of 1877 nor in the present code are there any nega-
tive or other qualifying words limiting contempts to
such causes as are therein specified.''

We might here observe that the last citations are
introduced to show how steadily this court has ad-
hered to the doctrines announced in *Hughes v. The
People,* and *Cooper v. People,* hereinbefore cited.
We do not desire to intimate by the excerpt from
*People v. Stapleton* that it would be competent for
the legislature to limit the power of courts, created
by the constitution, in reference to either civil or
criminal contempt. As we have stated, there is noth-
ing new ruled in the case of *People v. Stapleton.*

The foregoing cases constitute all the cases ruled
by this court, or our court of appeals, pertinent to
the questions now before us, or that would in any
way aid us in their solution.

These cases render *stare decisis* the questions
involved in this case. They have settled:

1. That the doctrine of criminal constructive
contempts as to pending causes obtains in this juris-
diction as at common law.

2. That the procedure in this state as to criminal
constructive contempts is regulated by the common
law and not by our code of civil procedure, and that
there has been no attempt by our legislature to pro-
vide a procedure as to criminal contempts, or to
define that offense. In saying that the legislature
has not attempted to provide a procedure as to crimi-
nal contempts, or to define that offense, we do not
desire to be understood as intimating that such power
is in the legislature. We simply say there has been
no effectual attempt by the general assembly to so
legislate.

3. That our state constitution leaves the status
of contempts as to pending causes as it was at the
common law, therefore unimpaired as to procedure,

or as to what constitutes contempt, or as to the defense to contempts by the constitutional provisions, as to freedom of speech, section 10, article II; prosecution of offenses by indictment or information, section 8, article II; due process of law, section 25, article II; warrants of arrest, section 7, article II.

4. That newspaper publications of the character set out in the information constituted criminal constructive contempt at common law, and are such in this jurisdiction.

5. That the gist of the offense of criminal constructive contempt by a defamatory newspaper article is the publication, the intent of the publisher, and the truth of the matter contained in the publication being no defense to the charge of contempt based thereon.

6. That the power to punish for criminal constructive contempt as to pending causes is inherent in this court.

### ONE.

Was the absence of a verification to the information, setting out the facts constituting the contempt, and initiating this proceeding, fatal to our jurisdiction? Let us again refer to the facts, and apply thereto the law:

June 30th the *ex officio* information of the attorney general was filed. In unmistakable terms it stated the facts constituting the offense charged against the respondent, and which he was called upon to answer. Upon the same date a simple citation issued, to which was attached a copy of the information. Upon the same date, copy of the citation and information was personally served upon the respondent in the city of Denver. He was thus clearly advised of the charge preferred against him. This citation was returnable October 23d, and required him

to show cause.  He thus had near three months' personal notice of the charge he was called upon to answer.  Under the authorities the office of the citation was to bring him into court.  He came into court by his motion to quash the citation and dismiss the information.  His appearance was a general one, because his motion assigned among other grounds that the information did not state facts sufficient to constitute the charge of contempt.  His motion went to the merits.  When this motion was overruled, he answered, admitting the facts charged.  Not until after the filing of the answer admitting the publication was an attachment issued.  In what possible particular was the respondent prejudiced by the absence of a verification to the information?  The procedure could not have been at all different had the information been verified.  He was as fully advised of the matter he was called upon to answer as he would have been had the information been verified.  He was not placed under arrest.  He had all the opportunities to make defense that he would have had had the information been verified.

"The proceeding is one conducted on behalf of the public, to maintain the dignity of the court and the public respect, without which courts are useless; and upon a review of such proceedings the appellate court will not be ready to reverse the proceedings taken by a court to preserve its self-respect and maintain its dignity, unless it pretty clearly appears that injustice has been done, or the rules of law promulgated for the protection of the liberty of the citizen have plainly been violated."—*People v. Court of Sessions,* 31 N. Y. Supplement 375.

Respondent in the last of the articles avowed his responsibility for their publication.  That the respondent sustained no prejudice from the procedure is conclusively evidenced by the answer he filed, and

by which, in the presence of the court, committed a direct contempt in reiterating the contempts charged in the information.

No constitutional right of the respondent was invaded in issuing the citation upon an unverified information, because, as has been seen, our constitution does not cover the offense of contempt, but leaves this violation of the law—as to what constitutes contempts, and its defenses, and the procedure for its punishment—as it was at common law. To repeat a citation above made:

"The constitutional guaranties apply to such acts as constitute violations of public and general laws. They leave contempts, which are simply acts in disobedience of judicial mandates or process, or which tend to obstruct the dignified and effective administration of justice, to be dealt with in the summary manner theretofore universally followed."— *Wyatt v. The People, supra,* 260; *Cooper v. People, supra,* 360; *People v. Stapleton, supra,* 568; Cooley's Const. Lim., p. 390, note 3.

No statutory right of the respondent was violated in proceeding on an unverified information, because, as we have seen, the offense charged was a criminal contempt, and we have no statute defining criminal contempts, or providing the procedure for their punishment.—*Wyatt v. People, supra,* 257; *Bloom v. People, supra,* 424.

No common-law right of the respondent was violated, because, as will be seen by the authorities hereinafter cited, it was permissible at common law to initiate this proceeding upon an unverified information.

This court has no power to compel the verification of an information for contempt.—*People v. Court of Sessions, supra.* To hold the verification of the information essential would be to deprive this

court of the power in many cases to punish for criminal constructive contempts, which power, as we have seen, has been by our decisions declared to be inherent and essential to the existence of the court. The fact that the proceeding may result in a fine or imprisonment furnishes no sufficient reason why the information should be verified. There are certain actions in tort where the proceeding may result in the seizure and imprisonment of the body of the defendant, yet it has never been contended that the complaint initiating the action must be verified. ·

As we have seen, our decisions have settled the question that the procedure as to criminal constructive contempts is with us as at common law. The following decisions from the courts of other jurisdictions, proceeding as to criminal constructive contempts according to the course of the common law, show that the absence of a verification to an information for criminal constructive contempt is not fatal to jurisdiction.

In *State v. Morrill*, 16 Ark. 384, the charge was for constructive criminal contempt in the publication of an article charging corruption in the court in the consideration of a certain cause. The action of the court was initiated by a letter from a member of the bar of that court addressed to one of its judges, calling attention to an article in a certain newspaper purporting to be published by the defendant. The author of the communication accompanied it by a copy of the newspaper, giving it as his opinion that the court ought to take some notice of the publication, and stating that his position as a member of the bar seemed to require at his hands an expression of the opinion entertained by him, that the dignity and usefulness of the court would be upheld and not impaired by making an example of the offensive publication. The court says:

"The publication thus having been brought directly to the notice of the court, by a member of the bar, expressing that interest in the preservation of public respect for the decisions of a tribunal of final resort which the worthier members of the profession, as well as all orderly and law-abiding citizens, usually manifest, the court concluded that it was due to the honor and dignity of the state, and its own usefulness, not to pass the matter by without some official action, but to institute an inquiry whether its constitutional privileges had not been invaded by the publication aforesaid. Accordingly an order was made reciting the publication and directing that the defendant be summoned to appear before the court, at its present term, to show cause why proceedings should not be had against him as for criminal contempt."

Upon the proceeding thus initiated upon a letter of a member of the bar, accompanied by a copy of a newspaper containing the contemptuous matter, the defendant was found guilty.

In *State v. Frew, supra,* the contemptuous matter was contained in a newspaper publication, which was called to the attention of the court through a letter of a member of the bar, a copy of the newspaper publication being attached to such communication. The court thereupon issued a rule upon the defendants to show cause why an attachment should not issue against them for contempt.

It was insisted by the defendants that the absence of a verification to the information upon which the court issued its rule was fatal to its jurisdiction. In its opinion by Johnson, president, the court said:

"It is claimed in the answer that the proceedings in this case are irregular, that the rule is too vague and ought only to have issued upon affidavit. There is no sufficient irregularity in the proceedings here that would justify the court in discharging the rule,

as clearly appears by the opinion of Brother Snyder, which merits my approval.''

In the opinion of Snyder, judge, referred to in the excerpt, the question of the absence of a verification to the writing or information upon which the contempt proceedings were initiated, the court said:

''The procedure in cases of this character is various in different jurisdictions, and the discretion of the presiding judge is so broad even in inferior courts that it will seldom be revised by the appellate court.''—*Androscoggin R. R. Co.* v. *Androscoggin,* 49 Me. 392; *Bates' case,* 55 N. H. 326.

In *Dandridge's case,* 2 Va. Cas. 408, decided in 1824, the general court, after a very full and able review of the law on the subject, both upon reason and authority, decided that ''an attachment for contempt has no other object than to bring the party into the court. When the contempt is in open court, the party being present, there is no need of any process to bring him in, nor any need of interrogatories to ascertain what has occurred in open court. * * * When the contempt is not in open court, the usual course is to issue a rule to show cause why an attachment should not issue, though the attachment sometimes issued without the rule. If the party appear to the rule to show cause, and instead of moving to discharge it, submit to answer interrogatories, there is no necessity for the attachment. The court also held that if, before the rule issued, the party appeared in court and a rule was made upon him to show cause, and he was recognized to appear on the next day, 'the rule for an attachment, as well as the attachment itself, may be dispensed with.' ''

The court, after citing *Moore's case,* 63 N. C. 397, making quotations from it and expressing its approval of the doctrine therein announced, says:

"Many other authorities might be produced to show that the judges may, not only in cases of contempt in the face of the court, but in cases of constructive contempt, upon their own motion and without affidavit or other sworn statement, award rules against the offenders. In direct contempts it is almost uniformly the practice for the judge to act on his own information. He acts upon the evidence of his own senses. And in the case of constructive contempts, if he has the same kind of evidence, he is equally at liberty to act upon it. In some cases the character of the offense may be more complicated and less susceptible of furnishing such proof of its existence as will authorize the court to act upon it. In such cases a sworn statement is necessary and should always be required as the foundation of the rule. But a publication in a newspaper is not of that class, and especially is such the case when the publication charged as the contempt is an editorial article in a newspaper published in the very city or town in which the court is at the time being held. Such a publication furnishes not only evidence of its character, but the paper in which it is published furnishes the names of the publishers. Such was the nature of the offense charged in this case, and the rule might with entire propriety, and no doubt would, have been awarded by the court on its information had not its action been anticipated by the counsel in the case to which the objectionable publication had reference."

The court, after quoting with approval *The State v. Morrill,* says:

"But if there could be any question about the legality and sufficiency of the rule in this case, the respondents, by submitting to answer and admitting the facts necessary to support the attachment, thereby waived all preliminary objections. It would certainly have been utterly useless if not absurd for the

court, after the respondents had fully answered and admitted all the facts to make out the offense, to award a rule, as it could have done at once, requiring them to admit the facts a second time. Under the circumstances I am clearly of opinion that the objections to the rule and mode of procedure are plainly untenable."

The court, in speaking of *Dandridge's case, supra,* says:

"This decision was made in 1824, by a unanimous court composed of some of the most eminent and conservative judges that ever adorned the bench of Virginia."

In *Moore's case,* 63 N. C. 397, an article appeared in the daily newspaper containing contemptuous matter reflecting upon the supreme court of North Carolina. It does not appear in what manner the publication was called to the attention of the court. The rule was issued to the defendants to show cause why they should not be punished for contempt. The objection was made that the information upon which the court acted was unsupported by affidavit. The court said:

"The other objection—that the rule was made without affidavit or other legal proof of the facts upon which it was based—is equally untenable. It is admitted that where the proof is furnished by the senses of the judges, it may be acted on. Here there was no such proof. We knew by our senses that a newspaper containing the paper referred to, purporting to be signed by Mr. Moore and others, had been extensively circulated and was then in the court room; and the want of a disavowal on his part, that he had signed the paper, or consented to its publication, furnished *prima facie* proof, not sufficient for final action, but all sufficient as ground for the rule. On his appearance he was at liberty to deny the fact with-

out an oath, and the denial, like the plea 'not guilty,' would simply have put the fact in issue; and he would have been entitled to have the rule discharged, unless the fact was proved by direct testimony. Instead of that, he admits the fact. So this is no legitimate ground of complaint. In short, all the preliminary objections were waived, and the reference to them can answer no useful purpose.''

See also *In re Deaton,* 105 N. C. 59, 64. There the distinction is made as in the Colorado cases between criminal contempt and civil contempt, it being held that their civil code applies only to civil contempts, and that in criminal contempt the procedure is not required to be upon affidavit.

In *Telegram Newspaper Company v. Commonwealth,* 172 Mass. 294, 70 A. S. R. 280, 284, summons was issued by the court of its own motion and without complaint made, to show cause why the respondent should not be adjudged in contempt. The court affirmed the judgment below holding the respondent in contempt, and in the course of its ruling said:

''When it comes in any manner to the knowledge of the presiding justice of a court that articles are published in a newspaper circulated in the place where the court is held which are calculated to prevent a fair trial of a cause then on trial before the court, the court, of its own motion, can institute proceedings for contempt. Such a power in the court is necessary for its own protection against an improper interference with the due administration of justice, and it is not dependent upon the complaint of any of the parties litigant. If the publication amounts to a contempt of court, because it interferes with the due administration of justice in a cause before the court, the contempt is analogous to a contempt committed in the presence of the court. The proceedings in the present cases after the service of process show that

the plaintiffs in error were specifically informed of the nature of the charge against them, and were given a full opportunity to be heard with the aid of counsel.''

To the same effect *People v. Court of Sessions, supra,* and authorities there cited. See also *State v. Shepherd,* 177 Mo. 205.

Other authorities might be cited. Upon reason and authority we conclude that the absence of a verification to the information was not fatal to our jurisdiction.

## TWO.

Did the publication of the newspaper articles set out in the information constitute contempt of this court? The articles did not require the aid of innuendoes to their understanding. In unmistakable terms they charged this court, and certain of its judges, with having been influenced by corrupt motives in their rulings theretofore made in pending causes, and that they would be so influenced in the final disposition of the same. Such articles further charged that such motives would operate on the court in its final decision of a pending cause—the auditorium case—in which no action had as yet been taken by the court. The articles appeared in newspapers published in this city, which newspapers are of great influence and wide circulation. Respondent, a member of the bar, a citizen holding the high position of a United States senator, and possessing great influence, declares in the last of the contemptuous articles his responsibility for them. The articles charge the court with being corrupt, and hold it up to public contempt. This with reference to pending causes. There can be no doubt but that the articles tend to degrade the court in the eyes of the public, impair its authority, and embarrass it in the disposition of pending business.

Under the long-settled law of this jurisdiction, as has been seen from the decisions of this court heretofore reviewed, the publications charged, constitute criminal constructive contempt, and the doctrine of criminal constructive contempt obtains in this commonwealth. We repeat from citations heretofore made:

"Criminal contempts are all those acts in disrespect of the court or its process, or which obstruct the administration of justice, or tend to bring the court into disrepute."—*Wyatt v. The People, supra,* 258.

"Constructive contempts, *i e.,* such as are committed outside of the view and presence of the court or judge at chambers. They consist of the publication in a newspaper, of general circulation in the place where the court was being held, of such articles in reference to a cause pending as were calculated to interfere with the administration of justice, as it is said. It is admitted that by the common law such acts were held to constitute a contempt of court."—*Cooper v. The People,* 13 Colo. 337, 356; *People v. Stapleton,* 18 Colo. 568; *Bloom v. The People,* 23 Colo. 416.

The weight of authority sustains the law as so announced by this court.—*State v. Morrill, supra; State v. Frew, supra; Myers v. State, supra; Sturoc's Case,* 48 N. H. 428; 7 American and Eng. Ency. of Law (2d ed., 59) and many cases there cited; *State v. Shepherd, supra.*

### THREE.

Was the truth of the allegations made in the newspaper publications a defense to the information charging such publications as contemptuous?

"The inquiry is limited to the issues, incidental or collateral questions cannot be considered or deter-

mined. Thus where the alleged contempt consists in the failure to comply with the terms of a court order or decree, inquiry into the merits of the order or decree will not be allowed.''—9 Encyclopedia of Law and Procedure, 47.

The gist of the offense of constructive contempt by a newspaper publication is that the matter published tends to hold the court and its judges up to public contempt, and to embarrass them in the consideration of a pending cause. The vital question is, does the language used, as ordinarily and fairly construed, tend to degrade the court and its judges, and embarrass them in the consideration of a pending cause? We repeat, the vital issue is, was there such a publication? If there was, the offense is made out. If there was not, the charge must fall. It does not disprove such publication to show that the matter therein contained was true or false. It does not disprove such publication to show that there was no intent to commit a contempt, hence the absence of intent is no defense to the charge of contempt.— *Hughes v. People, supra; Cooper v. People, supra; Bloom v. People, supra.*

"As regards the question whether a contempt has or has not been committed does not depend upon the intention of the party, but upon *the act he has done.*''—Taney, C. J., *Wartman v. Wartman,* Taney 362, 370; In *Cartwright's case,* 114 Mass. 230; *People v. Stapleton, supra,* 580; *Telegram Newspaper Company v. Commonwealth, supra.*

It does not disprove the charge of contempt to show that the court was not affected by the contemptuous language.—*People v. Stapleton, supra,* 580. No one would contend that contempt in attempting to corrupt a juror could be disproved or successfully defended against by showing that the juror was not

influenced by the attempt to corrupt him.—*People v. Stapleton,* 580. An immoral or blasphemous publication is a crime. The offense consists in the publication of such matter, and it is entirely immaterial whether the matter published is true or false. So it is with a publication amounting to constructive contempt.

It is contended that section 10 of article II of our constitution providing for freedom of speech, and that in actions for libel "the truth thereof may be given in evidence," authorizes the truth of the matter published to be pleaded and proven as a defense to the charge of contempt based thereon, but as we have seen from authorities above cited it is, and for years has been, *stare decisis* in this jurisdiction that the offense of contempt is not within this section of our constitution.

If the doctrine contended for be applicable to constructive contempts it would also be to direct contempts, yet we do not think it would be contended that it extends to direct contempts.

*State v. Shepherd, supra,* has been cited as *contra* our conclusion. The question is not presented by the answer of the respondent in that case, nor is its sufficiency as a defense considered or passed upon by the court. No case has been found which sustains or tends to sustain the contention of counsel.

We are clearly of the opinion that a verification of the information in this case was not essential to our jurisdiction; that the doctrine of criminal constructive contempts obtains in this jurisdiction, and that the respondent is guilty of criminal constructive contempt as charged in the information.

In so ruling we have but applied the law, as this court has long since and repeatedly declared it to be, to the admitted facts of this case.

Mr. JUSTICE STEELE, dissenting:

The court has punished the respondent for a mere libel, under a proceeding for contempt; and has held that the truth is not a justification, and that, when the truth is pleaded as a justification, the pleading of it is a direct contempt and as such is punishable summarily. To do this it was necessary for the court to set aside acts of the legislature and to hold that that section of the Bill of Rights which declares, that "every person shall be free to speak, write or publish *whatever he will on any subject,* being responsible for all abuse of that liberty; and that in all suits and prosecutions for libel, the truth thereof may be given in evidence, and the jury, under the direction of the court, shall determine the law and the fact," is inapplicable. As I am of opinion that it is not a crime in this state to speak, write, or publish the truth of or concerning the official conduct of public officers, I must dissent from the judgment.

The respondent's purpose in publishing the articles complained of is briefly stated in his reply to the question by the chief justice whether he had anything further to say why the judgment of the court should not be pronounced. He said:

"I feel, if your honors please, that, without having the slightest idea what punishment the court will inflict, under the circumstances of this very peculiar case I should say something why I should not be punished for contempt.

"Certain articles were published in The News and The Times for which the writing or publication, or both, I was and am responsible.

"The chief justice, in his own way, saw fit to initiate contempt proceedings by reason of these articles, and as a result of his steps the attorney

general filed this information commanding that I should show cause why I should not be punished for contempt, the allegations in the information being that these articles were contemptuous of the supreme court and certain of its judges.

"This court can rest assured that when that information and citation were served upon me I was confronted with perhaps as serious a situation as I have ever been face to face with in all the years of my manhood. I have felt, if the court pleases, the importance of maintaining the honor and dignity, not only of this court, but of minor courts, as keenly and as sincerely as any other citizen of the commonwealth; and one of the most gratifying episodes in my life was when Mr. Justice Campbell, now upon the bench to try me, but a few years ago commended me in the warmest terms for the respect I had always shown to courts with which he was associated, whether sitting as a *nisi prius* judge or as a member of this great body.

"I want to say to the court that I realize as keenly as any man in the United States the importance of an unsullied judiciary, and the importance of that judiciary ever maintaining the respect and the confidence of the people, for, if all else fails, it may be that the people of this country must depend upon the justice, the integrity and the patriotic spirit of our highest courts to preserve the liberties of the country.

"But, if your honors please, I have always felt that there should be reciprocity between courts and the people. While the courts should receive the respect and confidence of the people, there is a duty devolving upon the courts to ever maintain the law and the integrity of the constitution, and to keep within the limits prescribed by the constitution and laws of the state and the country; and in every one

of their judgments, as their consciences tell them, to do the very right, and nothing but the right. If these relations exist between the people and the bar upon the one side, and the courts of the country upon the other, there will be little need of contempt proceedings, and there will be little provocation for criticism either of the courts, or by the courts, of the public press.

"So far as these articles are concerned, I want to say that I never wrote or published articles in my life the justice of which I was more sincerely convinced of; not only convinced of the justice was I, but of the necessity for their publication, and when this citation was served upon me, as I said, I was confronted with the most serious situation in which I had ever found myself in all of either my public or my private life. From all the information I could obtain after careful investigation—from those whose word could not be doubted—I felt that whatever was in those articles was justified, and the question was then up to me: Shall I, to escape the wrath of the court, say that I have been a slanderer, a libeler? Shall I proclaim to the public that I am infamous, in that I falsely charge the supreme court of my state with such things as are supposed to be contained in those articles? Or should I do what any true man ought to do, firmly believing that he spoke the truth, say, that he had spoken the truth and offer to establish the verity of the articles?

"That, may it please the court, was the reason for the answer I filed.

"The attorney general tells the court that this court should not for a moment sit to investigate charges against its membership. I can only say, if your honors please, that is the most stupendous indictment that can be framed against this whole doctrine of constructive contempt; or, has it come to this

in the United States, that the publisher of a newspaper, because men are judges, may not speak the truth of them as to their official actions, except at the peril of confinement in the common jail, the payment of heavy monetary penalties, or both?

"I realize, if your honors please, that, so far as the legislature of this state is concerned, it has done everything in its power to change that condition. It has declared what shall be contempt, and has omitted everything with reference to constructive contempt; therefore, so far as the legislature is concerned, it has eliminated proceedings in constructive contempt from the powers of the court. The legislature has further provided for answers in contempt proceedings, for investigations, for juries, has fixed a limit to the power of the court in assessing punishments for contempts; and, if constructive contempt is to be maintained, as it has been maintained by this court, it can simply mean—and I speak it in a thoroughly impersonal way so far as the membership of this court is concerned, I speak it as though I were addressing an impartial jury with no duty devolving upon its membership except to find and declare the truth—if this is to be maintained, it simply means that we have in each of the states of this Union a chosen body of men who may commit any crime; who may falsify justice; who may defy constitutions and spit upon laws, and yet no man dare make known the fact.

"So far as I am concerned, if the court please, I am unwilling to be bound by such a system, and, therefore, if no other result is to come from these proceedings beyond my own punishment, than the arousing of the public to the danger of such a power in the hands of any body of men, a great good will have been accomplished; more, perhaps, than is necessary to compensate for what I may suffer; and

I only desire to say, further, before I sit down, that no matter what penalty the court may inflict, from this time forward I will devote myself—by constitutional amendment if necessary, and by the decisions of the court it has become necessary—to deprive every man and every body of men of such tyrannical power, of such unjust and dangerous prerogative, of the ability to say to publishers of newspapers: 'While about everybody else you may speak the truth, no matter what our offenses may be, you speak the truth with the open door of the jail staring you in the face, or the depletion of what you may possess of this world's goods, and probably of both.'

"If the court pleases, I am now ready to receive the judgment of the court."

The opinion of my brother Gunter, which, I am pleased to note, is based upon the doctrine of *stare decisis,* rather than his own opinion, declares: First, That an affidavit is not essential to the jurisdiction of the court in cases of constructive contempt; Second, That the offense of constructive contempt was committed by the respondent by publishing the articles set out in the information, and that a direct contempt was committed by filing the answer; Third, That it is immaterial whether the articles or the averments of the answer were true or false.

I shall discuss these matters in their order, and shall endeavor to demonstrate that the court, instead of announcing the law applicable to the conditions of the people and the institutions of this country, has revived the oppressive and tyrannical doctrines of the star chamber. In no case found in the Colorado reports was the proceeding begun without affidavit; and in every one, as I read them, where the subject is mentioned, it is stated that an affidavit is essential to the jurisdiction of the court. The attorney general appears to have regarded an affidavit as necessary;

for, before the return day of the order to show cause, he, under leave of court, attached his verification to the information. This of course did not cure the defect, if any existed; for, if an affidavit is essential to give the court jurisdiction, it must be filed as the initial step in the proceedings. The opinion correctly states that up to the time of the decision in *People v. Wyatt*, 17 Colo. 252, there appears to have been no distinction made in the opinions between civil and criminal contempts; but I do not agree with the court in its statement that the case of *Thomas v. The People*, 14 Colo. 254, which holds that an affidavit is essential to the jurisdiction, has been overruled by the decision in the *Wyatt case*. The holding that an affidavit is essential has been expressly affirmed; and in the *Wyatt case* it is held that an affidavit is required by the common law. The court says, in the *Wyatt case*:

"Constructive contempts—those not committed in the presence of the court—must of course in some regular and legitimate way be brought to the court's knowledge; until this is done the process of attachment will not issue. * * * And in *Gandy v. The State, supra*, it is said that such proceedings must be commenced by a sworn information. But the practice generally recognized throughout the United States, and according to Blackstone frequently followed in England, is for some proper official or interested party to set forth by *affidavit* the material facts relied on. A little contrariety of opinion exists as to whether the warrant of commitment or the order of court must recite the jurisdictional facts. But the overwhelming weight of authority in this country sustains the proposition that the affidavit upon which the proceeding for a constructive contempt is based must state facts which, if established, would constitute the offense; and that if the allega-

tions of the affidavit are not sufficient in this respect, the court is without jurisdiction to proceed. Rapalje on Contempts, secs. 93, 94, and cases cited; *Mullin v The People, supra; Thomas v. The People, supra; Cooper v. The People, supra; Wilson v. The Territory,* 1 Wyo. 155; *Ex parte Peck,* 3 Blatch. (C. C.) 113; *McConnell v. The State,* 46 Ind. 98; *Phillips v. Welch,* 12 Nev. 158; *Gandy v. State, supra; Batchelder v. More,* 43 Cal. 412. Some of the opinions above cited refer the authority for the affidavit to statutes similar to section 322 of our civil code. But the statute mentioned and others of like tenor are simply declaratory in this particular of what may fairly be termed the modern common-law practice. And the rule concerning the materiality of the affidavit should prevail to the same extent in the absence of statute. * * * ·

"The position of those authorities which hold that where the contempt is constructive the affidavit must show the offense, commends itself with irresistible force. A proper regard for the liberty of the citizen forbids the arrest of parties upon criminal attachment charged with this kind of contempts, without information under oath touching the precise character of the alleged offenses."

Wyatt was discharged for the reason that the court was without jurisdiction. This although the judgment of the court recited the fact essential to jurisdiction, the affidavit failing to set forth such fact. This does not appear to overrule the case of *Thomas v. The People,* but appears to approve it. The case is cited with approval, and holds, as does the *Wyatt case,* that unless an affidavit showing facts constituting contempt is presented, the court is without jurisdiction; and the practice of instituting the proceeding by affidavit in cases of contempt not com-

mitted in the court's presence has been invariably followed in this jurisdiction.

In reviewing the *Wyatt case,* the court says:

"The question that the court considers is not whether the information filed in the court as a basis for the attachment should have been verified, but whether or not it stated facts sufficient to constitute a contempt of court. It held that it did not do so, not because the court could not punish for constructive contempt, but for certain facts omitted from the information not material to this ruling. As for example an order of the court requiring the grand jury to make the inspection refused by the respondent. The court then considers the question as to whether the missing matter is supplied by the answer, and while not holding whether it could or could not be so supplied, held that the information was not aided in such particular by the answer."

The proceeding was commenced by affidavit, not by information. The court, of course, did not hold that the *information* must be verified; but it did hold that the overwhelming weight of authority sustains the position that the *affidavit* must state facts which, if established, would constitute the offense. It also holds that the principle generally recognized throughout the United States is for some proper official or interested party to set forth by *affidavit* the material facts relied upon; and the word "affidavit" is italicized. Mr. Justice Helm, writing the opinion, says:

"It is not necessary to consider whether this jurisdictional defect could be waived, or could be cured by answer or other subsequent proceeding; for certain it is that such waiver or correction did not take place. The judgment, it is true, says that an order of court was disobeyed, and also that the grand jury was investigating a criminal offense. But this judgment was rendered upon the pleadings wherein

no such order or its disobedience was alleged or admitted. * * * There is absolutely nothing in the record, save the judgment, intimating the existence of this order. To say that such recitals in the judgment are sufficient, would be to nullify all attempts by appellate tribunals to inquire into the jurisdiction of the court pronouncing the same. It would be to make that court the sole arbiter as to what does or does not constitute a contempt, and render the judgment itself conclusive of this jurisdictional question.''

This decision, it seems to me, does not sustain the contention of the court that it is not necessary that an affidavit be presented, but clearly says that an affidavit must be presented, and that unless an affidavit is presented the court is without jurisdiction.

As a reason for holding that an affidavit is not necessary, the court says: ''This court has no power to compel the verification of an information for contempt—*People v. Court of Sessions, supra.* To hold the verification of the information essential would be to deprive this court of the power in many cases to punish for criminal constructive contempts, which power, as we have seen, has been by our decisions declared to be inherent and essential to the existence of the court.''

This means that there may be times when no one—the ever-vigilant counsel, the ethical bar association, the zealous friend, or the officer designated by law to represent the authority of the state—would be willing—because no contempt had in fact been committed, because it would escape attention, or because the criticism was truthful and just—to initiate proceedings in contempt, and that the court should therefore have power to proceed; that whenever no one else is willing to maintain the dignity and honor of the court in this manner that it is essen-

tial that the court itself should have the power to act.
It is difficult to conceive of a case in which there
would not be some one willing and anxious to become
the court's champion—although, in this instance, the
court proceeded upon its own motion; and it would
seem to be wise for the court to ignore publications
or speeches charging its members with corruption
and political intrigue.    In the case reported in 46
Kan. 613, the court, in discussing this branch of the
subject, uses this language:

"And a careful examination of the authorities
satisfies us that in all cases of constructive contempt,
whether the process of arrest issues in the first in-
stance, or a rule to show cause is served, a prelimin-
ary affidavit or information must be filed in the court
before the process can issue.    This is necessary to
bring the matter to the attention of the court, since
the court cannot take judicial notice of an offense out
of court and beyond its power of observation.    There
are a few cases in the books where the courts have
taken notice of constructive contempts, and issued
process without any affidavit or information having
been filed to bring the subject-matter of the con-
tempt to the attention of the court; but such cases
are very rare in this country, and the practice is
nearly or quite obsolete.    The great weight of author-
ity is certainly opposed to such practice.    Courts
should never be required to go about looking for
contempts of their authority.    To do so is sufficient
to lower their dignity and bring them into con-
tempt."

The court, in the *Stapleton case,* was careful to
say:

"This proceeding was not instituted or insti-
gated by this court of its own motion.    A party whose
cause was pending in this court presented his sworn
petition complaining of the articles published by

respondents, and praying protection from such assaults pending the consideration and determination of his cause. We were thus bound to take cognizance of his petition or give some reason for refusing so to do. If we refused, what reason could we give? Could we say to petitioner: 'You are a convicted criminal, and, therefore, you have no rights which this court is bound to respect'?   *   *   *

"It is true, this court could have disposed of the petition in this case, by quietly declining to take cognizance of it. Only petitioner, his counsel, and a few of their confidential friends, perhaps, would have known of our refusal. But we should always have been conscious that we had been wanting in courage to meet a disagreeable issue; and that we had declined to hear a suitor because he was under the ban of a public newspaper's displeasure. The only just and honorable way, therefore, was to take jurisdiction of the proceedings, and require respondents to show cause, if any they had, why they had thus deliberately and repeatedly assailed the honesty and integrity of this court in and about petitioner's cause."

The court has not only taken unto itself a power which most of the courts of the country do not regard as essential, but it has added another section to the enumeration of powers heretofore taken by the court, so that it is now essential to the very existence of the court that, in the event no one else is willing to take the initiative, it may proceed of its own motion to attach and punish those who incur its displeasure. In its struggle for existence, its necessities would seem to be without limit. To assert that such a power is necessary is the assertion of weakness, and inability to otherwise maintain dignity and the respect of the people. Of course, it is not essential to the existence of the court, notwithstanding the assertion

to the contrary.   If it is essential to the existence
of the court, how does it happen that only a very few
of the courts of the country have taken this power;
that none of the federal courts could take it if they
would; and that the supreme court of the United
States has never regarded such a power as essential
to its existence?   What the court really means is this:
not that it is essential, but that it is convenient.   That,
as the respondent made charges against the court
which it did not relish (there being no one who would
voluntarily present the matter), it was essential to
the court's convenience and satisfaction that it should
proceed *sua sponte*.

The respondent's plea to the jurisdiction is said
to be a general appearance, and it is held that by
filing his plea he waived the right to question the
jurisdiction.   The respondent, even if it be conceded
that by moving to quash the information he entered
a general appearance, could not confer jurisdiction
upon the court except of his person.   But, according
to the authorities, the court has no jurisdiction of
the subject-matter unless an affidavit is presented setting
forth the facts constituting the alleged contempt;
and it will not be seriously contended that jurisdiction
of the subject-matter can be conferred by waiver
or consent.   The subject under discussion has no very
important bearing upon the case at bar; for the court
might have sustained the motion to quash and granted
leave to refile, and ordered respondent to answer by
the return day of the order to show cause.   I dissent
from the order overruling the motion, not so much
because the respondent's rights and privileges have
been infringed, as upon the ground that the court
has, in my judgment, changed the practice that has
always prevailed in this jurisdiction.

The following citations clearly declare that, unless
the cause is pending and the articles are calcu-

lated and intended to influence the court in its de-
cision, the court is without authority to punish for
contempt.   They not only bear upon the very subject
under consideration, but discuss generally the whole
matter, including the liberty of the printing press
and the freedom of speech, and I quote at length from
them because they seem to controvert every conclu-
sion reached by the court.

In the case of *Stuart v. The People,* 3 Scammon
395, after quoting from several authorities upon the
subject of constructive contempt, Mr. Justice Breese
said:

"Into this vortex of constructive contempts, have
been drawn, by the British courts, many acts which
have no tendency to obstruct the administration of
justice, but rather to wound the feelings, or offend
the personal dignity of the judge, and fines imposed,
and imprisonment denounced, so frequently, and
with so little question, as to have ripened, in the
estimation of many, into a common-law principle;
and it is urged, that inasmuch as the common law is
in force here, by legislative enactment, this principle
is also in force.   But we have said, in several cases,
that such portions only of the common law as are
applicable to our institutions, and suited to the genius
of our people, can be regarded as in force.   It has
been modified by the prevalence of free principles,
and the general improvements of society, and whilst
we admire it as a system, having no blind devotion
for its errors and defects, we cannot but hope, that in
the progress of time, it will receive many more im-
provements, and be relieved from most of its blem-
ishes.    Constitutional provisions are much safer
guaranties for civil liberty and personal rights than
those of the common law, however much they may
be said to protect them.

"Our constitution has provided that the printing presses shall be free to every person who may undertake to examine the proceedings of any and every department of the government, and he may publish the truth, if the matter published is proper for public information, and the free communication of thoughts and opinions is encouraged.

*   *   * "The right to punish for contempts committed in the presence of the court is acknowledged by our statute; and while it affirms a principle that is inherent in all courts of justice, to defend itself when attacked, as the individual man has a right to do for his own preservation, it may also, with great propriety, be regarded as a limitation upon the power of the courts to punish for any other contempts. In this power would necessarily be included all acts calculated to impede, embarrass, or obstruct the court in the administration of justice. Such acts would be considered as done in the presence of the court. So of rules entered by the court prohibiting the publication of the evidence or other matters while the case is pending and undecided. The limitation of the power to such cases only, is better calculated to strengthen the judiciary, and fasten it in the affections and esteem of the people, who have so large a stake in its purity and efficiency, than the enlarging the power to the extent claimed.

"An honest, independent and intelligent court will win its way to public confidence, in spite of newspaper paragraphs, however pointed may be their wit or satire, and its dignity will suffer less by passing them unnoticed, than by arraigning the perpetrators, trying them in a summary way, and punishing them by the judgment of the offended party.

"It does not seem to me necessary, for the protection of courts in the exercise of their legitimate powers, that this one, so liable to abuse, should also

be conceded to them. It may be so frequently exercised as to destroy that moral influence which is their best possession, until, finally, the administration of justice is brought into disrepute. Respect to courts cannot be compelled; it is the voluntary tribute of the public to worth, virtue and intelligence, and whilst they are found upon the judgment seat, so long, and no longer, will they retain the public confidence.

"If a judge be libelled by the public press, he and his assailant should be placed on equal grounds, and their common arbiter should be a jury of the country; and if he had received an injury, ample remuneration will be made.

"In restricting the power to punish for contempts, to the cases specified, more benefits will result than by enlarging it. It is at best an arbitrary power, and should only be exercised on the preservative, and not on the vindictive, principle. It is not a jewel of the court, to be admired and prized, but a rod rather, and most potent when rarely used."

In speaking of liberty of speech and of the press, Cooley, in his work on constitutional limitations, at page 520, says:

"Except so far as those guaranties relate to the mode of trial, and are designed to secure to every accused person the right to be judged by the opinion of a jury upon the criminality of his act, their purpose has evidently been to protect parties in the free publication of matters of public concern, to secure their right to a free discussion of public events and public measures and to enable every citizen at any time to bring the government and any person in authority to the bar of public opinion by any just criticism upon their conduct in the exercise of the authority which the people have conferred upon them. To guard against repressive measures by the several departments of the government, by

means of which persons in power might secure themselves and their favorites from just scrutiny and condemnation, was the general purpose; and there was no design or desire to modify the rules of the common law which protected private character from detraction and abuse, except so far as seemed necessary to secure to accused parties a fair trial. The evils to be prevented were not the censorship of the press merely, but any action of the government by means of which it might prevent such free and general discussion of public matters as seems absolutely essential to prepare the people for an intelligent exercise of their rights as citizens.''

Seymour D. Thompson, in reviewing the decision in the *Stapleton case*, said, in 28 American Law Review, page 122:

''The whole case, including the statement of facts and the opinion of the court, furnishes very painful reading. A considerable portion, both of the statement and of the opinion, is devoted to a vindication of the court against insinuations and charges made in language so reckless and extreme as to be unworthy on its face of the slightest credit. We are not commenting on the decision for the purpose of offering any opinion upon the propriety of the conclusion of the court. Undoubtedly the publications quoted in the statement of the case constitute contempts at common law, and contempts which no editor in England would dare to commit; for the judges in that country would deal very severely with the authors of such a publication. It must also be said that such publications are a great public evil, for they tend to impair the just confidence which the public should possess in the integrity of their judges—a confidence which in the United States, as in the parent country, has seldom been misplaced. If the constitution and statute law of

Colorado throw no restraints upon the power which judges possess at common law to punish contempts committed against their own dignity and authority, then undoubtedly the court reached the correct conclusion; and if the proceeding has resulted in imposing a severe punishment upon the authors of those wanton and malicious libels upon the integrity of the judges, no right-minded citizen will regret the fact.

"But what we want to draw attention to is this: That the offense thus committed, in so far as it was an offense personally to the judges, should have been redressed, if worthy of notice at all, in an action for damages for libel; and that, in so far as it consisted of public offense—an offense against the people of Colorado—it should have been redressed in a proceeding by indictment against the offenders, in which proceeding all questions of law and fact would have been, under the principles of American constitutions, committed to the decision of twelve disinterested and impartial citizens, instead of being decided by the judges who themselves were smarting under the sense of injury and outrage. Except so far as is absolutely necessary to protect their proceedings from interruption and their process from obstruction, the judges of a court, whenever they arraign a person for contempt of their court, present to the public the unseemly spectacle of a judge sitting in his own cause. In this case it was that and little else. We doubt whether the confidence of the people in the administration of public justice is not more deeply wounded by such a spectacle than by the publication of the libel and the passing it by unnoticed. It is, moreover, to be observed that in states where, as in Colorado, the people elect their judges, it is in accordance with the spirit of our institutions that the newspaper press should possess

the same right to criticise the conduct of the judges which they possess to criticise the conduct of any other public officer. No sound reason can be urged for exempting the judges from public criticism for their official acts which will not equally apply to the officers of the legislative and executive departments of the state. The article of Mr. Pingrey in a former number of this publication, which attracted attention in England, contains valuable suggestions upon this question. The right publicly to criticise public officers and candidates for public office is a valuable popular right, which ought not to be unreasonably curtailed. But those who abuse the privilege, by the publication of wanton and unfounded libels, ought to be punished; but they ought to be punished, not by the officers against whom the libels are written, but by the verdicts of impartial juries."

In the case *Ex parte Steinman*, 95 Pa. St. 220, Chief Justice Sharswood, speaking of a former opinion of that court, said:

"Some of the remarks in the opinion in that case have been much relied on by the learned counsel who argued as *amici curiae* in support of the action of the court below. But there are two considerations bearing upon the question which now exist, but did not at the time that decision was rendered. The first is, the new provision on the subject of the liberty of the press which has been introduced into the Bill of Rights of the constitution of 1874, and the second is that at that time the judiciary was not elective. Judges, in 1835, were appointed by the governor, and their tenure of office was during good behavior. There might then be some reason for holding that an appeal to the tribunal of popular opinion was in all cases of judicial misconduct a mistaken course and unjustifiable in an attorney. The proceedings by impeachment or address were the course and the

only course which could be resorted to effectually to remedy the supposed evil. To petition the legislature was then the proper step. To appeal to the people was to diminish confidence in the court and bring them into contempt without any good result. We need not say that the case is altered and that it is now the right and the duty of a lawyer to bring to the notice of the people who elect the judges every instance of what he believes to be corruption or partisanship. No class of the community ought to be allowed freer scope in the expression or publication of opinions as to the capacity, impartiality or integrity of judges than members of the bar. They have the best opportunities of observing and forming a correct judgment. They are in constant attendance on the courts. Hundreds of those who are called on to vote never enter a court-house, or if they do, it is only at intervals as jurors, witnesses or parties. To say that an attorney can only act or speak on this subject under liability to be called to account and to be deprived of his profession and livelihood by the very judge or judges whom he may consider it his duty to attack and expose, is a position too monstrous to be entertained for a moment under our present system.''

The editor of The Central Law Journal, in discussing the decision of the Michigan court in the case of *In re Chadwick,* reported in 109 Michigan, and cited with approval by this court, says, on page 403 of Vol. 57, of that journal:

''In view of this decision it may be well to emphasize the opinion which we expressed of this dictum in the case of *In re Chadwick,* 57 Cent. L. J. 102. If, as we have said, the dictum in that case was an 'unprecedented and revolutionary extension of the court's jurisdiction,' how much more so is it in a case which actually decides that point and at-

tempts to sustain it by argument and the citation of ancient authority. The individual members of the court should have no greater rights in cases of libel than the governor or other officers of the state government in matters of libel. No halo of immunity from public criticism should surround the heads of the state's judiciary while other servants of the people, equally as honorable, must stand forth in the broad light of day open to attacks of adverse criticism and searching investigation on the part of the press and the people. The judiciary are but men, and therefore are as open to corrupting influences as those in control of any other of the co-ordinate branches of government, and like them, need the deterring influence of free public criticism. Like them, also, they should have their individual actions for libel. Certainly, no greater right to shut off adverse criticism can be given to them without throwing wide open the door to the corruption of the judiciary. The argument that it is the court and not the members thereof that has been libeled is purely metaphysical and does not rest on the facts. Every contempt of this kind that is ever committed is not against the court as a court, but against the court as then constituted; in other words, against the particular members of the court. No one but an avowed anarchist would denounce the court as an institution. A good judge will make the court highly respected, while a Jeffreys will bring it into contempt, but in both cases, in reality, it is the judge himself who is either respected or held in contempt. Any criticism not in regard to a case pending, therefore, alleged to constitute a contempt, must, in nearly every instance, constitute merely a libel on the judge or judges composing the court, for which, like other citizens, they should have their right of action, but no greater rights.''

In *State ex rel. Ashbaugh v. Circuit Court,* reported in 38 L. R. A., page 554, the court, in considering the question of constructive contempt, said:

"Important as it is that courts should perform their grave public duties unimpeded and unprejudiced by illegitimate influences, there are other rights guaranteed to all citizens by our constitution and form of government, either expressly or impliedly, which are fully as important, and which must be guarded with an equally jealous care. These rights are the right of free speech and of free publication of the citizen's sentiments 'on all subjects' (Const. U. S., Amend. 1; Const. Wis., art. I, sec. 3); the right of trial by jury (Const. Wis., art. I, secs. 5, 7); also the right to freely discuss the merits and qualifications of a candidate for public office, being responsible for the abuse of such right in a proper action at law. In the present case it is of the utmost importance to bear in mind that Judge Bailey was a candidate before the people for re-election. Had he been a candidate for any other office, it would not be contended by anyone that the publications in question would afford ground for any other legal action than an action for libel in the regular course of the law; but the claim is that because he was a judge, and was holding court at that time, such unfavorable criticism of his past actions may be summarily punished by the judge himself as for contempt. Truly, it must be a grievous and weighty necessity which will justify so arbitrary a proceeding, whereby a candidate for office becomes the accuser, judge, and jury, and may within a few hours summarily punish his critic by imprisonment. The result of such a doctrine is that all unfavorable criticism of a sitting judge's past official action can be at once stopped by the judge himself, or, if not stopped, can be punished by immediate imprisonment. If there can be any more

effectual way to gag the press and subvert freedom of speech, we do not know where to find it. Under such a rule the merits of a sitting judge may be rehearsed, but as to his demerits there must be profound silence. In our judgment, no such divinity as this 'doth hedge about' a judge; certainly not when he is a candidate for public office.''

''In our opinion, it is not admissible, under our constitution, that a publication, however libelous, not directly calculated to hinder, obstruct or delay courts in the exercise of their proper functions, shall be treated and punished, summarily, as a contempt of court.''—*Storey v. People,* 79 Ill. 45.

If the publication was intended to influence the decision in a pending case, so as to prevent litigants from having a fair and impartial trial upon the merits, it should be punished as contempt of court. —*Sturoc's case,* 48 New Hampshire 428.

Mr. Justice Brewer, when a judge of the supreme court of Kansas, said:

''It will be borne in mind that the remarks we have made apply only while the matters which give rise to the words or acts of the attorney are pending and undetermined. Other considerations apply after the matters have finally been determined, the orders signed, or the judgment entered. For no judge, and no court, high or low, is beyond the reach of public and individual criticism. After a case is disposed of, a court or judge has no power to compel the public, or any individual thereof, attorney or otherwise, to consider his rulings correct, his conduct proper, or even his integrity free from stain, or to punish for contempt any mere criticism or animadversion thereon, no matter how severe or unjust. Nor do we wish to be understood as expressing any opinion as to the power to punish other than attorneys and officers of the court for language or conduct,

even while the matter is pending and undetermined.''
—*In re Pryor*, 18 Kan. 72.

In *Telegram Newspaper Co. v. Commonwealth*, 172 Mass. 294, the court stated that, ''The publications contained statements of facts, evidence of which was not competent at the trial and was not introduced at the trial, and they were so made that it was likely that the presiding justice and the jurors would read them during the trial, and the natural and probable effect of them would be improperly to influence the justice and the jury in the determination of the cause.''

''The general rule is, that to constitute any publication a contempt, it must have reference to a matter then pending in court, and be of a character tending to the injury of pending proceedings upon it, and of the subsequent proceeding.''—*Percival v. State*, 45 Neb. 741.

Wharton, in his work on Criminal Pleading and Practice, speaking of constructive contempts, says:

''(Sec. 958.)  But in any view, to justify a committal, it must plainly appear that the effect of the publication is to interfere with the due administration of justice.

''We should remember, however, that summary conviction is a process only to be used when no other remedy can protect public justice from obstruction. For a judge, who supposes himself insulted, to fine and imprison his supposed insulter, may be necessary, as where the insult is in open court, and is of such a character that unless it is summarily stopped and punished the court cannot proceed with its duties; *but to enable a judge to punish by summary procedure contempts other than those just mentioned is to set at naught, without adequate reason, some of our highest constitutional sanctions.*  Such a process *dispenses with a grand jury.  It inflicts punishment*

*without conviction of a petit jury.* It *permits the party who supposes himself injured to be the tribunal which binds over, finds the bill, decides both the law and fact, convicts, and sentences.* We are also told, though as will be seen erroneously, by those who advocate the prerogative to its full extent, that the process is subject neither to writ of error, nor to revision by *habeas corpus,* nor pardon. But the prerogative rests on a vicious line of reasoning. The supposed contempt is such that the judge will or will not be intimidated or swerved by it in the discharge of his duty. If not, then there is no reason for such an extraordinary remedy. If otherwise, then for the judge to confess his weakness in this respect, and to make this confession in so conspicuous a way, is at least as injurious to public justice as is the publication in which the objectionable matter is contained. But there is another view beyond this. We can conceive not only of a weak judge who dreads intimidation, but of a corrupt judge who dreads exposure. To give a bad, bold man of this class an engine so potent as this, is to take away one of the few means by which he can be exposed. Certainly a prerogative so violent and so damaging should not be exercised except in case of necessity.

\*    \*    \*    \*    \*    \*

"It may well be asked why, if such an extreme remedy is necessary in case of the judiciary, it is not in case of the executive? The executive, in cases of application for pardon, exercises a semi-judicial function, in which, equally with the judge trying the case, it is important that he should be kept free from the influence of fear, favor, or affection. The executive, when dealing with great questions of war, or almost equally great questions of currency expansion or contraction, should be in an eminent degree superior to the clamor of ignorant or timid or fanatical

declaimers, and to the false public sentiment generated by a real but baseless panic. . Who, however, would consider it consistent with either law or liberty for the executive to summarily arrest and imprison, without the relief of bail, without the interposition of a responsible prosecutor, without examination of witnesses, without the right of subsequent revision by *habeas corpus,* those from whom such publications should issue? Or, to take an alternative still more applicable, is such a prerogative safely to be claimed for the legislature? The legislature is co-ordinate in power and dignity with the judiciary. The legislature, either federal or state, has no doubt power to punish summarily for contempts by which the exercise of its distinctive functions is physically impeded; but can we rightfully claim for the legislature power to commit summarily persons criticising, no matter how unfairly or corruptly, measures over which it is still deliberating? But if the exercise of such a power is not permitted to executive or legislature, why should it be conceded to the judiciary? Or, if so conceded to the judiciary, why should we withdraw from the prerogative those general considerations of policy already noticed, which, while retaining for libels common-law prosecutions, invoke, in the institution of such prosecutions, peculiar caution, tenderness, and reserve? But however these questions may be determined, two points remain: first, the doctrine of constructive contempt is of recent introduction, not being part of the common law brought with them to this country by our colonists; and, secondly, it is a violent remedy, justifiable only in cases not reached by bindings over to keep the peace, or bindings over for trial."

The case of *Myers v. The State,* 46 Ohio St. 473, was the review of a cause originating in the circuit court at Columbus. Myers and another had

been jointly indicted, and upon the trial of the person joined with him in the indictment, Myers caused to be published in a newspaper circulated at the place of trial, an article in which it was charged that the indictment was returned for partisan purposes, that the jury was never honestly drawn, and that the judge, clerk and prosecutor had packed the grand jury. The supreme court of Ohio, in considering the case, said:

"It was not the libel against the judge which constituted the offense for which the respondent was liable as for a contempt of court. The offense consisted in the tendency of his acts to prevent a fair trial of the cause then pending in the court. It is this offense which constitutes the contempt, and for which he could be punished summarily; and the fact that in committing this offense, he also libeled the judge, and may be proceeded against by indictment therefor, is no reason why he may not and should not be punished for the offense against the administration of justice."

In applying the doctrine of "pending case," the court has indulged in a mere fiction, and has enlarged its powers as heretofore declared in the *Cooper* and *Stapleton cases,* where the court held that the articles were clearly calculated and intended to improperly influence a decision, and has punished for contempt a publisher who criticised the past action of the court. No party or person interested brought the matter to the attention of the court, and those in whose favor the judgments were rendered appear to have been entirely satisfied that their rights would be protected, and that the mental poise of the court would not be affected by the publications. No one will seriously contend, I think, that the respondent had any intention or expectation of influencing the ruling upon a motion for rehearing.

The parties were lost sight of completely.  The judgments, while affecting individuals, in effect declared a constitutional amendment unconstitutional; and the respondent condemned the judges and impugned their motives.  He was guilty of libel, and not of contempt, if the articles published were false.  That the judges regarded themselves, and not the parties, and proceeded against the respondent. for libeling them, rather than for intermeddling in a pending cause, is apparent from the fact that he is the only publisher in Denver against whom proceedings were commenced; although another journal, during the period covered by the articles in question, was in unmeasured terms commending the alleged patriotic action of the court, and announced that, although petitions for rehearing would be filed, they would be filed as a mere matter of form and without hope of favorable action.

The court says:  "While such causes were before the court upon the petition for rehearing they were, as to the law of contempts, pending causes."

They were pending—theoretically.  The court had rendered judgment.  The opinions were filed, giving reasons for the judgments, as required by law.  No petition for rehearing had been filed when the articles were published.  The opinions were given out for publication, and, as they involved great public questions, they were published.  By giving out the opinions, the court invited criticism, and should have expected that would happen which did happen —that they would be freely discussed in the public journals.  It was not only the right of these journals to criticise at this most opportune time, but it was the right of the public to read and hear concerning them.  Moreover, under our practice, nothing that has been presented will be considered by the court on petition for rehearing; so that, unless it is de-

signed to stifle and prevent criticism at the time when it is intended the public should hear what judgments its judges are rendering, the rule announced by the court is unjust. But, whether it was so designed or not, its effect is the same; for it is left to the judges to determine when they will pass upon a petition for rehearing, and it may be a year or more after the judgment is rendered before the petition for rehearing is granted or denied. In a case filed by one Moyer, in which the decision was rendered in the spring of 1904, leave to withdraw the petition for rehearing was not granted until the summer of 1905, although leave was asked in the summer of 1904. This was a case in which the people were vitally interested and the public had a right to hear the questions involved discussed, yet the court withheld its permission to withdraw the petition for nearly a year.

The judgment clothes every judge in the state with a power he should not possess; that it was never intended by our people that he should possess; and to possess which is altogether at variance with our free institutions. The judges should court criticism, not stifle it. The surest way to lose the confidence of the people is to render a judgment the effect of which is to suppress the truth, particularly if it affects the judge personally. The people want to respect the judges, and probably do respect them more than they do the officers of any other department; but they cannot be driven to respect them by oppressive and tyrannical judgments. They may, for the time, sullenly obey judgments such as this, but they have a right that is quite as sacred as the individual right of the printer or speaker, and that is the right to hear and know about all their servants; and it will require more than one judgment

to effectually deprive them of the right to hear and know about their judges.

The so-called "Auditorium Case" was pending; and if the judgment had been based upon the article in which that case is mentioned, I should have undertaken to show that under the decisions no contempt was in fact committed. But the court has punished the respondent, not because he has undertaken to unduly influence a decision and to prevent the litigants from having a fair trial, but because he has impugned the judges' motives, and because when he filed his answer he reasserted his charges.

The court cites one case in support of the proposition that the causes were pending, for the purposes of contempt. The general doctrine is that after the judgment is rendered, the people are at liberty to discuss it; and this is particularly true where, as under our statute, the court is required, when it announces its judgments, to file an opinion stating its reasons therefor. In the two cases from Colorado, the causes were both pending. The writer of the articles not only libeled the judges, but he stated facts concerning the parties which had a tendency to influence the community and the judges with respect to their causes. In the Ohio case which we have cited, *People v. Myers,* it was expressly held that the defendant was not punished for libel upon the judge, but because he had undertaken to publish matters in the presence of the court and the jurors which might have a tendency to affect the decision in the case. In the Massachusetts case, it will be observed that the newspaper articles published contained facts which, the court remarks, would not be admissible in evidence, and therefore the publisher, inasmuch as such facts were brought to the attention of the court and jury, was held for contempt. In a South Dakota case, on the day after the trial of a

criminal case, the publisher condemned the court and its judgment, but the supreme court of South Dakota said:

"The object of contempt proceedings is not to enable the judge, who deems himself aggrieved, to punish the supposed wrongdoer to gratify his own personal feelings, but to vindicate the dignity and independence of the court, and to protect himself, and those necessarily connected with it, while a matter is pending before it, from insolent and contemptuous abuse calculated to intimidate, influence, embarrass, or prevent a fair and impartial trial. If the judge was unjustly assailed by the article in question, he had the same, and only the same, remedies for the redress of the wrong which belong to all other citizens. After the conclusion of a trial the right of the press, without fear of punishment by contempt proceedings, in the interest of the public good, to challenge the conduct of the judge, parties, jurors, or witnesses, and to arraign them at the bar of public opinion in connection with causes that have been fully determined, cannot be denied by a court in any other manner than by the ordinary proceedings in courts of justice. It would be a perversion of the salutary doctrines governing the proceedings of courts and their power to punish for contempts, to permit a judge to summon before him and punish by fine and imprisonment one who challenges his learning, integrity, or impartiality as a judge in a public newspaper, except when the interests of the state demand it, to vindicate the independence and integrity of the courts, and to protect them from publications directly calculated to embarrass, impede, intimidate, or influence them in the due administration of justice in proceedings pending before them."

The New Hampshire case mentioned in the opinion as sustaining the decision of the court was a case in which a publisher, while jurors were in attendance upon the court ready to be summoned to try the cause, published articles reflecting upon one of the parties to the suit and commenting in severe terms upon the prosecution; and the court held that as the articles had a direct bearing upon the cause that was then pending, and might influence the jurors in the determination of that cause, that it was a contempt of court.

In the case *State v. Dunham,* reported in 6th Iowa 245, the court says, speaking of newspaper articles the publication of which had been held to be contempt of an inferior court:

"Nor are we to be understood as sanctioning the propriety of the course pursued by respondent in his comments and references to the proceedings of the court. If his attack was libelous, then it seems to us that he and the judge assailed should be placed on the same grounds, and 'their common arbiter should be a jury of the country.' No court can or should hope that its opinions and actions can escape discussion or criticism. When a case is disposed of, and the decision announced, such decision becomes public property, so to speak. The construction given to a statute—the reasoning and conclusion of the court upon the facts—all go to the public, and become subject to public scrutiny and investigation. In such cases, it is perfectly competent and lawful for any one to comment upon the decision, and expose its errors and inconsistencies. If such comments do not correct errors, they will, at least, lead to renewed caution and circumspection upon the part of those whose duty it is to declare the law. It would be a fruitless undertaking in this country—where the freedom of speech and the press

is so fully recognized, and so highly prized—to attempt to prevent judicial opinions from being as open to comment and discussion as an opinion or treatise upon any other subject. It is well, and fortunate that it is so. This right is fully recognized in England, and it would be strange, if, under our institutions, we should be less tolerant. To investigate and discuss the opinion of the court, and to disobey its mandates or orders, are quite different things. All men may rightfully make their comments, but none should disobey, except upon pain of suffering the penalty attached for violation. And should those thus commenting leave the subject, and impute dishonesty or base motives to the judge, he may be punished by indictment for a libel—he may be answerable in damages in a civil action—or he may be liable to both prosecutions."

But in none of the cases I have cited is language more applicable than that of Mr. Justice Helm in the case of *People v. Green*, 7 Colo. 244, where he says:

"But respondent undertakes to shield himself under the plea of freedom of speech, and a right to criticise. In this country, and in England also, the utmost liberty of speech is guaranteed by statute and enforced by the courts; the right to discuss all matters of public interest or importance is everywhere fully recognized; judicial decisions and conduct constitute no exception to the rule; the judge's official character, and his acts in cases fully determined, are subject to examination and criticism; in most states the office is elective, and it is proper and right that the people should be informed of the occupant's mental and moral fitness. True, under the guise of criticism in the public press, and otherwise, judges are often compelled to endure the sting of misrepresentation and calumny, with no other redress than an ordinary civil action; and doubtless it sometimes

happens that their efficiency in office is thereby les-
sened, to the detriment and injury of the public
service; but it is wisely considered better that these
wrongs and injuries should be tolerated, than that
the sacred liberty of speech, printed or spoken,
should be abridged by lodging an arbitrary power to
interfere therewith in the hands of the court or
judge, so long as such criticism is not designed to
influence the mind of the judge in a cause still unde-
termined."

It is, as Wharton says, "a confession of weak-
ness" for a judge to confess in so conspicuous a way
as punishment for contempt, that criticism of his
opinions handed down may influence a decision on
a petition for rehearing if one is filed. And it is, "at
least as injurious to public justice as is the publica-
tion in which the objectionable matter is contained."

But the court makes the plea that it is one of the
essential powers of the court—essential to its very
existence, and absolutely necessary to maintain
dignity and command respect. I concede that power
to punish for contempt is essential to a proper en-
forcement of the decrees of a court, for this is recog-
nized by the legislature; but I deny that it is essen-
tial and necessary, to maintain dignity and command
the respect of the people, that the power should
extend to contempts of this character. Instead of
commanding respect, it has the opposite effect. The
respect must be earned by honest judgments and
upright conduct of the judges; and when this arbi-
trary power is used, the people regard it as an
element of weakness rather than as an evidence of
integrity. The people themselves will rally to the
support of the court. The newspapers will be first
of all to resist an unwarranted attack upon the court.
Public opinion will discountenance unjust assaults,
and when the court is unreasonably assailed, the per-

sons who thus assail it will in the end suffer. For a court having the confidence and esteem of the public cannot be harmed by unjust criticism.

Lord Erskine, in speaking upon the subject of free speech and fundamental rights, said: "Engage the people by their affections, convince their reason and they will be loyal from the only principle that can make loyalty sincere, vigorous or rational—a conviction that it is their truest interest, and that their government is for their good. Constraint is the natural parent of resistance, and a pregnant proof that reason is not on the side of those that use it. You must all remember Lucian's pleasant story: Jupiter and a countryman were walking together, conversing with great freedom and familiarity upon the subject of heaven and earth. The countryman listened with attention and acquiescence while Jupiter strove only to convince him—but, happening to hint a doubt, Jupiter turned hastily around and threatened him with his thunder. 'Ah! ha!' says the countryman, 'now, Jupiter, I know that you are wrong; you are always wrong when you appeal to your thunder.' "

So I say. Whenever we exert this arbitrary and despotic power, as pelting and petty officers always do; this power not given by the constitution or by legislative enactment, but taken and exercised because of its alleged necessity, we convince no one; and that unless our judgments are wise and just, and our members are themselves honest and incorruptible, we shall receive the just censure of the public, through the exercise of the right of free speech and through the medium of the printing press, nothwithstanding our thunder.

For nearly thirty years the judges of the federal court have held sessions here, and have determined great and momentous cases of public import. Yet,

in the face of the fact that they have not the power
to punish as for contempts the publishers of articles,
or for spoken words defaming the judges, no one that
I now recall has ever attacked the integrity of the
judges or impugned their motives. During this time,
one of the judges has resided here in Denver, and not-
withstanding the fact that he is forbidden by statute
to entertain proceedings of this nature, he holds the
respect and confidence of the people, and the motives
for his judgments are not questioned.

In a recent work on Constructive Contempt by
John L. Thomas, former judge of the supreme court
of Missouri, this subject is so convincingly presented
that I shall quote what he says upon the "Law of
Necessity," at length. This eminent jurist says:

"The courts base their power to punish for con-
tempt chiefly upon the law of necessity, which is the
law of self-defense. To some extent that may be
true. That the courts should have power, by sum-
mary process, at the time to keep the peace within
their own precincts; to protect themselves and the
parties concerned, in the business before them, from
insult and interference, and enforce their orders and
judgments, is too axiomatic to admit of proof by
argument; but acts or words, done or said, or pub-
lished away from the courts, and not in their pres-
ence, stand upon different grounds entirely, *because
the law of necessity* does not apply in these, there
being other more appropriate remedies for any
wrong growing out of them.

"It is submitted that the law of necessity can-
not be invoked in support of the power of the court
to try and punish for contempt any one for the pub-
lication of a libel upon them or for other acts not
done in their presence. An abstract theory, though
in appearance it may be most plausible and beautiful,
is sometimes flatly contradicted by experience and

the facts of history, and that is the case with the theory upon which this power is made to rest by its advocates. It is asserted that this power is an *essential* attribute of *constitutional* courts only—that a statutory court may be deprived of this essential attribute, and yet continue to exist as a court. This is the rule generally applied by the courts. This was done by the supreme court of the United States in *Ex parte Robinson,* 19 Wall. 505; in the Frew case, 24 W. Va. 416; in the Shepherd case, and many others. So that it seems that the law of necessity is the support of some courts, and some courts have to stand without that law. The reason for such a distinction is not apparent to the writer. To my mind, that so-called law of necessity is no law at all, for if it were, *no* court could exist without it.

"But this is not all. This theory of the law of necessity, as applicable to the punishment for contempt for newspaper publications, is flatly contradicted by the facts of history. The supreme court of the United States has never exercised, or attempted to exercise, such a power, though it has, at times, for one hundred years or more, been vilified, abused and libeled in an outrageous manner. It has been libelously criticised by the public press for its decisions in the National Bank cases, the Dartmouth College case, the Dred Scott case, the Reconstruction cases, the Legal Tender cases, and we all remember the vituperative and libelous attacks, made by the press and many public speakers, upon that high tribunal for its decisions in the Income Tax and Insular cases; and yet the court remained silent and passive; but it still exists in all its vigor. That court, in 1873, in *Ex parte Robinson,* decided that under the act of congress of March 2, 1831, the courts, inferior to the supreme court of the United States, have no jurisdiction in a contempt proceed-

ing for acts not committed in their presence; and yet there are no courts of the states of this Union that stand higher or are more respected than the United States courts of appeals, the United States circuit courts, and the United States district courts. The members of the supreme court often sit in some of these, and aid in the administration of the law in the trial of causes. These courts are absolutely, so far as their power to punish as for a contempt a newspaper publication, at the mercy of the slanderers and libelers of this country, which our supreme court stands so much in dread of. And yet those courts continue to exist as courts. And our state supreme court, the courts of appeals, and the circuit courts never exercised this extraordinary prerogative prior to 1903, and yet they continued to exist. The same may be said of ninety-nine per cent. of all the courts in our country. Lords Erskine and Campbell did not think the power essential to a court.

"Speaking upon this very point, the supreme court of Illinois, in the *Storey case, supra,* quoting from a former decision of the same court, said: 'It does not seem necessary for the protection of courts in the exercise of their judicial power, that this one (contempt for libelous publication), so liable to abuse, should be conceded to them. It may be so frequently exercised as to destroy that moral influence which is their best possession, until finally the administration of justice is brought into disrepute. Respect for courts cannot be compelled. It is the voluntary tribute of the public to worth, virtue and intelligence, and while they are found upon the judgment seat, so long, and no longer, will they retain the public confidence. If a judge be libeled by the public press, he and his assailant should be placed on equal grounds, and their common arbiter should be a jury of the county.'

"The supreme court of Wisconsin, speaking on the same subject, in *State ex rel. v. Court*, 44 L. R. A. 554, said: 'Is it necessary that a court should possess this power? We feel bound to hold that, considering the rights of the citizen just referred to, *no such power as this is necessary for the due administration of justice*. It may be fully admitted that under the common law as administered in England, the mere writing contemptuously of a superior court of justice has been declared a constructive contempt.—4 Bl. Com. 285. We, however, adopted no part of the common law which was inconsistent with our constitution (Cons. Wis. Schedule, sec. 131), and it seems clear to us that so extreme a power is inconsistent with and would materially impair the constitutional right of free speech and free print.'

"To the same effect is the opinion of the court in Mississippi, in *Ex parte Hickey*, 4 Smedes & M. 751, and it has been the firm conviction of the people of this country for over a hundred years that this power is not necessary, but that it is a power so arbitrary and so liable to abuse, that it ought not to be intrusted to the court, but that cases involving the abuse of freedom of speech and the press ought to be tried by an impartial jury before courts that have and can have no personal interest in the result. Hence this power in this respect, not being based on the law of necessity, can be taken away from, or not conferred on, the courts at the will of the legislature. Whether the power to protect themselves from insult and keep the peace in their own precincts, and enforce their own judgments, can be taken away from the courts, or given to some other judicial tribunal, has not arisen in this country yet, for no legislature has ever up to this time attempted to go that far, and, until such an attempt is made, so improbable a contingency need not enter into the discussion.

"Our contempt statute not only recognizes, but, in terms, confers the power on the courts to punish for contempts committed in their presence, and for refusing to obey the process or orders of the court, and beyond these the law of necessity, if it exist at all, does not extend."

This plea of necessity has always been urged as the reason for the exercise of arbitrary power not sanctioned by law. All tyrants take refuge behind it. It is the reason urged for misgovernment everywhere. The constitution is ignored and the statutes disregarded mainly upon the plea of necessity. The power of judging of the necessity is, by this same doctrine of necessity, as a matter of course lodged in the person making the plea.

Judge Thomas further says, page 41:

"Those who opposed proceedings, based on attachment for contempt of court for newspaper publications, did not deny that courts ought to be protected against unjust and malicious criticism; but they did deny the propriety, if not the right of the judge to try any issue in which his personality must, of necessity, more or less enter, and which, they felt, can but influence his decision. This objection, however, applies only where the contempt proceeding is for criticism of the judge by print, writing or picture, and does not apply to the enforcement of the orders of the court, for in this the personality of the judge does not enter in the slightest degree, and hence, personal bias in such cases can have no appreciable influence over the decision of a just judge. Lord Erskine, at the close of his great career, gave it as his opinion that there ought to be a jury trial when a person is charged with libeling a court or judge; and Lord Campbell, one of the chief justices of England, in a note to the case of *Rex v. Almonds* (Wilm., Op. 243, 3rd volume of his 'Lives of the Lord

Chief Justices,' 190), says: 'In consequence of the resignation of Sir Fletcher Norton, who as attorney-general had made the motion, it (the Almond case for contempt) was dropped after cause shown while the court was considering its judgment; and although there can be no doubt as to the power to proceed by attachment in such a case—if a prosecution for a libel on judges be necessary—the preferable course is to proceed by information or indictment, so as to avoid placing them in the invidious situation of deciding where they may be supposed to be parties.' "

The court says that the case of *Hughes v. The People* is authority for holding, as it does, "that the truth of the matter charged as contemptuous is not justification to the charge of contempt." The court further says that, the court very briefly disposed of the offer of Hughes to prove the truth of his charges; and quotes the following language used by the court: "It is further assigned for error, that the court rejected testimony offered to prove the truth of the matter charged in the writings. After what we have already said, it is scarcely necessary to add that this assignment is untenable."

I cannot place such construction on this portion of Justice Stone's opinion. He had already said:

"A contempt consists as well in the manner of the person committing it, as in the subject-matter of its foundation; matters which, *if true*, would in their very nature be scandalous, may be presented, hinted at or brought to the attention of the court in so respectful a manner, that no judge would ever think to construe a contempt therefrom; while, on the other hand, it is easy to see, when under the guise and pretense of setting out *privileged* and necessary matters, circumstances are detailed, and scandalous and insulting charges and innuendoes are made and insinuated, upon pretended 'information and belief,'

in a manner that bears the unmistakable earmarks of malice and deliberate contempt.

"These remarks, we think, will indicate sufficiently clear the path which each attorney is expected to advise and follow in choosing the language he employs in papers filed in court, as well as in speech addressed directly to the judge."

This explains the words quoted as declaring that the proof of the truth of the matter charged in an alleged contemptuous paper filed in the court is not a justification. Taken all together, it is not authority for the opinion in this case, but is simply a holding that the attorney who presents a paper to a court must use language, if possible, that is not scandalous; and that he should, rather than relate a plain, unvarnished tale, hint at such matters, and gloss them in such a way that a discriminating judge will not deem the language contemptuous. But it is not possible to use this case as authority for holding that under no circumstances is the truth a justification; for, suppose that an attorney has merely hinted at a scandalous matter, and the judge has cited him for contempt, and as a justification, the attorney offers to prove the truth. There is positively nothing in the opinion which would justify the court in denying the attorney the right to prove such matters in justification.

In the case *Mullin v. People,* 15 Colo. 437, Mullin had prepared a petition for a change of venue, wherein he set forth, among other things, that the wife of the judge had just before the trial of a certain cause told him that she must return home at once and see the judge and arrange with him to have Mrs. Davis win her case; that Mrs. Davis did win the case; and that, as he was interested in the same litigation, although in another suit, he feared that the judge would be prejudiced against him, and he asked

to have the venue of the cause changed. After stating that the statute requires the petitioner, in cases where the change of venue is asked on account of the prejudice of the judge, to set forth the facts upon which he bases his fears that he will not receive a fair trial, Mr. Justice Hayt, who delivered the opinion of the court, said:

"Assuming then, for the purposes of this case, that the wife of the presiding judge made the statement attributed to her, plaintiff in error had the undoubted right to embody such statement in his petition for a change of venue without subjecting himself to being punished for contempt. The principal ground relied upon to sustain the action of the court below therefore fails. Had it been charged that the affidavit was false in this respect, and that such false statements were made willfully and maliciously, as argued, a different case would have been presented."

This case seems to hold that in a petition for change of venue the party seeking the change may set out the reasons upon which he bases his fears that he will not receive a fair trial, and that if the statements therein contained are true, he is not subject to punishment for contempt.

John Peter Zenger was tried for a defamatory publication of certain public officials in New York, in 1735. Andrew Hamilton defended him. Speaking of the effect of censuring those in power, Hamilton said:

"It is said that it brings the rulers of the people into contempt so that their authority is not regarded, and so that in the end the laws cannot be put into execution. These, I say, and such as these, are the general topics insisted upon by men in power and by their advocates. But I wish it might be considered at the same time how it often has happened that the

abuse of power has been the primary cause of these evils, and that it was the injustice and oppression of these great men which has commonly brought them into contempt with the people.  The craft and art of such men are great, and who that is the least acquainted with history or with law can be ignorant of the specious pretenses which have often been made use of by men in power to introduce arbitrary power and destroy the liberties of a free people.  *   *   *

"But, to conclude, the question before the court, and you, gentlemen of the jury, is not of small nor private concern; it is not the cause of a poor printer, nor of New York alone, which you are now trying. No! it may, in its consequences, affect every free man that lives under a British government on the main continent of America.  It is the best cause; it is the cause of liberty; and I make no doubt but your upright conduct, this day, will not only entitle you to the love and esteem of your fellow-citizen, but every man who prefers freedom to a life of slavery will bless and honor you as men who have baffled the attempt of tyranny, and, by an impartial and uncorrupt verdict, have laid a noble foundation for securing to ourselves, our posterity, and our neighbors, that to which nature and the laws of our country have given us a right—the liberty of exposing and opposing arbitrary power (in these parts of the world, at least) by speaking and writing truth."

Through the efforts of Hamilton, Zenger was acquitted, in spite of the judge's efforts; and this at a time when the truth was not a defense to such an action.  Gouverneur Morris is said to have stated that instead of dating American liberty from the Stamp Act, he traced it to the persecution of Zenger; because that event revealed the philosophy of freedom, both of thought and speech, as an inborn human right,

so nobly set forth in Milton's speech for the liberty of unlicensed printing.

Harry Croswell, the publisher of a newspaper at Hudson, New York, was convicted for libeling Thomas Jefferson, the then president of the United States. The case was taken to the supreme court. It has attracted great attention, not only because of the importance of the questions raised, but because of the eminence of court and counsel. The lower court had refused to instruct the jury that it was the judge of the law and fact, and that the truth was a justification. The case is reported in 3 Johnson's cases, page 323. In opening the case, counsel for Croswell said:

"The opposite doctrine, which maintains that a writing is equally libelous, whether true or false, originated in a polluted source, the despotic tribunal of the star chamber. (Moore 627, 5 Co. 125.) * * * The star chamber had no authority to alter the common law. Our ancestors, when they emigrated to this country, brought with them the common law as their inheritance and birthright; and one of the earliest acts of our colonial legislature was to assert their claim to the enjoyment of the common law. * * * The doctrine which will be contended for on the other side, that the truth cannot be given in evidence, and is in no case to justify libel, although it should be promulgated with the purest motives, is repugnant to the first principles of policy and justice, and contrary to the genius of a free representative republic. Freedom of discussion and a freedom of the press, under the guidance and sanction of truth, are essential to the liberties of our country, and to enable the people to select their rulers with discretion, and to judge correctly of their merits."

Gen. Alexander Hamilton appeared for Croswell; he said, in the closing argument:

"The liberty of the press consists, in my idea, in publishing the truth, from good motives and for justifiable ends, though it reflect on government, on magistrates, or individuals. If it be not allowed, it excludes the privilege of canvassing men, and our rulers. It is in vain to say, you may canvass meas-ures. This is impossible without the right of looking to men. To say that measures can be discussed, and that there shall be no bearing on those who are the authors of those measures, cannot be done. The very end and reason of discussion would be destroyed. Of what consequence to show its object? Why is it to be thus demonstrated, if not to show, too, who is the author? It is essential to say, not only that the measure is bad and deleterious, but to hold up to the people who is the author, that, in this our free and elective government, he may be removed from the seat of power. If this be not done, then in vain will the voice of the people be raised against the inroads of tyranny.   *   *   *   But if, under the qualifications I have mentioned, the power be allowed, the liberty for which I contend will operate as a salutary check. In speaking thus for the freedom of the press, I do not say there ought to be an unbridled license; or that the characters of men who are good will naturally tend eternally to support themselves. I do not stand here to say that no shackles are to be laid on this license.

"I consider this spirit of abuse and calumny as the pest of society. I know the best of men are not exempt from the attacks of slander. Though it pleased God to bless us with the first of characters, and though it has pleased God to take him from us and this band of calumniators, I say that falsehood eternally repeated would have affected even his name. Drops of water, in long and continued succession, will wear out adamant. This, therefore, cannot

be endured. It would be to put the best and the worst on the same level.

"I contend for the liberty of publishing truth, with good motives and for justifiable ends, even though it reflect on government, magistrates, or private persons. I contend for it under the restraint of our tribunals. When this is exceeded, let them interpose and punish. From this will follow none of those consequences so ably depicted. When, however, we do look at consequences, let me ask whether it is right that a permanent body of men, appointed by the executive, and, in some degree, always connected with it, should exclusively have the power of deciding on what shall constitute a libel on our rulers, or that they shall share it, united with a changeable body of men chosen by the people. Let our juries be selected, as they now are, by lot. But it cannot be denied that every body of men is, more or less, liable to be influenced by the spirit of the existing administration; that such a body may be liable to corruption, and that they may be inclined to lean over towards party modes. No man can think more highly of our judges, and I may say personally so of those who now preside, than myself; but I must forget what human nature is, and how her history has taught us that permanent bodies may be so corrupted, before I can venture to assert that it cannot be. As then it may be, I do not think it safe thus to compromise our independence. For though, as individuals, the judges may be interested in the general welfare, yet, if once they enter into these views of government, their power may be converted into an engine of oppression. It is in vain to say that allowing them this exclusive right to declare the law, on what the jury has found can work no ill; for, by this privilege, they can assume and modify the fact, so as to make

the most innocent publication libelous. It is, there-
fore, not a security to say, that this exclusive power
will but follow the law. * * * Passages have been
adduced from Lord Mansfield's declarations to show
that judges cannot be under the influence of an ad-
ministration. Yet still it would be contrary to our
own experience to say that they could not. I do
not think that even as to our own country it may not
be. There are always motives and reasons that may
be held up. It is, therefore, still more necessary here
to mingle this power, than in England. The person
who appoints there, is hereditary. That person can-
not alone attack the judiciary; he must be united with
the two houses of lords and of commons, in assail-
ing the judges. But, with us, it is the vibration of
party. As one side or the other prevails, so of that
class and temperament will be the judges of their
nomination. Ask any man, however ignorant of prin-
ciples of government, who constitute the judiciary,
he will tell you the favorites of those at the head of
affairs. Accordingly, then, to the theory of this our
free government, the independence of our judges is
not so well secured as in England. We have here
reasons for apprehension not applicable to them. We
are not, however, to be influenced by the preference
to one side or the other. But of which side soever a
man may be, it interests all to have the question
settled, and to uphold the power of the jury, consist-
ently however with liberty, and also with legal and
judicial principles, fairly and rightly understood.
None of these impair that for which we contend—
the right of publishing the truth, from good motives
and justifiable ends, though it reflect on government,
on magistrates, or individuals.

"Some observations have, however, been made
in opposition to these principles. It is said, that as
no man rises at once high into office, every oppor-

tunity of canvassing his qualifications is afforded, without recourse to the press; that his first election ought to stamp the seal of merit on his name. This, however, is to forget how often the hypocrite goes from stage to stage of public fame, under false array, and how often, when men obtain the last object of their wishes, they change from that which they seemed to be; that men, the most zealous reverers of the people's rights, have, when placed on the highest seat of power, become their most deadly oppressors. It becomes, therefore, necessary to observe the actual conduct of those who are thus raised up.

\*       \*       \*       \*       \*       \*

"I affirm that, in the general course of things, the disclosure of truth is right and prudent, when liable to the checks I have been willing it should receive as an object of animadversion. It cannot be dangerous to government, though it may work partial difficulties. If it be not allowed, they will stand liable to encroachments on their rights. It is evident that if you cannot apply this mitigated doctrine, for which I speak, to the cases of libels here, you must forever remain ignorant of what your rulers do. I never can think this ought to be; I never did think the truth was a crime; I am glad the day has come in which it is to be decided, for my soul has ever abhorred the thought that a free man dared not speak the truth; I have forever rejoiced when this question has been brought forward.

\*       \*       \*       \*       \*       \*

"It is impossible to say that to judge of the quality and nature of an act, the truth is immaterial. It is inherent in the nature of things, that the assertion of truth cannot be a crime. In all systems of law this is a general axiom, but this single instance, it is attempted to assert, creates an exception, and is

therefore an anomaly.  If, however, we go on to examine what may be the case that shall be so considered, we cannot find it to be this.

\*      \*      \*      \*      \*      \*

"It is true that the doctrine originated in one of the most oppressive institutions that ever existed; in a court whose oppressions roused the people to demand its abolition, whose horrid judgments cannot be read without freezing the blood in one's veins. This is not used as declamation, but as argument. If doctrine tends to trample on the liberty of the press, and if we see it coming from a foul source, it is enough to warn us against polluting the stream of our own jurisprudence.  It is not true that it was abolished merely for not using the intervention of juries, or because it proceeded *ex parte,* though that, God knows, would have been reason enough, or because its functions were discharged by the court of king's bench.  It was because its decisions were cruel and tyrannical; because it bore down the liberties of the people, and inflicted the most sanguinary punishments.  It is impossible to read its sentences without feeling indignation against it.  This will prove why there should not be a paramount tribunal to judge of these matters."

Mr. Justice Kent, in an opinion, sustained General Hamilton, and adopted his views.  He said, in part:

"Mr. Barrington ('Observations on the Statutes,' 68) has given us a part of a curious letter, written at that time by the Dean of St. Paul's, from which we may infer his alarm and disgust at the new libel doctrines of the star chamber.  'There be many cases,' he observes, 'where a man may do his country good service, by libelling; for where a man is either too great, or his vices too general to be brought under

a judiciary accusation, there is no way but this extraordinary method of accusation.' * * *

"It appears clear, from this historical survey, that the doctrine now under review originated in the court of star chamber, and was introduced and settled there about the beginning of the reign of James I. (Breverton's case, 2 Jac. 1, and the case in 5 Co. 125, 3 Jac. 1, both settled the rule.) It was no doubt considered, at that time, as an oppressive innovation; but opposition must have been feeble to a court whose action and whose terrors were then at the greatest height, and which exercised its *superlative powers* (as Hudson terms them) with enormous severity. The principle was, however, received in after times with jealousy and scrutiny, as coming without the sanction of legitimate authority; and it was not to be expected that a people attached to the mild genius of the common law, of which trial by jury, in criminal cases, is one of its most distinguished blessings, would willingly receive the law and limits of the press from the decrees of so odious and tyrannical a jurisdiction. * * *

"The first American Congress, in 1774, in one of their public addresses (Journals, vol. 1, p. 57), enumerated five invaluable rights, without which a people cannot be free and happy, and under the protecting and encouraging influence of which these colonies had hitherto so amazingly flourished and increased. One of these rights was *the freedom of the press,* and the importance of this right consisted, as they observed, 'besides the advancement of truth, science, morality, and arts in general, in its diffusion of liberal sentiments on the administration of government, its ready communication of thoughts between subjects, and its consequential promotion of union among them, whereby oppressive officers are shamed

or intimidated into more honorable and just modes of conducting affaii s.'    *    *    *

"I have thus shown, that the rule denying permission to give the truth in evidence, was not an original rule of the common law. The ancient statutes and precedents, which are the only memorials to which we can resort, all place the crime on its falsity. The court of star chamber originated the doctrine, and it was considered an innovation. When it was brought into a court of common law, it was resisted and denied; the court dared not practice upon it, and the jury gave it their negative. Lord Holt totally disregarded the rule, in the case of Fuller; and it did not become an express decision of a court of common law till Franklin's case, in 1731; and there the counsel made a zealous struggle against it, as new, dangerous, and arbitrary. In the trial of Horne, Lord Mansfield laid the rule aside, and the counsel for the crown rejoiced at an opportunity to meet the defendant upon the merits of the accusation. In 1792, it was made a questionable point, in the house of lords, and one of the highest law characters in the house seems to have borne his testimony against it. I feel myself, therefore, at full liberty to examine this question upon principle, and to lay the doctrine aside, if it shall appear unjust in itself, or incompatible with public liberty, and the rights of the press.    *    *    *

"I adopt, in this case, as perfectly correct, the comprehensive and accurate definition of one of the counsel at the bar (Gen. Hamilton), *that the liberty of the press consists in the right to publish, with impunity, truth, with good motives, and for justifiable ends, whether it respects government, magistracy, or individuals.*"

In the case of *King v. Root,* 4 Wend. 114, the trial court instructed the jury upon the liberty of the press, as follows:

"A vigilant watch should be kept over the editors of our journals, to prevent them becoming vehicles for the indulgence of private resentment. Yet, however aggravated the practice of traducing character so openly and virulently through the press may become, you must be cautious not to let your anxiety to check a great evil, lead you to do a great wrong to these defendants. * * * and in seeking to restrain the licentiousness of the press, you will be careful not to trammel fair discussion, nor punish the truth, however painful it may be to those of whom it is published."

The judgment was affirmed, and this instruction was approved.

Horace Greeley was defendant in a suit for defamation. He pleaded that the articles published by him were true. In passing upon a preliminary motion, the court said:

"The press is allowed to comment fully and freely upon public characters, from the president down, and to utter those things with the utmost freedom—to charge official men with incompetency and imbecility, with ignorance or corruption—to charge judges with ignorance, incompetency, or venality—and the proof of any of these allegations is a perfect defense. But the press has no right, under its guaranteed freedom, to publish what is not true."—*Littlejohn v. Greeley,* 13 Abbott's Pr. 41.

In the case of *Negley v. Farrow,* 60 Md. 158, at page 176, the court, through Robinson, Justice, says:

"No one denies the right of the defendants to discuss and criticise boldly and fearlessly the official conduct of the plaintiff. It is a right which, in *every* free country belongs to the citizen, and the exercise

of it, within lawful and proper limits, affords some protection at least against official abuse and corruption. But there is a broad distinction between fair and legitimate discussion in regard to the conduct of a public man, and the imputation of corrupt motives, by which that conduct may be supposed to be governed. And if one goes out of his way to asperse the personal character of a public man, and to ascribe to him base and corrupt motives, he must do so at his peril; and must either prove the truth of what he says, or answer in damages to the party injured.''

In the case of *State v. Frew,* 24 West Virginia 416, Mr. Justice Snyder, one of the justices of the court, said:

''Having thus shown that the court has the power to punish for contempts, it must not be overlooked that this power can be justified by necessity alone, and should rarely be exercised, and never, except when the necessity is plain and unmistakable. It is not given for the private advantage of the judges who sit in the court, but to preserve to them that respect and regard, of which courts cannot be deprived and maintain their usefulness. It is given that the law may be administered fairly and impartially, uninterrupted by any influence which might affect the rights of the parties or bias the minds of the judges—that the court may command that respect and sanctity so essential to make the law itself respected—and that the streams of justice may be kept pure and uncorrupted. * * *. The public have a profound interest in the good name and fame of their courts of justice, and especially of the courts of last resort. Everything that affects the well-being of organized society, the rights of property, and the life and liberty of the citizen, is submitted to their final decision. The confidence of the public in the judiciary should not be *wantonly* impaired. It is all-important to the

due and efficient administration of justice that the courts of last resort should possess in a full measure the entire confidence of the people whose laws they administer. All good citizens will admit that he who willfully and wantonly assails the courts by *groundless* accusations, and thereby weakens the public confidence in them, commits a great wrong not alone against the courts, but against the people of the state. It must be and is cheerfully conceded that public journals have the right to criticise freely the acts of all public officers—executive, legislative and judicial. It is a constitutional privilege that even the legislature cannot abridge. But such criticism should always be just and with a view to promote the public good. Where the conduct of a public officer is *willfully corrupt,* no measure of condemnation can be too severe; but when the misconduct, apparent or real, may be simply an honest error of judgment, the condemnation ought to be withheld or mingled with charity.''

This is one of the cases cited by the court in support of its position in this case. Yet, by the use of the adverb *wantonly,* and of the adjective *groundless,* it would seem that, in the opinion of this justice, if the accusation were not wantonly made and were not groundless, no contempt would have been committed. He also appears to favor severe condemnation of those public officers who are *willfully* corrupt. The justices were careful to state that they had been falsely charged; and one of the judges insisted that the attorneys should have been fined because they must have known that the answer filed was false.

My brother Gunter relies upon the case *In re Moore et al.,* 63 North Carolina 397, decided in the year 1869, as supporting one of the positions taken by the court in this case. In that case more than one hundred members of the bar signed and published a

protest entitled: "A SOLEMN PROTEST OF THE
BAR OF NORTH CAROLINA AGAINST JUDI-
CIAL INTERFERENCE IN POLITICAL AF-
FAIRS." The protest declared, among other
things, that, "Active and open participation in the
strife of political contests by any judge of the state,
so far as we recollect, or tradition or history has
informed us, was unknown to the people until the
late exhibitions. To say that these were wholly un-
expected, and that a prediction of them, by the wisest
among us, would have been spurned as incredible,
would not express half our astonishment, or the pain-
ful shock suffered by our feelings when we saw the
humiliating fact accomplished.  *  *  *  Many of
us have passed through political times almost as
excited as those of to-day; and most of us, recently,
through one more excited; but, never before have we
seen the judges of the supreme court, singly or *en
masse,* moved from that becoming propriety so indis-
pensable to secure the respect of the people, and,
throwing aside the ermine, rush into the mad con-
test of politics under the excitement of drums and
flags. From the unerring lessons of the past we are
assured, that a judge who openly and publicly dis-
plays his political party zeal, renders himself unfit
to hold 'the balance of justice,' and that whenever an
occasion may offer to serve his fellow-partisans, he
will yield to the temptation, and the 'wavering bal-
ance' will shake."

This article was held to be libelous because false,
and contemptuous because libelous. The court said:
"The only allegation of fact on which this 'solemn
protest' rests, is that 'the judges, single or *en masse,*
did rush into the mad contest of politics, under the
excitement of drums and flags.' Is this allegation
of fact true, or is it false? There is no pretense that
it is *true.* It is said, this is a figure of speech, sug-

29

gested by something that was expected to occur, but never did occur; so the allegation of fact is false, and the inference drawn from it is also false. In our judgment the paper is libelous, and 'doth tend to impair the respect due to the authority of the court.' "

No case from America, since the constitutional provisions concerning free speech and the printing press have been in force, has been cited, in which a · judge has undertaken to punish as for contempt statements such as these. A redeeming feature of this case is that the respondents did not retract or apologize, and were not punished; and that the court held that to publish such an article is not contempt unless it is false.

In the *Wyatt case,* the court held that the legislature had not undertaken to control the procedure in criminal contempt, because the statute on the subject was contained in the civil code. It recommended, however, a substantial compliance with the code provisions in cases of criminal contempt.

In the *Stapleton case,* the court did not declare that the legislature could not legislate upon the subject of contempt, but expressly declares that, as it had not done so, the court had the common-law power of punishing for constructive contempt. Mr. Justice Elliott said, quoting from the *Hughes case:* " 'Such a statutory enumeration of causes as is found in our code, when applied to the ever-varying facts and circumstances out of which questions of contempt arise, cannot be taken as the arbitrary measure and limit of the inherent power of a court for its own preservation, and for that proper dignity of authority which is essential to the effective administration of law.'

"The *Hughes case* was based upon the code of 1877, which was repealed in 1887. Chapter 30 of the present code is, however, a substantial re-enactment of the former provisions relating to contempt pro-

ceedings. These provisions were re-enacted more than six years after the announcement of the decision in the *Hughes case.* Thus by a well known rule of statutory construction it must be presumed that the legislature had knowledge of, and were satisfied with, the construction given to such provisions, and so re-enacted them without change.—*Harvey v. Travelers' Ins. Co., ante,* 354. Moreover, neither in the code of 1877 nor in the present code are there any negative or other qualifying words limiting contempts to such causes as are therein specified.''

This language cannot be misunderstood; and the court has, in this case, in effect, overruled the *Stapleton case*—for it says:

"We do not desire to intimate by the excerpt from *People v. Stapleton,* that it would be competent for the legislature to limit the power of courts, created by the constitution, in reference to either civil or criminal contempt.''

Instead of accepting the decisions of this court as a warning that the court had already taken all the power necessary for its existence, it goes beyond that, and intimates, if it does not hold, that the subject of contempt is one over which the legislature has no control. Colorado has thus joined the group of states consisting of Arkansas, West Virginia, Virginia, Georgia and Missouri in declaring that necessity—a necessity essential to the very existence of the court—requires that the legislature should not legislate upon the subject of contempt. How the federal courts and the courts of the other thirty-nine states have managed to exist, for lo! these many years, without this essential power, is not explained in the opinion.

I shall not discuss the proposition that the common-law powers cannot be taken from the courts created by the constitution, by legislative enactment,

further than to say that, as the constitution that created the court adopted the common law only until altered or repealed by the general assembly, it would seem to follow that it is within the power of the legislature to take away any power not expressly granted by the constitution.

Although the court is sustained, in part, by the courts of the states mentioned, this court stands alone in holding that the truth is immaterial. In Georgia and Virginia the contempt was of an entirely different character. In Arkansas, the court says that one is punishable for contempt who *wantonly attempts* to obstruct public justice; and in West Virginia, the court speaks of *groundless* accusations made against the court as being contemptuous; while in Missouri, the court squarely holds that the power to punish is limited to those who tell an untruth. The doctrine that "the truth is immaterial," comes, as Kent and Hamilton say, from a polluted source, the obnoxious star chamber, and it was undoubtedly the cowardly conception of corrupt officials, as a means of shielding themselves from exposure, and why it should be revived in this day and generation is beyond my understanding.

The court disposes of the contention of the respondent, that he should not be punished for publishing the truth, by saying:

"*State v. Shepherd,* 147 Mo. 244, has been cited as *contra* our conclusion. The question is not presented by the answer of the respondent in that case, nor is its sufficiency as a defense considered or passed upon by the court. No case has been found which sustains, or tends to sustain, the contention of counsel."

It is true that the answer of the respondent did not justify by alleging the truth of the charges; but I can place no other construction upon the language

of the court than that, in the judgment of that court, proof of the truth of the alleged contemptuous articles is a perfect defense. As my brother Gunter and I have placed constructions upon the Missouri case that are diametrically opposed to each other, I shall quote from the opinion in that case the language upon which I base my conclusion that the court held that the truth of the charges made is a justification in a proceeding for contempt. The publisher of a newspaper had charged, in effect, that the judges of the supreme court had been bribed by the Missouri Pacific Railroad Company to render a certain judgment in its favor. The article stated, among other things, that "As the cap-sheaf of all this corruption in high places, the supreme court has, at the whip-crack of the Missouri Pacific Railroad, sold its soul to the corporations." Further, that: "The victory of the railroad has been complete, and the corruption of the supreme court has been thorough. It has reversed and stultified itself in this case until no sane man can ever have any other opinion but that the judges who concurred in the opinion dismissing the Oglesby case have been bought in the interest of the railroad." The court then proceeds: "If these charges are true, the persons who are thus charged should be prosecuted and removed from office. On the other hand, anyone who makes such charges should be prepared to make some sort of a decent showing of their truth. Instead of standing ready to prove the truth of the charges, the defendant, when called into court, neither asserts the truth of the charges, nor does he accept the challenge of the attorney general to introduce any evidence whatever of their truth. * * * In other words, the defendant has grossly, indecently, and cruelly vilified and scandalized every department of the government under which he lives, and which affords him protection for his life, liberty, and prop-

erty, and, when challenged to make his words good, he consummates his offending by failing absolutely to produce one word of testimony to show that he told the truth, and, instead of making the 'amende honorable,' by withdrawing the charges and apologizing like a man, he seeks to escape punishment by challenging the jurisdiction of this court.''

At another place in the opinion, the court says:

''The offense of *scandalum magnatum* has not existed in this country since the revolution, but everyone, of whatever rank or station in life, stands upon the same footing before the law, and is entitled to the same protection for his life, his liberty, his property, and his reputation. In the eyes of our constitution and laws, every man is a sovereign and ruler, and a freeman, and has equal rights with every other man. * * * Every man may lawfully do what he will, so long as it is not *mala in se* or *mala prohibita,* or does not infringe upon the equally sacred rights of others. Every man may speak and write what he will, so long as he tells the truth, but no man has any more right to-day to bear false witness against his neighbor than he had in the days of Moses.''

At another place, the court says: ''But the press has no greater liberty in this regard than any citizen. Newspapers and citizens have the same right to tell the truth about anybody or any institution. Neither has the right to scandalize anyone or any institution.''

And again: ''Good people obey the laws, slander no one, and speak the truth. Others must do so, or be punished. Upon no other basis could good government rest, or the rights of the people be protected. * * * This is the true rule. The liberty of the press means that anyone can publish anything he pleases, but he is liable for the abuse of this liberty. If he does this by scandalizing the courts of

his country, he is liable to be punished for contempt. If he slander his fellow men, he is liable to a criminal prosecution for libel, and to respond, civilly, in dam-ages for the injury he does to the individual. In other words, the abuse of the privilege consists prin-cipally in not telling the truth.''

And, quoting from a New York case, it says: ''It has been urged upon you that the conductors of the public press are entitled to peculiar indulgences, and have special rights and privileges. The law recognizes no such peculiar rights, privileges or claim to indulgence. They have no rights but such as are given to all. They have just the same right that the rest of the community have, and no more. They have the right to publish the truth, but no right to publish falsehood to the injury of others with impunity. It is the liberty of the press that is guaranteed, not the licentiousness. It is the right to speak the truth, not the right to bear false witness against your neigh-bor.''

And, quoting the following from an English case: ''Some people are very credulous, especially in politics, and can readily believe any evil of their opponents. There must, therefore, be some founda-tion in fact for the charges made.'' * * * ''The courts of other states have held that it is libelous to charge an officer with having taken a bribe, or with corruption, or with want of integrity. In such cases the publisher must stand ready to prove the truth of his charges, or he will not go unwhipped of justice.''

Here the court cites a great number of cases in support of its position. And, in speaking of the case the decision of which called forth the newspaper com-ment, the court said: ''No one believed or dared to charge another with dishonesty of opinion or action, and *there was no foundation in fact and in truth for any such charges. There was therefore no legal justi-*

*fication or excuse for the article that was published by the defendant.* He did not dare attempt to prove or claim that it was true, but stood mute as to that, and sought to escape punishment on other grounds which were untenable. He was therefore guilty of malice. He abused the liberty of the press and made himself liable therefor."

And, finally, in closing, the court says: "What is herein said in no manner whatever conflicts with what was said in *Marx & Haas Jeans Clothing Company v. Watson,* 168 Mo. 133. That was a suit in equity to enjoin a boycott, and it was held that injunction would not lie to restrain the utterance of a libel or slander, or to restrain free speech. It was held there, as it is here, that every one may speak, write or publish whatever he will, but is responsible for the abuse of the privilege. That case, as well as this, holds that the courts cannot prevent a man telling an untruth about another, but their power is limited to punishing him if he does so."

I must confess my utter inability to understand ordinary English words, if the court did not declare that the defendant presented no legal justification or excuse for the articles published, because he failed to establish the truth.

The court says: "But no case has been presented which sustains, or tends to sustain, respondent's contention that the truth is a justification. I have presented several, and none have been cited to the contrary. And it seems to me that it is contrary to the American spirit to punish a man for telling the truth. That no case is presented in which the answer of the respondent alleges the truth as a justification, and the court has discharged him because he proved the truth, I concede. In the cases cited where charges were made against the appellate tribunal, the court carefully calls attention to the fact

that the charges are false and makes explanation of its conduct. The law up to this time has been such that no judge would, probably, cite one for publishing truthful charges concerning him, unless he was satisfied that the respondent could not or would not undertake to prove his charges. This may account for there being no case just like the one under consideration.

I have always understood that the truth was a perfect defense to actions of this kind. That it was not only a right every person had to disclose the fact, but that it was a duty he owed to his country to proclaim abuses when found to exist in public office: "For truth can be outraged by silence quite as cruelly as by speech." An exception is said to exist in favor of judges, but I know of no good reason why the judicial department of the government should be screened from the searchlight of truth, while the officers of the other departments remain in its glare.

The court says the "weight of authority" sustains the law as so announced by the court; and cites *State v. Morrill, State v. Frew, Myers v. State,* Sturoc's case, *State v. Shepherd,* and 7 American and English Encyclopedia of Law, and cases. This statement I must flatly dispute. Judge Thomas, in his recent work on Constructive Contempts, says: "Out of forty-five states, the courts of only two, Arkansas and West Virginia, have set aside statutes in order to obtain jurisdiction to punish as for a contempt a libelous newspaper publication, * * * and two other courts, Georgia and Virginia, have held that the court's inherent power to punish contempts cannot be limited by legislative power; but these cases did not involve newspaper publications." * * * "The courts in these four states have gone farther than the courts in any other state, and they *stand alone* in holding contempt statutes, containing negative or restrictive words, unconstitutional in order

to exercise this extraordinary power. In these cases the question of the unconstitutionality of the statute was squarely presented by the record, and decided by the courts."

"Another fact must not be overlooked in the examination of this question, and that is, no court in this country, or any country for that matter, ever set aside a statute in order to acquire jurisdiction in a contempt case until the supreme court of Arkansas, in the Morrill case, in 1855, did that." So that as this insignificant *number* of cases cannot be regarded as sustaining the weight of authority, it must be that state pride was a very important element in inducing the statement from my brother Gunter.

I do not contend that one who in open court charges a judge with corruption may justify his act by proof that his charge is true, but I do contend that when the alleged contempt consists of the publication in a newspaper of defamatory accusations, such publication is not contempt, but libel, and that the constitution intervenes to prevent that offense from being tried by judges who are smarting under a sense of injury; and that when a court takes cognizance of a newspaper libel, either directly or remotely connected with a pending case, upon the ground that the publication was calculated and intended to influence its action, it ought, nevertheless, to prosecute and convict only for the contempt, and not for the libel; and that, so far as the libel is concerned, *the truth is always a justification,* no matter what the court is pleased to call the offense.

I do not approve of the decision in *State v. Shepherd,* from which I have quoted, insofar as it declares the court's jurisdiction; but I regard it as very much nearer correct than the decision in this case. For in that case the defendant was punished for publishing a false charge against the court, while

in this case it is held that a person is guilty of contempt, even though the charges made be true.

The theory upon which is based the doctrine that the truth is not a defense is stated by counsel for the people in the case *People v. Stuart, supra,* when he said, referring to the provision of the constitution which provides that the truth may be given in evidence:

"This provision of the constitution only relates to criminal prosecutions; and the truth may be given in evidence in such prosecutions, but in a proceeding for contempt, this cannot be done, and ought not to be, because it is not considered as affecting the individual, but the court. *Whether the publication was true or false,* is immaterial; because the court, as a court, *must be protected, whether right or wrong."* But this doctrine, though captivating, was repudiated by the court, and has found lodgment in none of the reports of this country; and I trust its lodgment here is but temporary. Even in Arkansas, where we find the first decision declaring the inherent power of the court to punish for this character of contempts, and holding the legislative enactment void which regulated the punishment and procedure, this doctrine does not germinate; for this language appears in *Neal v. State,* 9 Ark. 259: "But while the ægis of the law is so thrown over the judge, it finds no pleasure in him when he proves recreant to the high trust reposed in him, for, in the language of one of its oracles (Sergeant Hawkins), 'If a judge will so far forget the honor and dignity of his post as to turn solicitor in a cause which he is to judge, and privately and extra-judicially tamper with witnesses, or labor jurors, he hath no reason to complain if he be dealt with according to the capacity to which he so basely degrades himself.' "

In repudiating the doctrine, the Illinois court said: "If a judge be libeled by the public press, he and his assailant should be placed on equal grounds, and their common arbiter should be a jury of the country." And, again, in *People v. Storey, supra,* the court said: "The theory of government (British) requiring royalty to be invested with an imaginary perfection which forbids question or discussion is diametrically opposed to our theory of popular government, in which the utmost latitude and freedom of discussion of business affecting the public and the conduct of those who fill positions of public trust, that is consistent with *truth* and *decency,* is not only allowable but essential to the public welfare."

This doctrine does not thrive in Pennsylvania; for we find the supreme court of that state asserting, in *Ex parte Steinman, supra,* "We need not say that the case is altered, and that it is now the right and duty of a lawyer to bring to the notice of the people who elect the judges every instance of what he believes to be corruption or partisanship."

Judge Thompson was not seduced by the pleasing doctrine; for he says: "It is, moreover, to be observed that in states where, as in Colorado, the people elect their judges, it is in accordance with the spirit of our institutions that the newspaper press should possess the same right to criticise the conduct of the judges which they possess to criticise the conduct of any other official."

Nor was the editor of the Central Law Journal led astray; he observes: "The judiciary are but men, and therefore as open to corrupting influences as those in control of any other of the co-ordinate branches of the government, and like them, need the deterring influence of free public criticism."

And in Wisconsin—Wisconsin, upon which we so implicitly rely for our assertion of the high pre-

rogative power, and whose judgments we so often misconstrue—does not relish the doctrine; for its judges say, *In re Ashbaugh, supra:* "Under such a rule the merits of a sitting judge may be rehearsed, but as to his demerits there must be profound silence. In our judgment no such divinity 'doth hedge about a judge'; certainly not when he is a candidate for public office."

Justice Brewer, when judge of the supreme court of Kansas, denounced the doctrine; for he said, *In re Pryor, supra:* "For no judge and no court, high or low, is beyond the reach of public and individual criticism."

With Wharton the doctrine does not find favor; for he affirms: "We can conceive not only of a weak judge who dreads intimidation, but of a corrupt judge who dreads exposure. To give a bad and bold man of this class an engine so potent as this, is to take away one of the few means by which he can be exposed."

The court made a mistake in instituting the proceeding; a mistake in holding that an affidavit is not essential to its jurisdiction; a mistake in holding that the acts of the respondent constituted contempt. But infinitely greater than these was the mistake it made in holding the truth to be immaterial. For, aside from the fact that it denied to the respondent important constitutional rights, in the very nature of things, those who before believed the charges to be true are now confirmed in their belief, and those who did not believe them, now have their confidence in the court shaken solely because of the action of the court in refusing the respondent a hearing, and denying him the right to offer proof in support of the charges, and in holding that it is entirely immaterial whether the matter published is true or false.